UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA    *
                            *
            V               *
                            *
ALISON GU                   * CRIMINAL FILE NO. 16-84



### _TESTIMONY OF ALISON GU_

JURY TRIAL
Monday, November 6, 2017
Burlington, Vermont



BEFORE:

    THE HONORABLE CHRISTINA C. REISS
        Chief District Judge


APPEARANCES:

    KEVIN J. DOYLE, ESQ. and MICHAEL P. DRESCHER, ESQ.,
        Assistant United States Attorneys, Federal
        Building, Burlington, Vermont; Attorneys for the
        United States

    LISA B. SHELKROT, ESQ., Langrock Sperry & Wool,
        LLP, 210 College Street, Burlington, Vermont;
        Attorney for the Defendant



ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

# I N D E X

## E X A M I N A T I O N

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **ALISON GU** | | |
| Direct by Ms. Shelkrot | 3 | 8 |
| Cross by Mr. Drescher | 59 | 23 |
| Redirect by Ms. Shelkrot | 120 | 12 |

## E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | IN EVIDENCE |
|---|---|---|
| 350 | Document used to investigate ex-husband | 63 |
| 72 | E-mails with Judy Thompson re: Read Farm Property from certified file of Walnut Hill Realty | 80 |

1   MONDAY, NOVEMBER 6, 2017

2   (The following was held in open court with the jury

3   present.)

4               MS. SHELKROT:  I call Alison Gu.

5                           ALISON GU,

6       having been duly sworn by the courtroom deputy,

7       was examined and testified as follows:

8                       DIRECT EXAMINATION

9   BY MS. SHELKROT:

10  Q    Good morning.

11  A    Good morning.

12  Q    You are going to need to make sure you speak into

13  the microphone.

14      Can you please state your full name.

15  A    Alison Yi Gu.

16  Q    Where were you born?

17  A    In Shanghai, China.

18  Q    I need you to --

19  A    Shanghai, China.

20  Q    Can you just pull the microphone closer to you so

21  everybody can hear you.  Good.

22      What was your name at birth?

23  A    It's Yi Jing Gu.

24  Q    Can you spell that.

25  A    Y-I J-I-N-G G-U.

```
 1    Q    So who else was there in your family besides you?

 2    A    I'm the only daughter.  Only child.

 3    Q    And did you live with your parents?

 4    A    Yes, I did.

 5    Q    What's your father's name?

 6    A    Zhimin Gu.

 7    Q    And your mother?

 8    A    My birth mom or my stepmom?

 9    Q    Well, tell me who you lived with growing up.

10    A    My birth mom, her name is Yi Shao Jen.  Y-I is the

11    last name.  Shao Jen is the first name.  And she passed

12    away in 1990 -- no, actually the year of 9/11.

13    Q    The year of --

14    A    9/11, the World Trade Center.  She passed away that

15    year, 2001.  My stepmom, her name is Yi Jing Shao.  And

16    then she's here.

17    Q    Was your father employed when you were growing up?

18    A    Yes.  I remember he was always employed.

19    Q    What did he do?

20    A    He's a teacher.  He was a professor when I was

21    younger.  In China.

22    Q    When did you move to the U.S.?

23    A    When I was 16.

24    Q    What were the circumstances of your moving here?

25    A    Oh, my dad got opportunity to come here and study
```

1    for master degree in NYU.  So about two years later, I

2    follow him as an unaccompany minor, and come here to

3    attend high school.

4    Q    And did you attend high school in the U.S.?

5    A    Yes.  I came here as a sophomore, tenth grader, and

6    finished.

7    Q    Where did you do that?

8    A    Finished high school in FDR, Franklin D. Roosevelt,

9    in Brooklyn.

10   Q    Is Brooklyn where you were living at that time?

11   A    Yes.  That's the first place we stayed when we move

12   here.

13   Q    Did you speak English already when you moved here?

14   A    Yes.  We learned English.  I learned when I was two

15   or three years old, learning from my dad singing songs.

16   And my school taught English, so I speak English -- or

17   not very -- mostly in reading and grammar.  Not very

18   well in speaking and listening.

19   Q    So that's something that you learned after you got

20   here?

21   A    Yeah.  The speaking and the listening communication

22   part is mostly here talking to, you know, students in

23   the school.

24   Q    Did you adopt an English name or an American name

25   once you got here?

```
1    A    Yeah.  After little bit in high school, I feel
2    weird because people couldn't pronounce my name, and
3    they couldn't tell my name whether it's a female or
4    male, so my dad actually pick a name for me, and that
5    name is Alice.
6    Q    Did you like it?
7    A    Yeah.  I loved it.
8    Q    How did you do in high school?
9    A    I -- I always do well with my grades.  I always the
10   top 10 percent of my class, but socially, I didn't feel
11   like I fit in.
12   Q    So what did you do after high school?
13   A    I graduated on the top of -- I don't know if that's
14   called dean's list?
15   Q    Dean's list?
16   A    Dean's list, okay.  Then I got accepted by a few
17   colleges, one of which -- there's only one that I could
18   afford that could offer me a half scholarship, which is
19   St. John's University.
20   Q    Where is St. John's University?
21   A    It's in Queens; Jamaica, New York.
22   Q    Did you go there?
23   A    Yes, I did.
24   Q    And what did you study?
25   A    Well, I began with study biology, because I had
```

```
 1    ambition.  I always wanted to be a doctor.  And it's --
 2    runs in my mother's side of the family.  So I enter as
 3    an undergraduate for biology and a chemistry major, but
 4    later, in my junior and senior year, I also took up some
 5    business class, and I think I got a business minor.
 6    Q    Did you graduate?
 7    A    Yes.
 8    Q    When did you graduate?
 9    A    I graduate in three years, I think, instead of
10    four, but I'm not sure it was '97 or '98.
11    Q    So when you graduated, were you single or married?
12    A    Ah, I was briefly married to a college classmate --
13    he was about my same age -- at the time I was
14    graduating, so I worry about my -- my student status
15    might expire.  And he was very much in love with me, so
16    for me, it was really -- we both immature, but we
17    decided to get married.  But it only last a short while.
18    I'm not sure at the time I graduated if I got married to
19    him, but that's right around that time.
20    Q    And I think you have implied that that marriage
21    didn't last very long?
22    A    It didn't.
23    Q    Was there a second marriage?
24    A    Yeah.  That's when Allen, Allen Lin came into my
25    life.  I was working at the same time as I was attending
```

```
 1    full-time school in St. John's.  I also had a full-time
 2    job.
 3              MR. DRESCHER:  Excuse me.  Objection.
 4    Nonresponsive.
 5              THE COURT:  I'll allow it.
 6              MS. SHELKROT:  You can continue.
 7              THE WITNESS:  Can you repeat your question
 8    again.
 9              MS. SHELKROT:  Sure.
10    BY MS. SHELKROT:
11    Q    Tell me how you met Allen Lin.
12    A    Oh, yeah.  So I was working as insurance broker
13    selling car insurance in Flushing, and he came over as a
14    client to purchase insurance, and he told me he is a
15    restaurant owner, and I asked him if he can offer me a
16    part-time job because I need more to keep up paying with
17    my tuition, and he offer me a weekend job to work in his
18    restaurant.  And so that's how we met.  And then we
19    started dating ever since I start to work in his
20    restaurant.
21    Q    And did you marry him at some point?
22    A    I think we started to live together -- soon after
23    we started dating, we move in together, and the marriage
24    came very fast.  About a year, less than a year we lived
25    together.
```

```
1    Q    Why is that?

2    A    Because I find out I got pregnant.

3    Q    And so when was it that you got married?

4    A    I believe it was the end of 1998.

5    Q    When was your first child born, Philip Lin?

6    A    Philip was born in May of 1999.

7    Q    Did you change your name when you got married?

8    A    No, I didn't.

9    Q    Did you ever at any point take your husband's last

10   name?

11   A    His last name is Lin, L-I-N, and I never took his

12   name legally, but a lot of Americans would call me Mrs.

13   Lin.

14   Q    Lin or Ling?  I can't --

15   A    Lin, L-I-N.

16   Q    Okay.

17   A    So lot of people know me then as Alice Lin.

18   Q    Were you naturalized as a U.S. citizen?

19   A    Yeah.  That came much later.  Probably at least 10

20   years after I got married.

21   Q    And so I think you said your son was born in 1999?

22   A    Yeah.

23   Q    And do you have any other children?

24   A    Yeah.  Then my second son was born in the year of

25   World Trade Center.  He also was born two weeks before
```

```
 1    my mom passed away in September.  And then my daughter
 2    was born in 2003.
 3    Q    Did you continue working at the restaurant with
 4    Allen?
 5    A    At that time, much less often, because my focus --
 6    I was the only person that could take care of the
 7    children, but I would, if the restaurant need help, just
 8    to, you know, take anybody's place, a cashier, a
 9    waitress.  Sometimes on a part-time basis.
10    Q    So how did your responsibilities divide up as
11    between you and your husband?
12    A    Oh, he's there.  He's -- that's his job.  He is
13    there a hundred percent of time.  His family had a --
14    two or three restaurants.  I would say of that time, I
15    would be less than five percent, 10 percent of the time
16    he spend in restaurant.
17    Q    Did you get to know any of the other employees who
18    worked at the restaurant?
19    A    Yes.  I do have met a lot of them, but don't know
20    them very well.
21    Q    Did you develop relationships with any of them?
22    A    Were you talking about his old restaurants?
23    Q    With any of the employees at the restaurants.
24    A    Oh, yeah.  For his old restaurant, family
25    restaurant, I don't have relationship with his
```

1    employees.  I only know them.  I was too busy mostly

2    taking care of my kids.  That's my full-time job.  But

3    later, me and Allen opened two restaurant by ourselves,

4    so after that point, I was very actively involved in

5    both restaurants, and I know almost all my employees

6    very well, mostly in the Connecticut restaurant, because

7    we moved from Queens, New York, to Connecticut, about 10

8    minutes away from the restaurant.

9    Q    When was it that you moved to Connecticut?

10   A    Well, I'm not sure, but I can say that I remember

11   we bought the land to build our own house at around 2007

12   or '08, so it must be about '09-ish.

13   Q    Did you learn during your marriage to Allen

14   anything about his background?

15              MR. DRESCHER:  Objection.

16              THE COURT:  Basis?

17              MR. DRESCHER:  Foundation.  Hearsay.

18              THE COURT:  I will have the parties approach.

19   (The following was held at the bench.)

20              THE COURT:  So it appears that if it comes

21   from him, you are eliciting hearsay, but it may not be

22   offered for its truth.  It might be on her effect of --

23   on her state of mind.  But what is the proffer?

24              MS. SHELKROT:  Well, I can actually -- I can

25   ask her a more specific question that I think will

1    elicit it without hearsay.  I think she would say he has

2    a significant gambling problem.  She would also say that

3    he had a criminal record, and I can introduce a

4    certified copy of his criminal records.  Should come in.

5    So I think we can do that without hearsay.

6             MR. DRESCHER:  So I would object on the

7    grounds of relevance.  And -- and -- yeah.  I object

8    principally on relevance.  I'm not sure what the

9    ex-husband's gambling problem and criminal history has

10   to do with any conceivable defense.

11            THE COURT:  Did you have a copy of the

12   criminal history?

13            MR. DRESCHER:  She has produced it.

14            THE COURT:  Okay.  So let's hear a proffer as

15   to relevance.

16            MS. SHELKROT:  My proffer as to relevance is

17   that I believe my client will testify that she felt

18   motivated to keep assets away from him and keep them in

19   a form where he would not be able to recover them.

20            THE COURT:  Okay.  I'm reluctant to deprive

21   the defendant of the theory of defense, and that would

22   go to the contested issue of whether or not the alleged

23   fraudulent documentation was created or maintained for

24   the purpose of defrauding the banks as opposed to some

25   other purpose, so I will allow it.

1         And I don't want you to elicit hearsay because

2    it's -- well, I guess it is on the effect of her -- her

3    state of mind, so it would not be offered for its truth

4    but more her motivation for why she did what she did.

5              MR. DRESCHER:  And the conviction would be

6    hearsay.  It would be offered --

7              THE COURT:  Yeah.  I don't see why that would

8    be coming in.  I was more interested in if it had -- (a)

9    had been disclosed, but on what theory would his

10   criminal record be admissible?

11             MS. SHELKROT:  Well, his criminal record goes

12   to his -- what -- and also what she knows about his

13   potential for, I don't know --

14             THE COURT:  You claiming it's a public record?

15             MS. SHELKROT:  -- financial --

16        I beg your pardon?

17             THE COURT:  Are you complaining it's a public

18   record?

19             MS. SHELKROT:  Well, it is a public record,

20   and I have a certified copy, so I think that the hearsay

21   issue is overcome.  I was addressing the relevance

22   issue.  I don't think the hearsay issue is -- is in play

23   since I have a certified copy of his conviction records.

24        But as to the relevance, it goes to her knowledge

25   of his history of and perhaps future of committing

1    financial crime or violent crime.

2              THE COURT:  Is she going to say she pulled the

3    criminal record or she was aware of it?  Is there going

4    to be a foundation laid of --

5              MS. SHELKROT:  She would say that she was

6    aware of it.

7              THE COURT:  Okay.  And you --

8              MS. SHELKROT:  She would not say that she --

9    I'm sorry.  I didn't mean to interrupt.

10             THE COURT:  Go ahead.

11             MS. SHELKROT:  Wouldn't say that she pulled

12   the certified copy.

13             THE COURT:  Any objection?

14             MR. DRESCHER:  I'm not -- I'm not sure the

15   fact that it's a public record takes it outside of the

16   hearsay rule.

17             THE COURT:  Well, let's see.  There is a

18   public record exception to the hearsay rule, and I don't

19   think it requires the declarant to be available.

20         So, public records and reports.  Declarant

21   immaterial.  Records, reports, statements or data

22   compilations, in any form, a public office or agency,

23   setting forth the activities of the agents or -- office,

24   agency or matters observed pursuant to duty imposed by

25   law as to which manners there was a duty to report,

1    excluding, however, in criminal cases, matters observed

2    by police officers and other law enforcement personnel,

3    or (c) in civil actions in proceedings and against the

4    government in criminal cases -- civil actions and

5    proceedings, and against the government in criminal

6    cases, factual findings resulting from an investigation

7    made pursuant to authority granted by law unless the

8    sources of information or the circumstances indicate

9    lack of trustworthiness.

10          MR. DRESCHER:  My recollection -- and I

11   apologize for not being totally boned up on this in

12   anticipation of this line of inquiry.  My recollection

13   is there's an exception that applies specifically to

14   records of convictions in that it is the manner by which

15   copies will come in for impeachment purposes.

16          THE COURT:  Well, let's not have the exhibit

17   right now.  You are the proponent of it.  You need to

18   show that it's admissible.  I am not so sure about

19   subsection C, in civil actions and proceedings --

20   against the government.  It's -- because it's excluding

21   those in criminal cases or -- well, no.  Excluding

22   criminal cases.

23       I will think about it for a little.

24          MS. SHELKROT:  And I would also point out, as

25   the Court noted at the outset, it's not necessarily for

1    the truth of it since it is as to her basis for action.

2    I can do it without the certified copies, frankly.  She

3    has a reasonable belief and understanding that he has

4    prior violence and fraudulent history that gives her a

5    basis for acting.  We can do it without the records.

6              THE COURT:  All right.  I don't want to

7    deprive you of the right to do it with the records if

8    you are entitled to it, so it looks to me like a public

9    record, but I haven't analyzed it on that basis.  So you

10   may go ahead and ask your questions, and you can decide

11   whether to introduce the document, with your

12   understanding that it's your obligation to explain how

13   it is -- comes in under 803.  Okay?

14             MS. SHELKROT:  Thank you.

15   (The following was held in open court.)

16             MS. SHELKROT:  Let's see if I can remember

17   where we were.

18   BY MS. SHELKROT:

19   Q    Did you come to understand anything about whether

20   your ex-husband had a violent history?

21   A    Yes, I did.

22   Q    And what did you come to learn about that?

23   A    After we got married, I discovered he have a lot of

24   friends that were -- he met from jail or that were in

25   not really legitimate business together, and he gambles,

1    gambles a lot with them.  And one instance that -- I

2    can't recall if it was from him or his family, he told

3    me -- I will become aware -- he got a conviction.

4                MR. DRESCHER:  Objection.  Hearsay.

5                THE COURT:  And the Court has allowed it for

6    the impact on her state of mind as opposed to it being

7    offered for the truth.

8    A    He -- he had -- he had gone to jail, incarcerated

9    for about three to four years before we met, and I think

10   it was again related activity called racketeering.  And

11   then he violated his probation for gambling and entering

12   casinos.  So that's one part of the violence.  I wasn't

13   really clear about what exactly the charges were, but

14   the other part of the violence, I sort of experienced

15   myself.

16   BY MS. SHELKROT:

17   Q    Okay.  Can you tell us about that.

18   A    Yeah.  On the surface, he is very normal and

19   charming person, but he -- it's the abuse.  It's both

20   physical and mental.  And I think he hated to marry me

21   because I was pregnant.  And from my family background,

22   my dad would not allow me to, you know, have a kid

23   without getting married.  So we had to talk to his

24   parents and -- to convince him to get married.  And my

25   feeling from my family's side, we always talk about

1    Allen hated his first son Philip because he got tied up

2    and he had to marry me.

3         So the abuse was constant.  It was, you know,

4    sometimes he is not feeling good, he would punch, hit,

5    slap, throw stuff at me, hit his son with -- his son

6    with belts.  Yeah.  And I can't say how often because I

7    don't remember, sort of -- my memory and my son's memory

8    about the abuse, which we just don't recall because

9    of -- in 12 years of marriage, and I really never

10   comfortable talk about it.  I don't even -- a lot of

11   things, times, I hide from my parents.  They didn't know

12   about it.

13   Q    Okay.  You need a second?

14   A    I need some water.

15   Q    Did you eventually divorce Allen?

16   A    Yeah.  About 10, 11 years late.

17   Q    Do you remember what year it was?

18   A    We filed divorce on -- in 2008, and we got the

19   finalized judgment in '09.

20   Q    Can you just describe briefly something about

21   the -- anything about the divorce process.  Was it

22   contentious?  Was it simple?

23   A    The process itself wasn't complicated.  He and I

24   mutually no contest, and we actually probably hired the

25   same attorney to represent us.  But at the time of the

1     divorce, the reason behind it was complicated.  He had

2     accumulated a lot of debts, whether I know about it or I

3     didn't know about it, and he had put my names on a lot

4     of properties, loans, credit cards, without my

5     knowledge.

6          So he had told me that, you know, "If we don't

7     divorce, we're facing losing everything.  The creditors

8     will come after me, the restaurant and everything."

9          So I agreed to sign the divorce.  And the divorce

10    is pretend.  He said, "We'll get remarried.  I will

11    stick around.  I will still be the part of -- the kids,

12    and we'll work our issues," like so many times that he

13    promised me, you know, after the abuse, and I would

14    forget them, and I believed him.  So that was the reason

15    that we divorced.  But he stayed around.

16    Q    Were there any sort of unresolved financial issues

17    after the divorce?

18    A    Oh, yes.  There's tons.  There's always been

19    financial issues.  Before the divorce would be credit

20    card debts, mortgage unable to pay because he gamble

21    away the money.  The creditors that I don't even know

22    show up at my house, the businesses.

23         After the divorce, it's even more because the

24    restaurants were transferred to my name, and we bought a

25    couple land trying to build house ourself for -- in

1    Connecticut, thinking about, you know, moving our kids

2    from New York to Connecticut to a better school, but

3    then the economy really hit the bottom.

4         So right after we purchased the two restaurant, the

5    two or three -- two land and -- yeah, two or three land,

6    I don't remember, it just -- I think within the next

7    year or two we lost half our money investment in it.

8    Q    Did Allen ever express to you that he thought you

9    owed him more money after the divorce?

10   A    Yeah.  There is a property that -- it's a piece of

11   land next to my restaurant, and we start to building six

12   townhouses for that project.  So for that property

13   project, as well as our Connecticut restaurant, his

14   family has put in some investment to help out in

15   addition to the mortgage.

16        So when we were signing the divorce agreement --

17   his family didn't know much later that we got divorced,

18   and once they become known, they become very concerned,

19   and him and his parents constantly harass me, call my

20   parents up and say, you know, "Your daughter needs to

21   sign off the rights to my son and my family."

22        And they believed that even before I was able to

23   sell the house and the restaurant I need to somehow

24   recognize, you know, their -- their ownership, but the

25   money I never got.  It's all tied up in the restaurant,

1    and the property project was going on way beyond -- like

2    two years beyond the completion date.  But after --

3    Q    So let me just stop you and ask you another

4    question.

5    A    Sure.

6    Q    So when you said he and his family were harassing

7    for -- what kinds of things would they do?

8    A    It's not so much his parents directly to me.  It's

9    his parents contact my father, contact the restaurant

10   employees, they badmouthing me and tell the story that,

11   "Look, my son got nothing left and she has everything"

12   in the circle of the friends that was within the

13   restaurant, within the --

14   Q    Did you ever hire any of the people who worked at

15   the restaurants as a baby-sitter?

16   A    Yes.  The first one started back when I -- when we

17   opened the New York restaurant.  That one was the first

18   of the two that me and Allen opened.  And this manager

19   called Yuki.  So in addition to being managers, these

20   girls, waitresses, managers, young girls in their 20s,

21   they're usually new immigrants.  They looking for more

22   work.  They looking for every possibilities, you know,

23   to pay their bills, to learn things.

24        So, yeah, Yuki was really the first part-time nanny

25   I hired.  Besides when she was doing work for my

1    restaurant, when she had time, she would come to my

2    house and take care of the nannies.

3    Q    You said she would --

4    A    Take care of the children.  I'm sorry.

5    Q    Okay.  And would you -- would these -- Yuki or some

6    of the later nannies, would they live at your house or

7    have their own home?

8    A    It depends.  Throughout the years, we had many

9    nanny workers from the restaurant.  For example, if

10   they're local -- we had a couple local bartenders.  One

11   of the name's Heidi.  She would just come in for the

12   hours.  Only one time she stay overnight.  But when

13   somebody like Yuki or CC and Bo and -- those people that

14   just happen to work in the restaurant -- and my house is

15   10 minutes away -- they would stay over two, three days

16   at a time or over on the weekends.

17   Q    What was your arrangement with the nannies?  How

18   did payment work?  Or were there any other kind of

19   benefits that you provided to them?

20   A    The payment, usually they want to pay by cash from

21   the restaurant, too.  So it's probably anywhere between

22   60, $80 a day.  And sometimes they would want to get

23   gift cards, because they -- they don't have Social

24   Security number, and that's the only means for them to

25   go online and buy stuff in stores.

1    Q    And did you ever give them access to things or give

2    them other property instead of actual cash payments?

3    A    Excuse me?  Can you -- what -- can you rephrase

4    that.

5    Q    Sure.  Did you ever give them -- did you give them

6    any other things as opposed to just cash or gift cards?

7    A    Not that I recall.

8    Q    Was there a young girl named Bo who came to you as

9    a nanny?

10    A    Yes.  But she's not particularly from the

11    restaurant background.

12    Q    Okay.  When did Bo come to work for you?

13    A    We hire her as au pair and -- through au pair

14    agency called aupair.com.  And I think she arrived here

15    in June of 2014.

16    Q    Where were you living at that point?

17    A    At that time we already be living in Cheshire,

18    Connecticut.

19    Q    At what address?

20    A    7 Edith Place.

21    Q    Who was living with you?

22    A    Matt, me, and my three kids.

23    Q    So when had you moved into the Cheshire house?

24    A    In the summer of 2013.

25    Q    Do you remember who had title originally to the

1    Cheshire house?

2    A    Yes.  The Cheshire house, both me and Matt decided

3    we are going to purchase that and place under LLC, and

4    we're going to call it Ramps Unlimited LLC.

5    Q    You said Matt.  Is that Matt Abel that you are

6    talking about?

7    A    Yes.

8    Q    Why did you decide together to put it in the name

9    of an LLC rather than one or the other of your names?

10    A    Because ever since my divorce and ever since I move

11    on from Danbury house, I change my phone number.  I have

12    been keeping my -- my identity and my credit,

13    whereabouts of my kids, safe, and I feel it was too much

14    danger for.  If Allen and his family and his loan sharks

15    and debtors were able to find us, I didn't feel safe.

16        So at that time I didn't want to use my name, my

17    credit for anything.  And also because in my previous

18    experiences, my identity, my Social Security number, has

19    been used by him many times without my authorization,

20    and he still knows my information.

21        So I don't -- I didn't want to use my name even if

22    it was a cash purchase, because I had the money from

23    selling the real estate, from selling the restaurant, to

24    be able to afford the house.

25    Q    That was going to be my next question, is where did

1    the money come from to buy the house?

2    A    It was some of the money from the restaurant

3    proceeds, liquidation of anything that we sold.  Some of

4    it from selling the -- the completed project of that

5    Danbury six-unit townhouses.  The proceeds from that.

6    Q    Was there any mortgage on that property when you

7    and Matt moved in together?

8    A    No.  It was all bought with my own funds.

9    Q    So going back to Bo, did -- was that her actual

10   legal name, as far as you know?

11   A    No.  Through the au pair agency, I was given the

12   legal name Jinata K something.  It's a very long, long

13   Thai name.  But then after I met her, she told me to

14   call her Bo, and I didn't understand.  She said that's

15   her nickname.  And then later I discovered her friends

16   were to call her Ting Ting in Chinese.  And then she

17   said, yes, part of her family was from China.  I don't

18   recall if the mom or dad.  And she actually had -- she

19   spoke fluent Chinese, fluent Thai and fluent English.

20   And she had a master degree from a Chinese very

21   prestigious agriculture school.

22        So she tried -- she explain it to me she had the

23   three names:  Bo, Jinata and Ting Ting.

24   Q    And so you said she came to you in June of 2014?

25   A    Yes.

```
1    Q    And is that shortly after the search that we heard
2    Detective Brooks testify about earlier this week, or I
3    guess last week?
4    A    Yeah.  It's about right around a month or two after
5    that.
6    Q    So do you remember Bo ever talking to you about
7    Thai passports?
8    A    Yeah.  Actually a few times.
9    Q    What do you remember her saying to you?
10              MR. DRESCHER:  Objection.  Hearsay.
11              THE COURT:  Sustained.
12              MS. SHELKROT:  Your Honor, it's not as to the
13   truth of the matter.  It's as to course of conduct and
14   what continued, what ensued from that moment.
15              THE COURT:  I'll have the parties approach.
16   (The following was held at the bench.)
17              THE COURT:  So let's hear a proffer as to what
18   the answer is.
19              MS. SHELKROT:  Sure.  I believe what she will
20   say is that Bo told her that she had the ability to get
21   or sell Thai passports and offered one to my client.
22              THE COURT:  And your objection?
23              MR. DRESCHER:  And I'm confused as to how this
24   is offered for something other than its truth.
25              THE COURT:  Well, there is a doctrine that
```

1    proposing an illegal act is not hearsay.  So if I --

2    just like saying you're arrested is not hearsay because

3    it's a legal act, so -- and it's on her --

4         Impact is on her state of mind as to what?

5              MS. SHELKROT:  As to -- so it's -- I mean,

6    there's going to be further testimony about what ensues

7    from that.  There's a further discussion about how to

8    get passports and whether you can get U.S. passports.

9         I actually have no idea whether it's true, and I

10   suspect it wasn't true that the nanny could actually get

11   Thai passports.  So it's certainly not for the truth of

12   the actual assertion.

13             THE COURT:  Well, it has -- unless your client

14   accepts it and pursues it, what contested issue does it

15   go to that Bo can get a false passport?

16             MS. SHELKROT:  So I believe she will testify

17   that they then have this whole conversation about Bo

18   getting both Thai and also U.S. passports and asking if

19   my client wants one.

20        I could move on, I guess, from the Thai passport

21   piece of it and just go to the U.S. passports, but I --

22   I don't think that there's any significant difference in

23   the testimony, and --

24             THE COURT:  It --

25             MS. SHELKROT:  -- it leads into it more

1    properly.  It's actually the way it occurred.

2              THE COURT:  Are you then going to solicit

3    evidence that Bo had access to the computer?

4              MS. SHELKROT:  I will.

5              THE COURT:  Okay.  So that's the connection.

6    Okay?

7              MR. DRESCHER:  So the fact that Bo is saying

8    she can have access to passports is offered then for the

9    truth if the suggestion is that Bo is the real culprit

10   here.

11             THE COURT:  Well, that is the suggestion, but

12   she's proposing a criminal act allegedly with Miss Gu,

13   and it isn't offered for the truth as to whether or not

14   she can get -- actually obtain a passport, but her

15   propensity to engage in this act, and it's on a

16   contested issue of identity.

17        So let's have it rephrased so we are not getting

18   direct "she told me this is what" -- does she show her

19   any false passports?

20             MS. SHELKROT:  She did.

21             THE COURT:  Okay.  Then have it that way as

22   opposed to out-of-court statements.

23             MS. SHELKROT:  Sure.

24   (The following was held in open court.)

25   BY MS. SHELKROT:

1    Q    When Bo was living at your house, did she ever show

2    you any Thai passports?

3    A    Yes.  She did.

4    Q    Did she make any offer to you?

5    A    She -- I think she -- her intention was trying

6    to --

7              MR. DRESCHER:  Objection.  Speculation.

8              MS. SHELKROT:  Yeah.  Don't tell me --

9              THE COURT:  I don't want you to speculate as

10   to what happened.  Miss Shelkrot will ask you the next

11   question.

12   BY MS. SHELKROT:

13   Q    Did she make any offer to you with respect to the

14   Thai passports?

15   A    Yes, she did.

16   Q    What was the offer?

17   A    She says these can be bought for a couple thousand

18   U.S. dollars.

19   Q    Were you interested in buying one at that point?

20   A    No.  But she became aware of --

21             MR. DRESCHER:  Objection.  Foundation.

22             THE COURT:  Yeah.  Sustained.  So let's -- we

23   want you not to think about what somebody else's mind

24   might be thinking or not thinking.  And Miss Shelkrot

25   will redirect you with a question.

1    BY MS. SHELKROT:

2    Q    So did you advise her that you weren't interested?

3    A    No, I didn't.  I advised her I'm not interested.

4    Q    Okay.  That was actually what I asked, but maybe --

5    A    Okay.

6    Q    -- you misheard.

7         So was there a conversation between the two of you

8    about the status of your own passport at that point?

9    A    Yes, there was.

10   Q    And what was that conversation?

11   A    I had told her that my passport has been taken due

12   to a case that involved my ex-husband.  And she asked me

13   to travel with her to Canada.  I think that she

14   mentioned she would like to go there.  That's when I

15   mentioned I no longer have my passport, I couldn't

16   travel, and I hadn't been traveling much because of my

17   kids, that I had to take care of them.

18   Q    Did Bo show you any other documents at this point?

19   A    After the passport, she actually showed me, on her

20   laptop, article.  It's called the change of identity

21   2012, whatever that year, that same PDF file that the

22   government showed.

23   Q    So how did Bo show you that?

24   A    Because I told her I was not interested in buying

25   another country's passport even though she claimed it

1     was real, and I said, "I'm a U.S. citizen.  I don't need

2     another country's passport."  And then she said, "Do you

3     know the U.S. citizenship, including the passport, can

4     be bought as well?"  And that's when she showed me the

5     article.

6     Q     And exactly how did she show it to you?

7     A     She showed me on the laptop.  We give each our

8     nanny -- we provide them with a laptop.  So that

9     laptop's actually from us, but she started using it.

10    And then she showed me, "Here it is on my laptop.  Look

11    at this article.  And it's also proven.  It has all the

12    testimonials.  It's on the website of people claim it's

13    all true.  It's a legitimate way of getting a passport

14    if you don't have one."

15    Q     So this is now in the summer of 2014, right?

16    A     Yeah.  A few months after she came over.

17    Q     So what about the computer that was -- the laptop

18    that was seized in 2014, earlier in 2014?  That

19    apparently had that how-to-change-your-identity document

20    on it.  What -- whose computer was that?

21    A     Yeah.  I saw the picture, and I realized that was

22    the computer, that's our laptop from Danbury house where

23    we provide it to our sitter, our nanny, Yuki.  And since

24    we moved, Yuki no longer worked for us, and we brought

25    over that laptop, and I think one of my kid was using

```
 1    it.
 2    Q    Did you recognize the -- when you saw the
 3    how-to-change-your-identity document that was found on
 4    that --
 5    A    I --
 6    Q    Wait.  Let me finish the question.
 7         Did you recognize the document that was found and
 8    introduced in court as the same one that Bo showed you?
 9    A    Yes, I did.
10    Q    So in the course of this conversation, did Bo show
11    you any other identity documents?
12    A    Yes.  She -- because I was skeptical, but I was
13    curious, she showed me some documents.  I don't know
14    exactly what, but from the look of it, birth
15    certificates, copies of Thai passports, driver's
16    license, credit cards, a few of those at that time.
17    Q    Did she show you any birth certificates?
18    A    Yeah.  I'm sure that there's -- there were a few of
19    birth certificates, but at the time I didn't know what
20    they were.  It looked like the government evidence, some
21    of those with the seal and the color background.
22    Q    Did you ever see Bo with any embossing tools?
23    A    Yes.  The first time I saw them was -- it was
24    laying over Matt's office, and it looked like some kind
25    of kid's, you know, artwork, craft.  And I know Bo was
```

1    in the office last.  And I just placed them under the

2    fish tank because that's where we usually -- I kept all

3    the, you know, stuff that came later on, their school

4    stuff, mostly under the fish tank, in that area, but I

5    didn't know what they were called, the embossing tools.

6    Q    And when I say the embossing tools, I am talking

7    about the things that had the seals.

8    A    Yeah.  I thought they looked like stapler.

9    Q    Okay.  But you said you thought you put them under

10   the fish tank?

11   A    Right.

12   Q    Did you also see any -- did you also see any blank

13   foil seals around the house?

14   A    Yeah.  That was with them, with the two embossing

15   tools at the time, but it's all blank.  It's -- those

16   star golden ones on the piece that together and somewhat

17   connected, so I thought those were craft projects that

18   the kids -- that they were doing decorations.  So I

19   actually moved them from the office, those stickers, to

20   put it in a separate place where the kids have their

21   arts and crafts stuff, or like under the sink area next

22   to the little wine fridge, but it's next to the fish

23   tank cabinet.

24   Q    And what about stamps and letters that go on

25   stamps?  Is that something you ever saw at the house?

```
 1    A    Yes.

 2              THE COURT:  So let's have less direct

 3    examination, because it's direction --

 4         "So what, if anything, did you see?"  "What, if

 5    anything, turned up in a particular event?"  "Have you

 6    seen this previously?"  But not having her agree to your

 7    answer -- your questions.

 8    BY MS. SHELKROT:

 9    Q    Was there anything else in that area right under

10    the bar sink, right under the sink that you just

11    mentioned?

12    A    Yeah.  I have seen the stamp kit, which was brand

13    new, in a paper cover, cardboard thing, and that was

14    something that we probably had brought over from Danbury

15    a long time ago, but I never get to use it or -- for

16    Allen for restaurant purpose.  So I always kept all

17    these craft stuff thing there, thinking that one day the

18    kids could use that.  And it was in -- brand new, still

19    inside a box, unopened.

20    Q    How long did Bo work for you?

21    A    Only briefly.  It last about two, three months.

22    Until September of 14.

23    Q    What happened that she left?

24    A    I had to fire her.  I caught her stealing.  I

25    caught her seducing my son, Philip.  And she was just
```

1    not paying attention taking care of the kids.  She spent

2    too much time on the internet or the phone, and then she

3    would not be at work.  She would go disappear two, three

4    days at a time, even though the au pair agency told me

5    the rule is she should only have a weekend off every

6    other weekend.

7    Q    What happened to her things when she left your

8    employment after you fired her?

9    A    Those things that was left in -- under the fish

10   tank or under the sink cabinet, I never went back to see

11   them.  I didn't know if she took them, if she left it

12   for purpose, but I -- the next time I seen from the

13   government evidence.  So she must have left the two

14   tools and everything under there.  But she also left a

15   few things from her rooms.

16       The laptop -- the laptop that I took her -- back

17   from her, it has not only that articles, it has rental,

18   you know, text document, mortgage information, people

19   IDs, picture in a few of them, and I think that's the

20   stuff Bo left behind.  Those are --

21   Q    Can you describe if you had any other relationship

22   with Bo after she left?

23   A    Yeah.  She actually contacted me again, probably a

24   month, two, after that, and trying to explain, you

25   know -- justify she didn't steal or she needed the

1    money, she just forget to tell me, and she really need a

2    job, otherwise the au pair agency was going to send her

3    back to her country.

4         And she apologized for her behavior with my son,

5    and then she blame Philip partially, and I -- I

6    understand.  I sympathize with her because my Philip, he

7    is a special-needs boy, so -- so I start talking to her.

8    I say, "What can I do?  Just let me know if I can help."

9    So we keep in touch.

10   Q    So you had stayed in touch?

11   A    Yeah, we stayed in touch.

12   Q    So this is now the fall of 2014 that we're in.  And

13   did it happen -- did there come a time in the fall of

14   2014 when you became interested in selling your house?

15   A    Yes.  Actually started in the summer of '14, right

16   around after Bo came here.  It's -- our financial

17   situation was getting worse.  Matt actually got injured

18   and -- about three months to six months he was out of

19   work, and he was the only -- he was the only bread

20   winner for the house, and I had to put my entire savings

21   into the -- buying the house and renovating the house,

22   so we were running out of money.

23        So we talk about it, we should sell our house and

24   downsize to a smaller place, maybe in a different town,

25   and he wants to look for a job in another place.

1        So, yes, we -- in the fall of '14, we start to

2    looking to possibilities.

3    Q    What possibilities, if any, did you find?

4    A    Well, I started to talk to Bo.  We pretty much talk

5    a lot, because she's really the only person similar to

6    age that I opened up to her, and I said -- Bo wanted to

7    come back.  I explained to her I was not in any

8    financial position to hire her back because we wanted to

9    sell our house and we might be moving.

10        So at the time that Bo refer me to somebody that

11    she knew, and that person's name is Mr. Chen, Aijen

12    Chen.  So she put me in touch with him, and we started

13    talking, and I show him the picture of the house.  He

14    start to talk to Matt about pricing and offers, and we

15    come into agreement for a price that's acceptable, and

16    we enter into a contract with Mr. Chen.

17    Q    When was that?

18    A    Maybe around October, November of '14.

19    Q    Do you remember what the price was?

20    A    Yeah.  It was right around 900,000.

21    Q    Did you meet Mr. Chen at all during that period of

22    time?

23    A    No, never in person.

24    Q    How did you communicate with him?

25    A    The contact information was we chat, and we each

1    had user ID, and I contacted him via WeChat.

2    Q    Did you have any communication with Northeast

3    Financial regarding the Chens' purchase or Mr. Chen's

4    purchase?

5    A    About the contract or --

6    Q    So we heard testimony from Craig Thibeau at

7    Northeast Financial regarding some inquiries on a

8    financing for the purchase by Mr. Chen.  My question is:

9    Tell me about any communications that you may have had

10   with Craig Thibeau at Northeast Financial.

11   A    No, I never had any communication with him.

12   Q    So what happened with the Chens' purchase in the

13   fall of 2014?

14   A    A few months later, Mr. Chen told me that mortgage

15   didn't go through, the reason being that either him or

16   his wife or both of them were not residents of this

17   country.  They couldn't get a mortgage in this country,

18   and the money that he had in China, they could not wire

19   them out.  There's a limit from the Chinese government,

20   an annual limit of about 50 U.S. dollars per person to

21   wire out money to out of the country.

22        So they -- he told us that part of buying it, they

23   couldn't go through with it.

24   Q    Did Mr. Chen have a different suggestion for you?

25   A    Yes, he did.

1    Q    What was the suggestion?

2    A    He said he has a sister that has good credit and

3    lives in this country and has jobs and can apply for a

4    mortgage and be qualified for that.

5    Q    What was the sister's name?

6    A    It's Ai Chen, with a middle name J.

7    Q    And so what did you do as a result of that

8    conversation or that suggestion?

9    A    Well, the -- well, um, he suggested, because the

10   bank told him --

11            MR. DRESCHER:  Objection.

12            THE WITNESS:  I'm sorry.

13            MR. DRESCHER:  Nonresponsive.

14            THE COURT:  So I am going to strike your

15   answer, and make sure you are answering Miss Shelkrot's

16   question and not another question.

17            THE WITNESS:  Okay.

18   BY MS. SHELKROT:

19   Q    My question is what you did as a result of his

20   suggestion.

21   A    We follow through with his suggestion.

22   Q    What did you do?

23   A    We quitclaimed the deed of the Ramps Unlimited to

24   the sister's name and the wife's name.

25   Q    And what were those names?

1   A    It's Ai Chen and Jing Shao.

2   Q    Who did you understand Jing Shao to be?

3   A    I believe that's Mrs. Chen.

4   Q    Mr. Chen's wife?

5   A    Yes.

6   Q    What was the -- what was your theory in doing that?

7   What was the purpose in doing that?

8   A    Well, after speaking to Ed Hill, the attorney, he

9   referred us to verify the information.  I believed it's

10   legal.  It's -- it's very similar when a person buying a

11   property from another person, because we had entered the

12   LLC name, so we can just sell the ownership of the LLC

13   directly to Miss Chen, and they will pay us the money,

14   once they get financing using the sister's name, to add

15   up to the $900,000 that we agreed to.

16   Q    And how was that going to happen, exactly?

17   A    The first step he told us was to have Matt, which

18   is the agent of Ramps, to sign the quitclaim deed, sign

19   it to Chen and Ai Chen -- Ai Jen Chen and Jing Shao, and

20   because the house is free and clear, they could go ahead

21   and borrow, do a refinance to do -- to get the money out

22   of it.  And we were told that would be not a hundred

23   percent of the 900,000; that would be just maybe 50

24   percent to 80 percent, but they were not sure.

25        And then the rest of money, they would be -- pay us

1    back in two different ways.  One is that they going to
2    promise every year, use their quota to send out the
3    50,000 each, to wire to us from China.  But at the same
4    time they suggest us to use the money to investing in
5    real estate.  And then if -- to buy houses, and some
6    needed fix, some not, to later make rental income and
7    pay for the mortgage.
8    Q    Did you -- during this time, the winter of 2014,
9    2015, did you meet either Mr. or Mrs. Chen?
10   A    Mrs. Chen came over to our house one time.
11   Q    Tell me about that visit.
12   A    Yes.  She came over to bring some documents that
13   Mr. Chen had promised me to bring.
14   Q    What kind of documents?
15   A    So one of it is -- is a bank card, a debit card
16   from Citizen Bank in Ai Chen's name; and the other is a
17   Chinese notary or a power of attorney form.  It's like a
18   white booklet that has three or four pages in it.  And
19   that's the power of attorney that states that Ai Chen
20   was giving me full authority for her bank account for
21   buying houses.  I -- I didn't remember the legal term,
22   but it's not a word-to-word "power" in Chinese.  I
23   understood it as you are the executor or you are doing
24   things for her because she's not in this country.
25   That's basically what that document said.

1    Q    And what was your intention at that point to do

2    with the bank card?

3    A    Oh.  Miss Chen says once you get the mortgage

4    approved, in order for me to get the money, Chen is not

5    in this country, and --

6    Q    Let me just stop you.  Which Chen is not in the

7    country at the time?

8    A    Ai J., middle name, Chen, C-H-E-N.

9    Q    The sister?

10   A    Yeah.

11   Q    Okay.

12   A    So she said in order for me to access the funds for

13   the bank account that she already established, I might

14   need ID to present in addition to the debit card.

15   Q    So did you do anything to get that ID?

16   A    Miss Chen set up a trip for one of my other

17   assistant, part-time assistant -- her name is CC -- for

18   both of us to drive up to New Hampshire DMV -- actually,

19   two New Hampshire DMVs on the same day.

20   Q    So let's talk about the first of them.  Who went up

21   to the New Hampshire DMV with you, if anyone?

22   A    Me and -- me and CC.

23   Q    Was there anybody else in the car?

24   A    No.

25   Q    Do you remember which office you went to first?

1    A    I just remember it's next to a mall.  I don't

2    remember exactly which town in New Hampshire.

3    Q    So what happened when you got there?

4    A    When I got there, I was under the impression that I

5    came to take a road test for CC.  CC had already told

6    me -- I mean, the first time she told me was she need to

7    use my car, so I had to take the trip up there -- to

8    take the test, but on the way up, she actually told me

9    if I can do that for her.  She already failed once.  So

10   she needs my help.  And I ask her how that could be

11   done.

12        And then she told me no worry because her friend's

13   working that motor vehicle, and they already put my name

14   down and had a reservation for that day.  So I actually

15   did not go into the motor vehicle first.  That's why I

16   recall the mall.  We stayed a little bit in the mall.

17   Then we headed out to the parking lot, and I took the

18   test.

19        Then after I took the test, I passed.  I went into

20   the office, and the counter called my name, Aly Gu, and

21   I went to take the picture for CC.  And then CC told me

22   it has to be done because I was the person that took the

23   road test for her.

24   Q    Okay.  Did you submit any of the paperwork in

25   connection with that Aly Gu or Ally Koo driver's

1 license?

2 A No.  I never see any paperwork that day except the

3 road test paper.

4 Q What happened to that Ally Koo driver's license?

5 A CC took the driver -- it was not original driver

6 license.  They issued some kind of printout from the

7 printer, and she took it.

8 Q What about the other trip that same day?

9 A Yeah.  On that one, when we walked out to the car,

10 a gentleman walked out of the buildings and greet us and

11 took both CC and I into the building and directly to his

12 office.

13 Q Did you take a driver test at the second place?

14 A No, I didn't.

15 Q And what happened after you went into the

16 employee's office?

17 A Yeah.  We waited there about five, 10 minutes.  He

18 was just sitting at a desk entering information on his

19 computers, and then later he said, you know,

20 "Everything's set."  You know, "You come with -- both of

21 you come with me to the outside counter, to the lobby,

22 and then they will call the numbers, and all you need to

23 do is just to go take a picture."

24 Q And what did you do?

25 A I went and I took -- actually a few pictures.

1    Q    Okay.

2    A    Well, first time that they -- they -- one picture

3    they said was not good, and I forget who told me, CC or

4    the person behind the counter, told me to tie'd up my

5    hair and to put my vest out because the collar is -- is

6    showing, and they don't like anything sticking up.  So I

7    had two awful pictures for them to say, oh, okay, this

8    is a good one.

9    Q    Did you submit any of the forms in connection with

10   that driver's license?

11   A    No.  No, I didn't.

12   Q    Do you know who did?

13   A    I didn't know.

14   Q    Did you get a license as a result of this second

15   interaction?

16   A    Yeah.  The license name is Ai Chen's, and I kept

17   the temporary one, so -- and then I was told that the

18   originals will be mailed to Miss Chen.

19   Q    What was your thinking about getting this license

20   with Ai Chen's name on it?

21   A    Well, Miss -- Mrs. Chen explained, because Ai Chen

22   is not this country, and if I ever need, you know, to go

23   to the bank to get some cash, besides the normal use

24   with the debit card -- if I were to just buy stuff on

25   online or ATM, I didn't need my IDs, but if I get cash,

1    that's what's needed to present it.

2    Q    What was your thinking with respect to having the

3    bank account, access to the bank account in the Ai Chen

4    name?

5    A    My belief was that money was to pay for the house

6    that -- the Cheshire house, and I believe I -- it was --

7    and for me to use the account with the full

8    authorization with the Chinese certification that Miss

9    Chen was aware of and she allowed me to use that.

10   Q    Why not just put it in your own name?

11   A    I didn't have any bank accounts.  I didn't have any

12   credit cards.  I was scared to use my credit to apply

13   banks, so --

14   Q    Why?

15   A    It's because I was so scared of my past that I did

16   not want my name to be on anything anymore.

17   Q    So do you remember when these trips to the DMV

18   were?

19   A    In the winter of '15.

20   Q    And did there come a time when you saw Bo again?

21   A    Yeah.  It's also like around the winter of '15.

22   She actually contact me and then says that she is on her

23   way to Canada and want to come visit the kids and Matt

24   and our family.

25   Q    Do you remember when that was?

1    A    Possibly February or March, after the Chinese New

2    Year's.  Chinese New Year is February.  So February,

3    March-ish.

4    Q    Did she come to visit you?

5    A    Yes, she did.

6    Q    How long did she say?

7    A    Three or four days.  Two or three nights.

8    Q    What happened when she came?

9    A    When she showed up, she surprised me, said she

10   wanted her job back again, and I thought we had this

11   conversation, so I was nice enough to say I had to ask

12   Matt it and consider it.  But then she said, "Well, um,

13   can you give me a ride to Canada?  I am on my way to

14   travel there."

15        And I actually -- before that, when we were

16   communicating, I already advised her that she should

17   look into what travel documents she need.  If she is a

18   foreigner, she should go ahead and get a visa first.

19        So when she came over, she said if I could give her

20   a ride to Canada; I said no, I couldn't.  I didn't have

21   my passport, but "I could drive you to wherever you

22   want, as close as you want to Canada, if you like."

23   Q    And did you take her somewhere?

24   A    Yeah.  On the -- the second or third day of her

25   stay, that's -- the second day we planned the trip.  I

```
1    think the third, the last day, we left really early for
2    going there.  And she said her friend will be meeting --
3    meeting her up there.
4    Q    Where were you traveling from?  What was your
5    starting point?
6    A    Cheshire.
7    Q    How far did you drive with her?
8    A    A long time.  At least four to five hours.  And
9    that's not counting, you know, we stop a few times.
10   Q    Do you know what the final destination was?
11   A    I don't remember the final destination.  I put it
12   in the GPS.  But we did pass Burlington.  I remember
13   Burlington because I been to Burlington.  So we drove
14   past Burlington and at least another half an hour to an
15   hour.
16   Q    And what happened when you got to your destination?
17   A    So I remembered the address, she give it to me, and
18   when I arrived there, it looks like it's a post office,
19   and her friends was not there, and then she called.  A
20   few minutes later she showed up, and I dropped her off
21   with her luggage.  And then I just left.  I returned
22   back home.
23   Q    Do you know what happened after you dropped her
24   off?
25   A    No.  She -- I think she went on -- sorry.
```

1    Q    You don't know?

2    A    Yeah, but she's meeting with her friends and she

3    said she would go to Canada.

4    Q    So there was some testimony -- there was quite a

5    bit of testimony about the mortgages and the home

6    purchases beginning, I think, in the spring of 2015.

7    Tell me about who was working on those loan

8    transactions.

9    A    Well, the very first two I recalled because after

10   we got the idea for the investment from Mr. Chen -- he

11   showed us the possibilities of being able to cover all

12   the mortgages with rental income -- me and Matt had talk

13   about it, and we decided why don't we give it a try.  So

14   we use Matt's name.  We want to -- decide we want to use

15   his name to trying to apply for a mortgage for

16   investment properties.

17        So I don't remember if it was the Austin house

18   first or the Cape house first, but I do remember the

19   Austin house came about because his best fraternity

20   brother is a very successful real estate broker in

21   Austin, and a lot of -- Matt is a recruiter, so his work

22   field deal with a lot of high-tech IT people, and the

23   Austin was a tech hub, and a lot of the companies had

24   offered job opportunity for him to be working for them.

25   So that's how the Austin house came about.

1       We actually didn't even go to look at the house.

2   We got one from his friend, Sean Rooker, the realtor,

3   and we both like it, and we start to talk to one of -- I

4   start to call, because Sean would give me a phone number

5   for his friend, which name I don't remember, the

6   mortgage person -- company, I don't remember, but we run

7   Matt's credit and talk to him about the situation.  That

8   part I remember for Austin house.

9   Q    So was there anybody else other than you and Matt

10  working on getting mortgages?

11  A    In the Austin house, what I had done was to hook up

12  with Sean Rooker and Matt, and Matt was often traveling

13  and not easily reachable, so --

14      And also the mortgage broker, that if he needs some

15  documents from Matt, I would have him send it to the

16  e-mail, our business e-mail that we both shared, the

17  rampsfive@gmail e-mail address so that Matt could see

18  what he needs to send.

19      And at that time we also had CC working as Matt's

20  personal assistant.  So she helped him with a lot of the

21  e-mail correspondence and getting the document to the

22  broker.  So that's what I remember for Austin.

23  Q    Did CC or anybody else help with any other

24  mortgages?

25  A    Yes.  CC has been helping on and off his -- she

1    became -- she learned very quick.  And not only was she

2    doing very well for Matt's recruiting business, she also

3    learned to communicate and talk to the bank.  So at that

4    time she continued the second mortgage, the Cape.

5         After my first telephone conversation with the

6    mortgage broker -- his name is Michael, Michael Tubin --

7    I left him the same rampsfive@gmail e-mail and Matt's

8    cell phone number, and at that point CC would take over

9    the liaison because she already learned from the first

10   experience how to go ahead with submitting, you know,

11   all the docs the bank needs.

12   Q    So I know you heard a lot of testimony about false

13   documents and forged documents that were submitted to

14   the banks in connection with these mortgages.  Did you

15   ever send any falsified pay stubs or work authorizations

16   to any banks?

17   A    No, I never did.

18   Q    Did you ever send any -- any forged bank

19   statements?

20   A    No, I never did.

21   Q    Did you ever send the Ai Jen Chen driver's license

22   to the bank?

23   A    No, I never did.

24   Q    To any bank?

25   A    No, I never did.  By then, I already --

1              MR. DRESCHER:  Objection.

2    A    I didn't have --

3              THE COURT:  So make sure you are answering

4    Miss Shelkrot's questions, and she will ask you the next

5    question.

6              THE WITNESS:  Okay.

7    A    No, I didn't.

8    BY MS. SHELKROT:

9    Q    Do you know how the banks got any of those

10   documents?

11   A    I didn't.  No.

12   Q    Did you ever bring the Ai Jen Chen license to a

13   closing and pretend that it was you?

14   A    No, I never did.

15   Q    Alison, was that you at the passport office?

16   A    No.  That wasn't me.

17             MS. SHELKROT:  If I could just have a moment?

18             THE COURT:  You may.

19             (Brief pause.)

20             MS. SHELKROT:  I don't have anything further

21   right now.  Thank you.

22             THE COURT:  All right.  We have an unusual day

23   compounded by Daylight Savings Time, and, I'm sorry, I

24   had a matter I had to take care of so I got to you late.

25        If I give you till quarter of for lunch, is that

```
 1    going to be enough time for everybody?  And if it's not,
 2    don't -- we have plenty of time.  So raise your hand.
 3    And you might have something planned where that's not
 4    going to work, and that's fine.  So anybody who can't
 5    come back at quarter of -- quarter of two after our
 6    break and get lunch during that time period, whatever
 7    else you need to do?
 8         Seeing no hands raised, that's our plan.  And I
 9    apologize for the time.  Don't talk about the case.
10    Don't let anybody talk to you about the case.  I will
11    excuse the jury and have the attorneys remain in the
12    courtroom.
13    (The jury left the courtroom after which the following
14    was held in open court at 1:09 p.m.)
15              THE COURT:  And I realize I should have
16    consulted you first, but it gives you about 45 minutes
17    for lunch.  Does that work for both sides as well?
18              MR. DRESCHER:  We can live with that.
19              THE COURT:  You can live with that?
20              MS. SHELKROT:  We'll be okay.
21              THE COURT:  Okay.  We will see you then.
22    Thank you.
23    (Court was in recess at 1:10 p.m.)
24    (The following was held in open court without the jury
25    present at 1:54 p.m.)
```

1          THE COURT:  Anything to bring to my attention

2     before we bring back the jurors?

3          MR. DRESCHER:  Could we approach, please?

4          THE COURT:  You may.

5     (The following was held at the bench.)

6          MR. DRESCHER:  I intend to confront the

7     witness with her prior conviction.

8          THE COURT:  For identity theft?

9          MR. DRESCHER:  For identity theft.  I also

10    intend to get into the circumstances -- under Rule 608

11    of the circumstances of the conviction for -- for

12    several reasons.

13       As your Honor may be aware, the identity theft

14    conviction happened when the defendant pleaded guilty to

15    forging a judge's signature.  The document that the

16    forged signature appeared on was a document that was, in

17    essence -- that had the effect of seizing the assets and

18    giving her visibility into the bank account of her

19    ex-husband, who continued to work for her at the

20    restaurant after the divorce.

21       There's been some suggestion during the direct

22    testimony that the ex-husband was abusive and she was

23    victimized by him.  Following the divorce, she hired the

24    ex-husband to work for her at the restaurant, was

25    suspicious that he might be stealing from her, and in an

1    effort to get visibility into his financial

2    circumstances, forged a New York judge's signature on an

3    order that she then presented to banks in an effort to

4    find out what's going on.  So the -- the judge's forged

5    signature is relevant on several levels.

6        First of all, the context paints a more complete

7    picture of the relationship between her and her

8    ex-husband, and it is certainly an incident showing a

9    character for dishonesty.  And so I wanted to alert the

10   Court that I intended to get into in so that if there

11   were to be an objection, we could deal with it now.

12             MS. SHELKROT:  So to object -- that was

13   actually the subject of a motion *in limine* that we had

14   filed as to the conduct underlying the conviction.  It's

15   obviously proper Rule 609 impeachment to elicit the fact

16   of the conviction.  The conduct underlying it, however,

17   is a different matter, and along with everything else,

18   is subject to a 403 balancing test.  And it's

19   exceedingly prejudicial to have information about a

20   conviction for identity theft and specific acts about

21   it.

22             THE COURT:  You would agree that the

23   conviction itself is not subject to a 403 balancing

24   test?

25             MS. SHELKROT:  I do.

```
1              THE COURT:  Okay.

2              MS. SHELKROT:  The fact of the conviction, I

3    do.

4              THE COURT:  So the rule is -- 608, specific

5    instances -- inquiry into a witness's specific acts is

6    permissible only if the acts are probative of

7    truthfulness or untruthfulness.  The following are

8    illustrative of the type of acts that courts find

9    probative:  prior use of a false name, filing false tax

10   returns, failure to file tax returns, forgery, omitting

11   a material fact from an official report, filing of

12   bankruptcy.

13        And then it talks about Rule 608 applies only when

14   evidence is being offered to prove a witness's character

15   for truthfulness so that the jury may infer that

16   the witness is more or less likely to be testifying

17   truthfully.

18        Does not apply when evidence of specific acts is

19   offered for some other purpose.  Thus, extrinsic

20   evidence may be admissible to prove -- to rebut factual

21   assertions made by the witness on direct examination,

22   specific -- referring to specific contradiction, and to

23   cure a witness's misleading statements as to the extent

24   of his troubles with the law.

25        However, a party may not bootstrap proof of witness
```

1    misconduct into evidence by trying to elicit the

2    misleading statements or factual assertions in cross

3    examination and then adducing the evidence to contradict

4    the witness's statement.

5         So it is permissible because she has explained on

6    direct that the reason why she was not putting things in

7    her name was because she wanted to lie low so that

8    people didn't know her identity, her whereabouts and the

9    children's whereabouts, and because she had a husband

10   who was abusive and gambling and had compromised her

11   credit, and this was going to be a way of keeping away

12   from him.

13        So it's -- the door is wide open on a continuing

14   relationship with the husband and the underlying facts

15   of the identity theft conviction.  And in light of the

16   testimony on direct, the Court finds that the 403

17   balancing test weighs in favor of the government because

18   the probative value substantially outweighs any risk of

19   unfair prejudice or cumulative evidence.

20        If you want a curative instruction on the 609

21   conviction, you may propose it now.  So if you want me

22   to say:  Members of the jury, I caution you that

23   evidence of a prior conviction is -- is for the purposes

24   of impeaching the witness's credibility and not for

25   substantive evidence of guilt in this case, or something

1      to that effect --

2           So if you have one -- I alerted you to your ability

3      to propose curative instructions, or you can ask for me

4      not to mention it.  It's up to you.

5                MS. SHELKROT:  I'm more -- I am less concerned

6      with the curative instruction, this 609, than with the

7      curative instruction depending on the conduct underlying

8      it.  I guess I would like to reserve the right to

9      propose a curative instruction to be delivered with the

10     other instructions rather than have it done if it's

11     going to be right now.

12                THE COURT:  Okay.

13                MS. SHELKROT:  And would the Court consider my

14     objection is preserved without having to object again

15     when the government raises it?

16                THE COURT:  Yes.

17                MS. SHELKROT:  Very well.

18                MR. DRESCHER:  Also, I intend to introduce

19     the -- with the Court's permission, in light of the fact

20     that the defendant is testifying, the file of the ID

21     Creator, the ID Creator file that we tried to get in on

22     direct.  It has several communications between this

23     witness and the Johnson State College ID creations, in

24     light of the testimony to -- basically denying having

25     anything to do with these things.  I think that we

1      should be allowed to get into that.

2                  THE COURT:  Well, you can try to impeach her

3      with it, and in that respect, it is -- it did not need

4      to be disclosed in advance.

5                  MR. DRESCHER:  Okay.

6                  THE COURT:  But how you do that is up to you.

7                  MR. DRESCHER:  Okay.  Thank you.

8      (The following was held in open court.)

9                  THE COURT:  Okay.  We will bring back the

10     jury.

11     (The following was held in open court with the jury

12     present at 2:02 p.m.)

13                 THE COURT:  We are back on the record in

14     United States of America versus Alison Gu.  We have Miss

15     Gu on the witness stand.  She is still under oath, and

16     we are in the government's cross examination.

17                        CROSS EXAMINATION

18     BY MR. DRESCHER:

19     Q    Good afternoon, ma'am.

20     A    Good afternoon.

21     Q    In August of 2015, you were convicted of identity

22     theft in the first degree in the county court of the

23     state of New York, in Suffolk County, New York; is that

24     correct?

25     A    Correct.

1    Q    And that involved you forging the signature of a

2    judge on a document, didn't it?

3    A    No, I didn't.

4    Q    Ma'am, after you and your husband divorced --

5         That was in 2009?

6    A    Yes.  Correct.

7    Q    -- you continued to operate the restaurant,

8    correct?

9    A    Correct.

10   Q    And you, in fact, hired him to come work for you,

11   didn't you?

12   A    It's a mutual agreement.  Yes.

13   Q    You were in charge of the restaurant, and you hired

14   him to come work for you; isn't that correct?

15   A    Yes, I did.

16   Q    And you were concerned that he was stealing from

17   you; isn't that true?

18   A    Yes, I was.

19   Q    And you wanted to figure out whether there was

20   evidence of him stealing from you; isn't that correct?

21   A    That's correct.

22   Q    And in order to do that, you forged the name of a

23   judge on a court order; isn't that correct?

24   A    I didn't forge a name of a judge.

25   Q    You prepared a document that looked like a court

1    order, right?

2    A    I was not the one that prepared the document.

3    Q    You pleaded guilty to identity theft?

4    A    Yes.

5    Q    And the identity that you stole was that of the

6    judge; isn't that correct?

7    A    I pleaded guilty because I took responsibility for

8    that, and I was not understanding why the charge was

9    called identity theft, but, yes, I took the plea because

10   my lawyer advised me.

11       I had a signed confession at the office of Danbury

12   PD where Detective Brooks came from, and the cops had

13   interrogate me about four hours without allowing me to

14   hire -- have an attorney present, when I requested many

15   times.

16       And they said they know me.  They know Allen.  They

17   have been looking -- been to our restaurant and where I

18   live, and they understood that I was a victim, and

19   they -- they know everything about Allen's criminal

20   history.  As a matter of fact, they asked me, "We know

21   who did the court document" --

22   Q    Excuse me, ma'am.

23   A    Sorry.

24   Q    You had a lawyer representing you in the case in

25   which you pleaded guilty to identity theft; isn't that

```
 1     correct?  Isn't that right?
 2     A    Yes, I did.
 3     Q    And he gave you advice and he gave you counsel,
 4     didn't he?
 5     A    He did.
 6     Q    And he was looking out for your rights, didn't he?
 7     A    I'm not sure he did.
 8     Q    And you pleaded guilty, didn't you?
 9     A    I did, taking his advice.
10     Q    And the purpose of the document that was the basis
11     of that conviction, the purpose of that document was for
12     you to be able to do some investigating into your
13     ex-husband; isn't that correct?
14     A    That's correct.
15              MR. DRESCHER:  Your Honor, may I approach?
16              THE COURT:  You may.
17     BY MR. DRESCHER:
18     Q    I am showing the witness what has been marked for
19     identification as Government Exhibit 350.
20          That's the document you prepared, wasn't it?
21     A    No, I didn't prepare this.
22     Q    That's the document that you used to investigate
23     your husband; isn't that right?
24     A    Yes.  I have seen this.
25     Q    That's the document you used to investigate your
```

1    ex-husband; isn't that right?

2    A    Correct.

3    Q    And that's the document that has the name of a

4    judge signed on the last page; isn't that correct?

5    A    Yes, it is.

6            MR. DRESCHER:  Move the admission of 350.

7            THE COURT:  Any objection?

8            MS. SHELKROT:  I'm going to just have a copy.

9        No objection.

10            THE COURT:  350 is admitted.

11            (Government's Exhibit 350 was received in

12    evidence.)

13    BY MR. DRESCHER:

14    Q    And you were, in fact, able to freeze some of your

15    ex-husband's assets for a little while with the benefit

16    of that document; isn't that correct?

17    A    Yes, that's correct.

18    Q    Ma'am, you testified on direct that you and Mr.

19    Abel purchased the house at 7 Edith Place together; is

20    that right?

21    A    That's correct.

22    Q    And you had enough money such that you were able to

23    buy that house free and clear without any mortgage; is

24    that correct?

25    A    That's correct.

1   Q    And you purchased that house in about the summer of

2   2013; is that correct?

3   A    Yes, it is.

4   Q    Now, isn't it true that on September 23, 2013, your

5   bankruptcy case was finally adjudicated and there was a

6   final decree of bankruptcy in your name?

7   A    I wasn't aware of when it's adjudicated, yes, but

8   there was a personal bankruptcy case I filed.

9             MR. DRESCHER:  May I approach?

10            THE COURT:  You may.

11   BY MR. DRESCHER:

12   Q    I am showing you what's admitted as Exhibit 82.

13   What is the date of the final adjudication of your

14   bankruptcy case?

15   A    September 26th.  Oh, September 23rd, 2013.

16   Q    And you bought the Cheshire house with over

17   $600,000 of cash?

18   A    Yes, I did.

19   Q    Before you moved to Cheshire, you lived in Danbury;

20   isn't that right?

21   A    That's right.

22   Q    And your address was 109 Park Place; isn't that

23   correct?

24   A    Park Avenue.

25   Q    Park Avenue.  Thank you.

1              109 Park Avenue?

2     A     That's correct.

3     Q     You lived in a condominium?

4     A     Yes, it is.

5     Q     You lived there with your three kids?

6     A     Yes.  And my live-in nanny.

7     Q     And your live-in nanny?

8     A     Yes.

9     Q     And you sold -- in fact, you developed that

10    condominium complex, didn't you?

11    A     With my ex, together, in the beginning.  Yes.

12    Q     And then after you got divorced, it was yours;

13    isn't that right?

14    A     Yes, it is.

15    Q     And you lived in one unit and there were five other

16    units; isn't that correct?

17    A     That's correct.

18    Q     And you actually sold one of the units to somebody.

19    True?

20    A     Correct.

21    Q     And then you entered into a contract to sell the

22    other five to an individual; isn't that true?

23    A     That's true.

24    Q     And when you entered into that contract -- and his

25    name was a Mr. Haun; isn't that right?

1    A    It is.

2    Q    And he is from China?

3    A    He is.

4    Q    And you and he negotiated the deal?

5    A    And Yuki, yes.

6    Q    You and your nanny negotiated the deal?

7    A    No.  Yuki was my restaurant manager and a part-time

8    nanny back then.

9    Q    Okay.  Yuki didn't own the house -- the condominium

10   complex, did she?

11   A    No, but Mr. Haun is referred to me by Yuki.

12   Q    But Yuki did not own the condominium complex; you

13   did?

14   A    That's correct.  I did.

15   Q    And you entered into a contract to sell it to Mr.

16   Haun, correct?

17   A    Correct.

18   Q    And the purchase price was about $1.5 million; is

19   that correct?

20   A    1.4 something, yes.

21   Q    And in the negotiating process, Mr. Haun was given

22   what appeared to be a lease agreement suggesting that

23   four of the units had actually been leased out, were

24   generating rental income; isn't that correct?

25   A    I only became aware of the fact --

1    Q    Ma'am?

2    A    Yes?

3    Q    Isn't it correct --

4              THE COURT:  So let her respond, please.

5    A    I became aware of the lease agreement after the

6    Danbury search and seizure in the case came surface.

7    BY MR. DRESCHER:

8    Q    Isn't it true that Mr. Haun was given a lease

9    agreement that made it look like four of the units had

10   been rented out?

11   A    I can't say if it's true or not.  I didn't

12   understand how it happened.

13   Q    Now, Mr. Haun's from China and you are originally

14   from China, correct?

15   A    That's correct.

16   Q    And --

17   A    As a matter of fact, same city, he told me.

18   Q    And when the two of you communicated, it was

19   frequently in your native tongue; isn't that correct?

20   A    No.  It's in -- not in Xiang Chinese but in

21   Mandarin.

22   Q    So -- it was in Mandarin?

23   A    Correct.

24   Q    There was nobody renting the other four units in

25   the -- in the condominiums on Park Avenue; isn't that

1    true?

2    A    No, it's not true.

3    Q    It's your testimony today that people were actually

4    living in the four units?

5    A    Yes, they were.

6    Q    The units that were not even finished for

7    construction purposes?

8    A    They were -- only one of the five units has about

9    10 to 20 percent work done.  The rest are all fully

10   finished -- were fully finished, and the two or three of

11   the units has tenants in them.

12   Q    At the time you sold it to Mr. Haun there were no

13   tenants, correct?

14   A    Yes.

15   Q    In fact, you induced Mr. Haun to pay a price based

16   upon false information; isn't that true?

17   A    I didn't.

18   Q    Oh, that was Yuki?

19   A    I didn't.

20   Q    Was it Yuki?

21   A    I'm not sure who that is.

22   Q    So in any event, you and Mr. Abel moved into

23   7 Edith Place around the summer of 2013, around -- a

24   little before your final bankruptcy decree; is that

25   fair?

1    A    Correct.

2    Q    And you continued to live there; isn't that

3    correct?

4    A    Yes, that's correct.

5    Q    With Mr. Abel?

6    A    Not until last year when our situation changed.  So

7    he was living there full time, and me and the three kids

8    have moved to Vermont and live in Winhall.

9    Q    You and Mr. Abel are still in a close and committed

10   relationship, aren't you?

11   A    Yes.  We're partners.

12   Q    I believe you admitted during your direct testimony

13   that you did, in fact, hire Ed Hill to prepare the

14   quitclaim deed that Matt Abel signed conveying the

15   property at 7 Edith Place from Ramps Unlimited to Jing

16   Shao and Ai Jen Chen; is that correct?

17   A    No.  I didn't hire Mr. Ed Hill.  I had a

18   conversation with him.

19   Q    Do you agree that Mr. Ed Hill prepared that deed?

20   A    Yeah, he did.

21   Q    And did you -- do you agree that you spoke with him

22   about preparing that deed?

23   A    Yes, I did.

24   Q    And after you spoke with him about preparing that

25   deed, he prepared the deed?

1    A    After he spoke to Matt to confirm the procedures.

2    Q    After you spoke with him about preparing the deed,

3    he prepared the deed?

4    A    No, that's not after me.

5    Q    You spoke with him after the deed was prepared?

6    A    No.  I only merely made a phone call to ask him,

7    inquire about if what Mr. Chen had proposed for this

8    transfer is legitimate.  There's such a thing about you

9    can just sell the ownership of the LLC instead of sell

10   to individuals.

11   Q    Ma'am, did Matt Abel pay Ed Hill's fee for

12   preparing that deed?

13   A    As far as I know, yes, he did.

14   Q    And that deed conveyed every last piece of interest

15   that you and Matt Abel had in 7 Edith Place to two other

16   people; isn't that correct?

17   A    I was not under that impression.  I was told a

18   corporation has its stocks.  Unless you have a transfer

19   agreement to show the interest is transferred, that's a

20   separate document you need to make.

21   Q    So, ma'am, when you bought 7 Edith Place, you and

22   Matt bought it in the name of Ramps Unlimited; isn't

23   that correct?

24   A    That's correct.

25   Q    And Ramps Unlimited is owned by you, isn't it?

```
1    A    Ramps Unlimited is a company.

2    Q    Is Ramps --

3              THE COURT:  So let her finish, please.

4    A    Ramps Unlimited LLC is an LLC that me and Matt set

5    up using my own funds, with him as the agent, the

6    manager agent, and we have a separate agreement of who

7    owns how much share of it.  If you want to -- is that

8    your question?

9    BY MR. DRESCHER:

10   Q    You own a majority of Ramps Unlimited, don't you?

11   A    Yes, because the money came from --

12   Q    What --

13   A    -- me.

14   Q    What percentage do you own?

15   A    90.

16   Q    You own 90 percent of Ramps Unlimited and the rest

17   is owned by Matt Abel?

18   A    Yes.

19   Q    And in the deed conveying Ramps Unlimited to Jing

20   Shao and Ai Jen Chen, how much -- let me step back.

21        The deed that conveyed 7 Edith Place from Ramps

22   Unlimited to Ai Jen and Jing Shao conveyed the interest

23   of Ramps Unlimited to two other people, correct?

24   A    No.  I was not under the impression of that.

25   Q    You are experienced in real estate, right?
```

1    A    The only experience I had was developing the

2    six-units townhouse.

3    Q    So you developed a condominium complex, didn't you?

4    A    I finished it up.

5    Q    And then you bought 7 Edith Place, right?

6    A    Yes, using the --

7    Q    And then you also purchased the properties we have

8    been talking about during the course of this trial;

9    isn't that right?

10   A    No.  By purchase, if you mean we picked it, yes.

11   Me and Matt have gone -- look at the photos online, have

12   actually visited couple houses for checking it out, if

13   that's what you mean.

14   Q    Did you purchase 385 Cedar Avenue, Cocoa Beach,

15   Florida?

16   A    Yes, that's one of the properties.

17   Q    So you did purchase that?

18   A    Yes.  That's one of the properties.

19   Q    Okay.  Did you purchase 389 Read Farm Lane in

20   East Dorset?

21   A    That's also one of the properties that we

22   investigated.

23   Q    So the answer is yes?

24   A    Yes.

25   Q    Did you purchase the house in Yarmouth as well?

1    A    Yes.

2    Q    And in Austin?

3    A    Correct.

4    Q    So you admit that all of those properties were

5    purchased by you, or you and Matt, or Matt; is that

6    fair?

7    A    Using the money, yes, we purchased those to make

8    investment.

9    Q    Do you remember shopping for -- looking around the

10   properties in the Dorset area before you arrived at the

11   house in East Dorset?

12   A    On the day of?

13   Q    No.  You looked around at real estate for awhile

14   before you decided to make an offer?

15   A    Yes, I did.

16   Q    It's my understanding you are very fond of that

17   Manchester area; is that true?

18   A    Only right around that time, yes.  Starting to.

19   Q    Your realtor that you worked with towards buying

20   the house in East Dorset, that was Judy Thompson, wasn't

21   it?

22   A    I don't remember the name.

23   Q    But you did work with a realtor?

24   A    Yes, there was a realtor.

25   Q    It was a woman?

```
 1    A    It's a woman.

 2    Q    Named Judy?

 3    A    I couldn't say yes or no.

 4    Q    You heard Christianna Abel testify last week,

 5    right?

 6    A    Yes, I did.

 7    Q    That's Matt's sister?

 8    A    Yes, she is.

 9    Q    You were a bridesmaid in her wedding?

10    A    That's correct.

11    Q    Your daughter was a junior bridesmaid in her

12    wedding?

13    A    Yes.

14    Q    You attended her bridal shower?

15    A    Yes.

16    Q    She considered you to be like family; isn't that

17    right?

18    A    Yes.  She did.

19    Q    Do you consider her to be like family?

20    A    Yes, I do.

21    Q    And you heard her say that she e-mailed you once in

22    a while using the rampsfive@gmail account?

23    A    Yes, that's correct.

24    Q    And you don't dispute that, do you?

25    A    No.  That's an e-mail that both Matt and me and our
```

1    assistant have access to.  It's created for the Ramps

2    Unlimited business.

3            MR. DRESCHER:  Your Honor, may I approach?

4            THE COURT:  You may.

5    BY MR. DRESCHER:

6    Q    I'm going to show you a page from Exhibit 72.

7    Exhibit 72 has not yet been admitted.  And I am going to

8    show you page 003526.  Ask you to take a look at that.

9         Ma'am, are those e-mails between rampsfive@gmail

10   and a woman named Judy Thompson about the Dorset

11   purchase?

12   A    Yes, they appear to be.

13   Q    And does that refresh your recollection that Judy

14   Thompson was the realtor you worked with?

15   A    I only met her once, so --

16   Q    I'm sorry?

17   A    I only met her once.

18   Q    But you e-mailed --

19   A    I don't recall seeing this e-mail.

20   Q    Do you admit you e-mailed with the realtor?

21   A    I don't recall e-mail to -- directly with her.

22   Q    You agree that the subject of the e-mails are the

23   Read Farm property?

24   A    It didn't say anywhere about Read Farm.

25   Q    What is the subject of the e-mail in the "re" line?

1           THE COURT:  So this hasn't been admitted.

2           MR. DRESCHER:  Your Honor, I move the

3   admission of the certified file of Walnut Hill Realty.

4           THE COURT:  And this is Exhibit 723?

5           MR. DRESCHER:  Yes.

6           THE COURT:  Any objection?

7           MS. SHELKROT:  Yes.  Lack of foundation,

8   your Honor.

9           THE COURT:  So we have a certification, and I

10  am going to have the parties approach with the document,

11  please.

12  (The following was held at the bench.)

13          THE COURT:  Okay.  So she's certifying it's a

14  business record, and your objection is what?

15          MS. SHELKROT:  So my objection is the fact

16  that it's a business record doesn't mean that everything

17  contained within it is a business record.  So it may

18  mean that it is retained within her file, but it doesn't

19  necessarily mean that e-mails, for example, that are

20  contained within it have the same degree of reliability

21  that other records are -- that are created as part of

22  the business relationship.  So there doesn't seem to be

23  any foundation for admission of this e-mail at this

24  point.

25          THE COURT:  Are we going to hear from Miss

1    Thompson in rebuttal?

2            MR. DRESCHER:  Depending upon what this

3    witness said, we may very well.

4            THE COURT:  Okay.  Do you have a copy of the

5    e-mail?  So I -- Miss Shelkrot has a point in that the

6    business record says, "Every time I start listing, I

7    pull out this sheet and I pull out the seller's name."

8    It may well be that this witness keeps every

9    communication relating to a potential purchase, and it's

10   clearly a business record, but unless I see the document

11   in its -- it looks like a regularly recorded activity --

12           MR. DRESCHER:  So the file is pretty full of

13   e-mails involving both the rampsfive@gmail account but

14   also the alyramps@gmail account.

15           THE COURT:  Well, you can continue to ask her

16   if she recognizes it, if she sent it, and she can answer

17   accordingly.  And if you can connect it up through

18   another witness, you may do so.  Okay?

19       But I can't -- unless you can -- it's not

20   self-evident to me that this is, in fact, a business

21   record.  If Miss Thompson got on the witness stand and

22   said, "I keep everything as part of my record in the

23   file, so every communication from a potential purchaser

24   is in a file labeled with the property address and this

25   is how I do it, and as soon as I get the communication,

1    it goes in the file," then I know it's a business

2    record.

3        If it was something like a uniform listing

4    agreement, I would be more inclined in that direction,

5    but right now we're stuck with this.

6            MR. DRESCHER:  So we have the certification

7    that came from the realtor's office.  It contains

8    e-mails from -- to and from the rampsfive@gmail for

9    which there's foundation in the record to suggest that

10   this witness and defendant were -- was -- was using.  It

11   also has e-mails to and from the alyramps@gmail account,

12   and those are e-mails that appear on at least two other

13   places in this case.

14       They appear in the communications with Craig

15   Thibeau, relating to the efforts to purchase

16   7 Edith Place, at Northeast Financial, and they also

17   appear in -- with regard to communications relating to

18   the efforts to buy -- to prepare some Johnson State

19   College fake IDs.

20           THE COURT:  What does the grand jury subpoena

21   ask for that she references?

22           MR. DRESCHER:  I don't recall, as I stand here

23   at the moment, Judge.

24           THE COURT:  Okay.  Do you have a copy of the

25   e-mail in question?  I don't want to take your file from

1    you.

2              MR. DRESCHER:  The --

3              THE COURT:  The one you are asking her about

4    and the one you are asking her to read from, that hasn't

5    been admitted.  That's how we got stopped.

6              MR. DRESCHER:  Yeah.  What I was trying to do

7    is basically establish the *prima facie* relevance of the

8    file given the fact that the file involves e-mails

9    between the realtor and those addresses.

10             THE COURT:  Can you show me a copy of the

11   e-mail that you have just shown to the witness?

12             MS. SHELKROT:  I have it here.

13             THE COURT:  Okay.

14             MS. SHELKROT:  Tell me what the page number

15   is.

16             THE COURT:  I can't see how this would not be

17   a business record, so I am going to allow it with the

18   certification.  This is not some stray e-mail about some

19   subject unrelated to the purchase and sale of a house.

20   It's directly with regard to how they proceed, and I

21   find it squarely within the certification.  You can go

22   ahead on that basis.

23             MR. DRESCHER:  Thank you.

24   (The following was held in open court.)

25             THE COURT:  Exhibit 72 is admitted.

1           (Government's Exhibit 72 was received in

2    evidence.)

3    BY MR. DRESCHER:

4    Q    You remember the testimony of Craig Thibeau of

5    Northeast Financial?

6    A    No, I don't.

7    Q    You don't remember the testimony?  He testified

8    earlier in the trial last week.

9    A    Not clearly which one you mention about.

10   Q    I will call up a few documents that have been

11   admitted as part of Exhibit 31.  Maybe that will help

12   you remember.

13           MR. DRESCHER:  Could you please pull up page

14   000439, Chris.  Can we look at the top half of this,

15   please.

16   BY MR. DRESCHER:

17   Q    You recognize this document, don't you?

18   A    Yes.  Yes, I do.

19   Q    This is a purchase and sale contract for the

20   purchase of 7 Edith Place for a total purchase price of

21   $880,000; isn't that right?

22   A    I believe the correct price was 900 or 905 because

23   they wanted the furnishings, too.  So we had to separate

24   those.

25   Q    You had to separate the furnishings for Ai Jen

1    Chen?

2    A    Yeah, the buyer.

3    Q    Okay.

4            MR. DRESCHER:  And can we see the full

5    document, please.

6    BY MR. DRESCHER:

7    Q    And this was a contract that, it's your testimony,

8    Mr. Chen signed?

9    A    I'm sorry?  Can you --

10   Q    Is that Mr. Chen's signature on this document?

11   A    I believe that Ai Jen Chen -- when the first two

12   letters was spelled separate, it's his sister.

13   Q    Oh, so the sister's the buyer?

14   A    Of -- it looks like, according to the name, that I

15   know that's the sister.  And the Mr. Chen has Aijen,

16   A-I-J-E-N, all in one word, and I believe that's

17   Mr. Chen.

18   Q    So this is the Mr. Chen that didn't work for

19   Alexion Pharmaceuticals, isn't it?

20   A    I'm not sure.

21           MR. DRESCHER:  Can you go to page 00391,

22   please, and zoom in on the top, please.  Thank you.

23   BY MR. DRESCHER:

24   Q    This is the Ai Jen Chen who wanted to buy your

25   house; isn't that right?  The one who worked for Alexion

1    Pharmaceuticals?

2    A    I believe so.

3    Q    And you communicated with Mr. Thibeau with regard

4    to this transaction, didn't you?

5    A    I don't even know who -- which person are you

6    talking about?  Could you refresh my memory?

7            MR. DRESCHER:  Can you please pull up 000634.

8    BY MR. DRESCHER:

9    Q    So, look, we have an e-mail from Aly to Ai Jen Chen

10   with a cc. to Craig Thibeau, right?

11   A    That's not me.

12   Q    You're -- you're the sender of the ==alyramps== e-mail,

13   aren't you?

14   A    I don't use A-L-Y on any of -- close captionings,

15   and alyramps is not an e-mail that I use or know of.

16   Q    I want to be clear about that.  Are you testifying

17   that you do not use alyramps@gmail.com?

18   A    I don't send or receive stuff from that e-mail.

19   Q    But you do use rampsfive@gmail.com.  You do admit

20   that?

21   A    Yes.  Rampsfive@gmail was created by me and Matt.

22   Q    And you'd agree also frequently when you send

23   e-mails, you sign them "Aly"?  Do you agree with that?

24   A    No, I don't.

25   Q    You don't sign off as "Aly"?

```
1    A    No, I don't.

2    Q    Do you remember when Ms. Marone testified and she

3    said that she knew you as Aly?

4    A    My name was -- is always Aly.

5    Q    Thank you.

6    A    Which is spelled as A-L-I.

7            MR. DRESCHER:  Can we pull up 000424, please.

8    This is part of the -- the Northeast Financial file.

9    And this is a power of attorney.  That's right.  And

10   it's a power of attorney.  And if you could turn to the

11   next page, please.

12   BY MR. DRESCHER:

13   Q    And this is a document signed by Ai Jen Chen too,

14   isn't it?

15   A    It appears to be.

16   Q    And it's notarized by Luz Simmons, isn't it?

17   A    It appears to be.

18   Q    You are familiar with that name, aren't you?

19   A    No, I am not.

20   Q    I am going to show you what's been admitted as

21   Exhibit 102X, which was present in your home in June of

22   2016.  You agree that that exhibit was in your home in

23   June of 2016, don't you?

24   A    Yes.

25   Q    Yes?
```

1    A    Yes.

2    Q    And that is the notary stamp for Luz Simmons, isn't

3    it?

4    A    I'm not sure.

5    Q    You're not sure?

6         Can you see on the screen where it says, "Notary

7    public, Luz Simmons"?

8    A    Yes.

9              MR. DRESCHER:  Would you please pull up

10   000554.

11   BY MR. DRESCHER:

12   Q    This is an e-mail that's also part of the Northeast

13   Financial file, and it says, from alyramps:  "Attached

14   please find, one, signed forms; two, source of funds,

15   China bank transaction statement; three, Nov. Wells

16   Fargo statement; and, four, copy of SS card."

17        Did I read that correctly?

18   A    Yes, you did.

19             MR. DRESCHER:  Please call up 000453.

20   BY MR. DRESCHER:

21   Q    And this is part of the Northeast file, too.  This

22   was attached to that e-mail.  Sent from alyramps.  And

23   this is the Social Security card that was issued on

24   December 3rd, 2014, isn't it?

25   A    Yes, it is.

1    Q    And that's the same Social Security card that you

2    presented to the New Hampshire Department of Motor

3    Vehicles in January of 2015, isn't it?

4    A    I have never seen this or presented to New

5    Hampshire Motor Vehicle this Social Security card.

6    Q    Ma'am, it's your testimony today that you acquired

7    a New Hampshire driver's license in the name of Ai Jen

8    Chen?

9    A    I did not acquire a driver license for Ai Jen Chen.

10   Q    You testified this morning that you went to the New

11   Hampshire DMV, you took the driver's test, you had your

12   picture taken, and you got a driver's license.  Didn't

13   you?

14   A    Yes, but not for Ai Jen Chen.

15   Q    And you did that for two different driver's

16   licenses on the same day in different offices of the New

17   Hampshire DMV; is that right?

18   A    That's not right.

19   Q    You testified that you and -- was it CC -- went to

20   the DMV?

21   A    Yes.

22   Q    And CC said she'd already failed once, so she

23   wanted you to take the test?

24   A    Yes, I did.

25   Q    And you took the test and you passed?

1    A    Correct.

2    Q    And then you had your picture taken?

3    A    Yeah.  When they call my name, Ally Koo, I had my

4    picture taken.

5    Q    And then you went to another office of the DMV?

6    A    Yes.  She took me to another place in DMV.

7    Q    And then you had your picture taken there; is that

8    right?

9    A    That's right.

10   Q    And then you got another driver's license?

11   A    That was not -- I was not under the impression to

12   get a brand new driver license.  I was only under the

13   impression to have my picture taken so I can have a

14   temporary ID card so I can have access to Ai Chen's bank

15   account, which I had the power of attorney to authorize

16   me to do so.

17            MR. DRESCHER:  Could you please blow up

18   0008032.

19   BY MR. DRESCHER:

20   Q    Do you remember the testimony of the fellow from

21   the DMV who talked about the license -- licensing

22   process?

23   A    I don't remember exactly.

24   Q    Okay.  Do you remember how he explained how the

25   images would get captured on different dates

1  depending -- and their files would indicate the days the

2  images got captured?

3  A    Vaguely.

4  Q    Now, this is the photo in the New Hampshire DMV

5  file, one of the photos, associated with Ai J. Chen,

6  right?

7  A    Yes, it is.

8  Q    And that's a picture of you, isn't it?

9  A    Seems like.

10  Q    It seems like?  Ma'am, that's your picture, isn't

11  it?

12  A    I've never seen pictures -- this pictures of me

13  until -- in my discovery and today.

14  Q    I just want to be clear.  Do you agree that this is

15  your picture?

16  A    I'm not a hundred percent sure.

17          MR. DRESCHER:  Page 000 -- I'm sorry, 008040,

18  the next page in the exhibit.

19  BY MR. DRESCHER:

20  Q    So this is part of the DMV file associated with the

21  Ai Jen Chen driver's license.  You see the name of the

22  applicant here?  It's first name Ai, middle name Jen,

23  last name Chen.  Did I read that correctly?

24  A    Correct.

25  Q    And do you see the street address for Ai Jen Chen?

1        MR. DRESCHER:  Can you zoom in on that street

2   address, please, Chris.

3   BY MR. DRESCHER:

4   Q    You see where it says "street address"?

5   A    Yes.

6   Q    Do you see where an address had been crossed out?

7   A    Yes.  Vaguely.

8   Q    You see -- you see the crossed-out address?

9   A    Is it 555 Route 78E?

10  Q    You see the apartment number there, 498, I think it

11  is?

12  A    Yeah.

13  Q    Yeah.

14  A    Not very clear.

15  Q    And what town is that?

16  A    Swanton.

17  Q    Swanton.  That's right.  You wrote that, didn't

18  you?

19  A    No.  I didn't write this.

20       MR. DRESCHER:  Can we go back to 008039,

21  please.

22  BY MR. DRESCHER:

23  Q    You see the issue date on this record?  Over here.

24  You see that?

25  A    Yes, I do.

1    Q    You see how this record was issued on January 22nd

2    of 2015?

3    A    Yes, I see that.

4    Q    And that was the day you showed up and you failed

5    the driver's test.  Do you remember that?

6    A    I have never taken another driver test that failed.

7    No, I don't have any memory.

8    Q    You don't remember driving on the sidewalk or

9    parking on the sidewalk and driving on the wrong side of

10   the road?

11   A    No.

12              MR. DRESCHER:  008050, please?

13   BY MR. DRESCHER:

14   Q    So this is a record from the DMV.  This is a record

15   of the exact same Social Security card that was in the

16   records of Northeast Financial, isn't it?

17   A    I'm not certain.

18   Q    It's the same issuance date and the same Social

19   Security number, isn't it?

20   A    Yes, it looks like it.

21              MR. DRESCHER:  008057, please.

22   BY MR. DRESCHER:

23   Q    And the New Hampshire DMV received in January of

24   2015 these copies of the orders of the Montgomery

25   County, Alabama, probate court?

1    A    I'm sorry, I didn't hear what you said.  Who

2    received it?

3    Q    The New Hampshire DMV has this Montgomery County

4    court order from Alabama in its files; isn't that right?

5    A    I'm not sure which file it came from.

6    Q    So you remember you testified that that day you had

7    your picture taken at different DMV offices, they told

8    you to do something with your hair and to do something

9    with your jacket?  Or was it a hoody?  Do you remember

10   testifying about that earlier today?

11   A    Yes.

12           MR. DRESCHER:  008059, please.  That's Exhibit

13   29A.

14   BY MR. DRESCHER:

15   Q    So this is that hoody, right?  This is one of those

16   pictures you are talking about, right?

17   A    Yes.  It appears as though.

18   Q    And in this particular picture your hair is up?

19   A    Yes.

20   Q    And this picture was issued on February 20th, 2015,

21   wasn't it?

22   A    Yes.

23   Q    Wasn't it?

24   A    Yes.  Sorry.

25           MR. DRESCHER:  Chris, can you please call up

1   Exhibit 14A, which is 008110.

2   BY MR. DRESCHER:

3   Q    And that's the other picture taken that same day,

4   isn't it?

5   A    Yes, it is.

6   Q    And in this picture, your jacket is inside out

7   compared to the other picture.

8            MR. DRESCHER:  Chris, can you call them up

9   side by side, 8059 and 8110.

10  BY MR. DRESCHER:

11  Q    So, ma'am, you agree both of these are pictures of

12  you, correct?

13  A    Correct.

14  Q    And in one picture your jacket is inside out, and

15  the other jacket it's right-side out; is that fair?

16  A    No.  It's two piece, different clothes.  It's a

17  vest.

18  Q    Okay.  But it's reversed in one compared to the

19  other?

20  A    Yeah.  I was told to put my hair down.

21  Q    Okay.  And in one, your hair is up, and the other

22  your hair is down?

23  A    Right.  Right.

24  Q    Right.  And in one, your name is Ally Koo, and the

25  other your name is Ai J. Chen?

1    A    It appears on the paper, yes.

2    Q    I'll put this on the ELMO.

3         And this is the very driver's license that has that

4    picture of Ally Koo, isn't it?

5    A    That's my picture, and it looks like the driver

6    license.

7    Q    And this driver's license was in your house at

8    7 Edith Place in June of 2016, wasn't it?

9    A    I found it from the government discovery.

10   Q    It was in your house in June of 2016, wasn't it?

11   A    Yes, I believe so.

12   Q    You and Matt came up with the name for Ramps

13   Unlimited, didn't you?  The two of you?

14   A    Yes, we did.

15   Q    And it's one letter for everybody's name in your

16   family; isn't that right?

17   A    That's right.

18   Q    So you admit that you purchased the house at

19   385 Cedar Avenue in Cocoa Beach, Florida?  You admitted

20   that earlier, right?

21   A    I did not use my name to purchase the house, but I

22   used the money that's mine to purchase the house, so --

23   Q    Did you purchase the house at 385 Cedar Avenue in

24   Cocoa Beach, Florida?

25   A    I'm not sure by "purchase," what do you mean?

1    Q    So it was purchased with your money, right?

2    A    Right.

3    Q    And you go there from time to time to check on the

4    place, right?

5    A    Very few times.

6    Q    But you have been there, right?

7    A    Correct.

8    Q    Because it was yours and you wanted to check on the

9    place; isn't that right?

10   A    In that sense, yes.

11   Q    Yes.  You purchased the house, didn't you?

12   A    If in that sense, yes.

13   Q    Yeah, in that sense.

14   A    Okay.

15   Q    And you purchased the house pretending to be

16   somebody you weren't; isn't that right?

17   A    No, I didn't.

18   Q    Well, the -- you saw the loan paperwork, and you

19   listened to the testimony of Gail Gilbert and Peter

20   Bjorlie to talk about the financing of that property.

21   Remember -- do you remember how the closing officer held

22   the Ai Jen Chen driver's license in her hand?

23   A    Can you refresh my memory?

24   Q    Did you go to the closing?  Did you go to the

25   closing for that property?

1    A    No.

2    Q    You didn't?

3    A    No.

4    Q    Did you go to Cocoa Beach to sign some papers to

5    acquire the property?

6    A    The first time, yes, we went to look at the house.

7             MR. DRESCHER:  Chris, can you please call up

8    008208.

9    BY MR. DRESCHER:

10   Q    This is an e-mail from you to Peter Bjorlie; isn't

11   that right?  This is Exhibit 90C for the record.

12   A    No, that's not from me.

13   Q    I'm sorry, I couldn't hear you.

14   A    That's not from me.

15   Q    That's not from you?  It's from rampsfive.

16   A    Where can you tell?

17            MR. DRESCHER:  Can you go to the next page,

18   please?

19   BY MR. DRESCHER:

20   Q    You can see the e-mail that's involved from the

21   person that Mr. Bjorlie is dealing with,

22   rampsfive@gmail.com; is that right?

23   A    Yeah, that's from our e-mail.

24   Q    Okay.

25            MR. DRESCHER:  And if you can go back to

1    the -- the other page, please, Chris.

2    BY MR. DRESCHER:

3    Q    And this e-mail, you write, "Hi Peter.  See

4    attached.  Please call and confirm that you received all

5    attachments, 12 total.  Thanks.  Aly."  Did I read that

6    correctly?

7    A    That's correct.

8    Q    And then attached to this e-mail were several

9    items; isn't that right?

10         MR. DRESCHER:  Let's go to 008239.

11   BY MR. DRESCHER:

12   Q    That was attached to the e-mail, right?  This is

13   your license -- this is your driver's license in the

14   name of Ai J. Chen.  Correct?

15   A    This is a driver license.

16   Q    And this is your picture?

17   A    Yes.

18   Q    And the next page is 008240.  And that's your

19   partner's picture, right?  His driver's license.  Matt

20   Abel?

21   A    Yes.

22         MR. DRESCHER:  And if we go to 0088232.

23   BY MR. DRESCHER:

24   Q    You know what this document is, don't you?

25   A    It's a loan application.

1    Q    It's a loan application.  That's right.  And this

2    is a loan application to purchase 385 Cedar Avenue,

3    Cocoa Beach, Florida, right?

4    A    Yes.

5    Q    This is to purchase it in the names of Matthew Abel

6    and Ai Chen, correct?

7    A    Correct.

8    Q    And both Mr. Abel and Ai Chen live at

9    7 Edith Place; isn't that right?

10   A    There's no Ai Chen living at 7 Edith Place.

11   Q    No?  But you live in 7 Edith Place?

12   A    I'm not Ai Chen.

13   Q    It's your picture on the driver's license, right?

14   A    I have actually never seen the actual driver

15   license.

16   Q    You do agree that this is Matt Abel, your Matt

17   Abel, right?

18   A    On the driver license, yes.

19   Q    On the loan application.  That's the Matt Abel that

20   you live with on the loan application, isn't it?

21   A    Yes.

22         MR. DRESCHER:  008235, which is the last page

23   of the application.  The signature, please.

24   BY MR. DRESCHER:

25   Q    That's Matt Abel's signature, isn't it?

1    A    I can't be sure.

2    Q    You recognize his signature, don't you?  I mean,

3    you're partners.

4    A    This one, I can't be sure.

5    Q    And this is your signature, isn't it?

6    A    No.

7    Q    So this is a loan application to purchase the

8    property that you consider to be yours; isn't that

9    right?  The one that you go down to check on from time

10   to time, that you paid for with your own money; is that

11   right?

12   A    Yeah.  We consider --

13   Q    And this is the application that led to the

14   financing for the purchase of that property, isn't it?

15   A    It appear to be, yes.

16   Q    And it's signed --

17             MS. SHELKROT:  Could he not interrupt the

18   witness, please.

19             THE COURT:  Yes.  Let's have the answer and

20   then pause and then ask the next question, please.

21             MR. DRESCHER:  Thank you.  I will try.

22   BY MR. DRESCHER:

23   Q    And that's your signature?

24   A    No, that's not my signature.

25   Q    Did you -- you agree that the -- the house in

1    Dorset you purchased by financing through the Bank of

2    Bennington, don't you?

3    A    No.  I did not finance that through --

4    Q    Let me take a step back.

5    A    Okay.

6    Q    I want to make sure we are not, like, talking about

7    "purchasing" in some funny way like a moment ago.

8        The house in Dorset, you had your eye on and

9    entered into a purchase and sale contract to purchase;

10   is that correct?

11   A    Yes.

12   Q    Okay.  And you went to the Bank of Bennington to

13   help you finance the purchase of that property; isn't

14   that right?

15   A    I never went to the Bank of Bennington, the bank.

16   Q    You went -- the Bank of Bennington was the bank

17   that financed the purchase of that property, right?

18   A    Yeah, that's right.

19   Q    And it's actually a construction loan.  Wasn't it?

20   It was like part for purchase and part for construction;

21   isn't that right?

22   A    Right.

23   Q    And that's, in fact, the house that you showed up

24   at last week to try and buy out of foreclosure; isn't

25   that correct?

1    A    That's correct.

2    Q    Okay.  So we're all talking about the same house.

3    A    Yes.

4    Q    And you consider it the house that you purchased

5    and are trying to take out of foreclosure now; isn't

6    that right?

7    A    Correct.

8    Q    And you have been to real estate closings before,

9    haven't you?

10    A    A few times.

11    Q    A few times.  And you know when you go to the real

12    estate closing, you have to sign the financing

13    application if you are financing it, don't you?

14    A    Is that the same as the loan application?

15    Q    Yes.

16    A    Okay.  Yes.

17    Q    Yes.  And that at the Bank of -- at the closing for

18    the property in Dorset at the Bank of Bennington, the

19    loan applications were signed on that day too, weren't

20    they?

21    A    I don't know.

22    Q    Well, did you consider yourself -- well, let me

23    take a step back.

24        Bank of Bennington -- you owed money to the Bank of

25    Bennington because the Bank of Bennington lent money to

1    you to help buy that property; isn't that correct?

2    A    I understand that to be, yes.

3    Q    You agree that you owed money to the Bank of

4    Bennington because you took out a loan?  Is that

5    correct?

6    A    Correct.

7    Q    And when the transaction was completed, there was a

8    closing in Bennington, right?  Or at Manchester,

9    actually.  At Manchester.  Do you remember that?

10   A    I don't have memory of that.

11   Q    Do you remember talking to Lisa Souls about being

12   excited to join the community?

13   A    I don't even know -- recognize --

14   Q    Were you excited to join the community?

15   A    I am not a community person.

16   Q    Where do your kids go to school?

17   A    One -- they both currently in the Long Trail

18   School.

19   Q    And that's where?

20   A    In Dorset.

21   Q    And you like them going to school there, don't you?

22   A    This year, they love it.

23   Q    Because it's a good community, isn't it?

24   A    In that sense, yes.

25   Q    I want to make sure we understand the history of

```
 1    your names.  When you came from China, it was Yi Jing
 2    Gu; is that right?
 3    A    Right.
 4    Q    And then after you were married, it became Alison
 5    Ling, L-I-N-G?
 6    A    After married to Allen, I never changed my legal
 7    name.  The Alice name was just a/k/a name, American
 8    name, that usually a lot of Chinese people take upon,
 9    but they don't go change their legal name.  And I didn't
10    change my last name to Ling.  I kept my Gu name up until
11    I become citizen.
12         At the naturalization ceremony they told me I
13    had -- that was the only option, only time I can change
14    a name quickly without going through a lengthy process,
15    so I picked the name Alison Ling when I became
16    naturalized, with the Ling as L-I-N-G.
17    Q    Okay.  So you were Alison Ling?
18    A    Yes.  That was the name Allen told me to change my
19    name to.
20    Q    And then after your divorce, then your name became
21    Alison Yi Gu; isn't that right?
22    A    I only changed the name on my naturalization paper
23    and the passport.  I never really used my name Alison
24    Ling or tell anybody I'm Alison Ling because that was
25    the name Allen picked for me, Alison.
```

1    I use -- I kept use my first name Alice, and the

2    fact that I changed my last name without asking my dad,

3    he was really mad, and he told me stop using it.  So I

4    kept my driver license name as my original Chinese name,

5    Yi Jing Gu, and most people know me -- friends or

6    family, they will call me Alice, but Matt called me Aly

7    because he likes --

8    Q    So you had a driver's license in the name of Yi

9    Jing Gu, and you had the passport in the name of Alison

10   Ling.  You can see it on your left.

11   A    Yes.

12   Q    And this is the passport that Detective Brooks and

13   his colleagues took from your house in April of 2012; is

14   that right?

15   A    Yes, I believe so.

16   Q    And you knew they had taken it that day.  Didn't

17   they?

18   A    No, I didn't for a while.  I didn't know where the

19   passport was.

20   Q    I'm showing you what is in evidence as Exhibit 92

21   on the ELMO.  This is your application for your current

22   passport; isn't that right?

23   A    Yes.

24   Q    And this application has you living at

25   7 Edith Place, right?

1    A    Right.

2    Q    Why are you still living at 7 Edith Place if you

3    sold it?

4    A    We kept living there because we never got paid

5    for the place.

6    Q    You never got paid for it.  So you got to stay

7    there until somebody pays you; is that -- is that the

8    plan?

9    A    No.  We loved it there.  As a matter of fact, we

10   want to keep it and rebuild this place.

11   Q    So I want to make sure we understand that, because

12   you conveyed the interest of Ramps Unlimited to Chen and

13   Shao, right?

14   A    Right.

15   Q    And you have never moved out, right?

16   A    Yeah.  That was the agreement, because they were

17   from overseas, and they told me that they were buying a

18   house in this country, close to a million dollars.

19   They're able to get an investment program to get Green

20   Card, so the process takes about two to three years, and

21   during that time, they wouldn't -- they have no

22   intention of moving to the States, so me and Matt could

23   continue, keep on living there, and we didn't have to

24   pay the rent.  All --

25   Q    Excuse me.

1        THE COURT:  No.  Let her finish her answer,

2   please.

3        MR. DRESCHER:  Oh.

4   A    All we had to do is keep taking care of the kids --

5   the house, and keep it in nice condition, and we were

6   treating it as our house because we did not get paid the

7   full -- the full money that's agreed.  So we never give

8   up the Ramps Unlimited stocks.  We never give away to

9   anybody.

10  BY MR. DRESCHER:

11  Q    You see here on the application that's Exhibit 92

12  where you wrote about your lost or stolen passport, that

13  it was misplaced during a move from 109 Park Ave. in

14  Danbury?

15  A    Correct.

16  Q    And you wrote that that happened in June of 2014?

17  A    That's what I wrote, yes.

18  Q    Yeah.  That's wrong, isn't it?  In fact, it was

19  taken from your house in April of 2014 by the police?

20  A    I remember it now, but at the time of the

21  application, I couldn't find my passport, and I don't

22  remember when was the last time I saw it.

23  Q    And you didn't even -- you didn't move from Park

24  Avenue to Cheshire in June of 2014?  You lived there for

25  over a year by then.

```
 1    A     Sounds right.
 2              THE COURT:  Mr. Drescher, is this a logical
 3    breaking point?
 4              MR. DRESCHER:  Yes.
 5              THE COURT:  All right.  We are going to take
 6    our midafternoon break, approximately 10 to 15 minutes.
 7    Don't talk about the case.  Don't let anybody talk to
 8    you about the case.  We will excuse the jury, and I will
 9    have the attorneys remain in the courtroom.
10    (The jury left the courtroom after which the following
11    was held in open court at 3:13 p.m.)
12              THE COURT:  Anything to bring to my attention
13    before we break?
14              MS. SHELKROT:  No, your Honor.
15              MR. DRESCHER:  No.
16              THE COURT:  Let's hear an estimate, which will
17    be a nonbinding one, as to how much more you have on
18    cross.
19              MR. DRESCHER:  If it's nonbinding, I will say
20    a half an hour.
21              THE COURT:  Okay.
22              MR. DRESCHER:  But it could go longer.
23              THE COURT:  Okay.  All right.  Okay, we will
24    see you back here after the break.
25    (Court was in recess at 3:14 p.m.)
```

1    (The following was held in open court without the jury

2    present at 3:30 p.m.)

3              THE COURT:  Anything to bring to my attention

4    before we bring back the jury?

5              MR. DRESCHER:  I don't believe so.

6              MS. SHELKROT:  No, your Honor.

7              THE COURT:  Okay, let's do that.  Thank you,

8    Jim.

9    (The following was held in open court with the jury

10   present at 3:32 p.m.)

11             THE COURT:  We are back on the record in

12   United States of America versus Alison Gu.  We have Miss

13   Gu on the witness stand.  She is still under oath, and

14   we are in the government's cross examination.  You may

15   proceed.

16             MR. DRESCHER:  Thank you.

17                  CONTINUED CROSS EXAMINATION

18   BY MR. DRESCHER:

19   Q    I want to ask you a few questions about the

20   property in Dorset and your purchase of that property.

21   A    Okay.

22   Q    This is the one at Read Farm Lane; is that right?

23   A    Right.

24   Q    The fixer-upper, so to speak?

25   A    Yes.

1   Q    When you were initially looking to buy that

2   property -- or when the property caught your eye

3   initially, it was your understanding at the time that it

4   was owned by a bank at that point, that it had been

5   foreclosed on by the bank with regard to the previous

6   owner; is that right?

7   A    I remember its foreclosure, but I didn't recall who

8   owned it.

9   Q    Okay.  And we are talking about foreclosure back in

10  2015?

11  A    Okay.

12  Q    Not the most recent one.

13  A    Okay.

14  Q    Right?

15  A    Right.

16  Q    And when you were purchasing it originally, you

17  remember the foreclosure aspect?

18  A    Right.

19  Q    Okay.  I'd like to draw your attention to a page

20  inside Exhibit 72, which is the realtor's file, and

21  specifically page 003502.

22       So at the bottom here we have an e-mail from

23  alyramps@gmail.com to Judy Thompson regarding 389 Read

24  Farm Lane.  Did I read that correctly?  Did I read that

25  correctly?

1    A    Yes, you did.

2    Q    And it says, "Hi Judy.  Could you please let me

3    know if this Dorset foreclosure is still available?  If

4    so, I'd like to talk to you about making a offer.

5    Please call me at (203) 564-6487.  I tried your cell

6    phone before.  It was a wrong number."  And it was

7    signed by Aly.

8         Did I read that correctly?

9    A    It's correct.

10   Q    Okay.

11        MR. DRESCHER:  And then if we can go -- see

12   the whole page now, Chris.  And if we can scroll up.

13   BY MR. DRESCHER:

14   Q    And this is an e-mail on the same page inside the

15   realtor's file, and this is an e-mail from

16   rampsfive@gmail.com, isn't it?

17   A    Yes.

18   Q    And this e-mail reads, "Hi Judy.  Please use this

19   e-mail for all future communication."  Right?

20   A    Right.

21   Q    And you agree that rampsfive is an e-mail address

22   you use, right?

23   A    Me and three or four other people, yes.

24   Q    Okay.

25        MR. DRESCHER:  Could we go down to the bottom

1    part of this page, please.

2    BY MR. DRESCHER:

3    Q    But on June 4th of 2015, you used the

4    alyramps@gmail.com; isn't that right?

5    A    I didn't use that e-mail.

6    Q    This is the e-mail that the realtor was

7    communicating with until you changed it to rampsfive;

8    isn't that right?

9    A    I wouldn't know.  That was not me.  I never use

10   alyramps e-mail.

11   Q    But you don't dispute that the alyramps e-mail is

12   in the realtor's file relating to the purchase that you

13   made of that property, correct?

14   A    Correct.

15   Q    I'd like to draw your attention now to Exhibit 90D,

16   and that's page 008543.

17        And you see here this is an e-mail involving

18   alyramps@gmail.com?  Do you see that?

19   A    Yes.

20            MR. DRESCHER:  And if we could look at the

21   bottom e-mail, please, Chris.

22   BY MR. DRESCHER:

23   Q    This is an e-mail from ID Creator to alyramps

24   thanking you for registering on ID Creator.  Isn't that

25   right?

1    A    Sorry.  Can you repeat your question.

2    Q    This is an e-mail from ID Creator thanking you for

3    registering on ID Creator using the e-mail

4    alyramps@gmail.com; isn't that right?

5    A    It says "thank you for registering," yes.

6    Q    Yes.  Okay.

7              MR. DRESCHER:  Can we see the upper part of it

8    now, Chris.

9    BY MR. DRESCHER:

10   Q    And in this e-mail from alyramps, using the same

11   phone number that was shared with Judy Thompson nine or

12   so months later in 2015, you write, "One of my

13   associates already created an account from your website.

14   Please see details below.  For today's order, we need

15   one card for each design attached, with hologram and

16   hi-co magnetic strip on the back."

17        Did I read that correctly?

18   A    That's correct.

19   Q    And then there's an address here that says to ship

20   it to 555 Route 78E, number 498.  Do you remember seeing

21   that address a few moments ago on the application for

22   the Chen driver's license in New Hampshire?

23   A    Yes, I remember.

24   Q    And on page 008455, this image was attached.  And

25   that's an image of the card that was found in your house

1    in June of 2016, isn't it?

2    A    I don't remember.

3    Q    Let's take a look on the ELMO.  I'm showing you

4    what's been admitted as Exhibit 101K.  Look.  It's the

5    same card.  It's the same name.  Right?

6    A    Yes.

7              MR. DRESCHER:  If we could go to page 008546.

8    BY MR. DRESCHER:

9    Q    This was also attached to the e-mail from alyramps

10   to ID Creator, and this is a card in the name of Hoa

11   Nguyen.  You recognize that name, don't you?

12   A    Somewhere.  I don't remember exactly.

13             MR. DRESCHER:  Chris, Exhibit 22, please.

14   005099.  The top, please.

15   BY MR. DRESCHER:

16   Q    That's the name of the little girl who was born in

17   1980, on September 28th, and died in 1988, isn't it?

18   Hoa Nguyen, isn't it?

19   A    Yes, appear to be.

20             MR. DRESCHER:  And, Chris, 008546547, which is

21   part of Exhibit 90D, which was another attachment from

22   alyramps, the same e-mail that Judy Thompson

23   communicated with about the Dorset property.

24   BY MR. DRESCHER:

25   Q    It had this attached to it.  Thi Tran.  And you

1    know what that name is, don't you?

2    A    I have no idea.

3    Q    You don't know?

4              MR. DRESCHER:  Exhibit 12, please, 008018.

5    Zoom up at the top, please.

6    BY MR. DRESCHER:

7    Q    That's the name of the little girl who died in

8    1989.

9              MR. DRESCHER:  Exhibit 11, please, 008012.

10   Next page.

11   Q    -- who was born in Texas in October of 1982 --

12             MR. DRESCHER:  Next page, please.

13   Q    -- whose name was amended to Ally Lynn Koo.

14             THE COURT:  Let's make sure these are

15   questions.

16   BY MR. DRESCHER:

17   Q    The questions about page 008547, which is part of

18   Exhibit 90D --

19             MR. DRESCHER:  Call that up, please.

20   Q    -- that's the name on the e-mail that you sent to

21   ID Creator in 2014, isn't it?

22   A    No, I never sent any e-mails.

23   Q    So I think you testified on direct that you had a

24   nanny named Bo; is that right?

25   A    Right.

```
1    Q    And Bo came to work for you after your house was
2    searched in April of 2014?
3    A    Correct.
4    Q    I think you said she came to work for you in the
5    summer of 2014; is that right?
6    A    Correct.
7    Q    But she only lasted with you for, what, two or
8    three months before you fired her?
9    A    Yeah.
10   Q    And you fired her because she seduced your son?
11   A    Correct.  And then later I found out she seduced
12   Matt, too.
13   Q    And you later found out what?
14   A    She seduced Matt.  She groped him.
15   Q    So she seduced your son and hit on your partner?
16   A    Correct.
17   Q    Is that correct?
18   A    Right.
19   Q    How old was your son in 2014?  He was born in 1999.
20   A    15 years old.
21   Q    Okay.  So the nanny was seducing your 15-year-old
22   son?
23   A    Correct.
24   Q    You must have called the police.
25   A    I had no evidence.  I was suspicious, along with
```

1    Matt's, and then she denied it, and I believed her.

2    Q    And you also caught her stealing, I believe you

3    testified?

4    A    Yes.

5    Q    So she stole, she hit on your partner, and she

6    seduced your son; is that right?

7    A    Yes.

8    Q    And then she shows up in 2000 -- early 2015 and

9    asks for a ride to Canada, and you give her a ride to

10   Canada?

11   A    Yeah.

12   Q    Is that -- is that your testimony?

13   A    That is.

14   Q    Okay.

15   A    I did not know she seduced Matt until recently.

16   That came out.  And for the stealing part, she explained

17   it to me, and I totally understand.  She needed cash for

18   something.  I told her, "You should just ask," and she

19   apologized.

20   Q    And Bo was the one that showed you "Changing Your

21   Identity 2013"; is that right?

22   A    For the first time, yes.

23   Q    Yeah.  And your other nanny had the exact same

24   document on the laptop that was on your kitchen counter

25   in April of 2014 when the -- when Detective Brooks was

1   there?

2   A    Yeah.  It appeared to be the same -- same document.

3   Q    Two nannies, same document, both your nannies?

4   A    One is an au pair, and one is a part-time nanny.

5   She was a manager.

6   Q    You would agree that's quite a coincident?

7   A    I thought so in the beginning, but it's still being

8   circulated on the internet as of today.

9           MR. DRESCHER:  Chris, I would like to call up

10  Exhibit 15, page 008088.  The top half, please.

11  BY MR. DRESCHER:

12  Q    So you have seen this before, haven't you?

13  A    Yes.

14  Q    In fact, this is your handwriting, isn't it?

15  A    No.

16  Q    In fact, you're the person who wrote "555 Route

17  78E, Suite 498," on the passport application, aren't

18  you?

19  A    No.

20  Q    You're the person who put down the Social Security

21  number of Thuy Tran ending in 5683 on this passport

22  application, aren't you?

23  A    No.

24  Q    And you're the person who wrote down the phone

25  number, area code (203) 564-6487; isn't that right?

1    A    No.

2    Q    That's the same number that was on the e-mails to

3    ID Creator, right?

4    A    Right.

5    Q    It's the same number that was shared with Judy

6    Thompson, the realtor, for the purchase of the Dorset

7    property on Read Farm, right?

8    A    That may be.

9    Q    Showing you what's been admitted as 15A, which is a

10   copy of the application retained by the State

11   Department.  Ms. Gu?

12   A    Yes.

13   Q    That's your picture, isn't it?

14   A    I don't think so.

15   Q    You don't think so.  Your children's names are

16   Philip --

17   A    (Witness nods head.)

18   Q    -- and Rachel --

19   A    Um-hum.

20   Q    -- and Sean.  Is that right?

21   A    Correct.

22   Q    Now, accompanying a passport application was a

23   travel itinerary.  I don't know if you remember hearing

24   about that during the testimony earlier.  But it was

25   a -- it was a Jet Blue itinerary.  Do you remember

```
 1   hearing about that?

 2   A    Yeah.  Vaguely.

 3   Q    And it was going to go to -- from Hartford to

 4   Kingston?  Remember?

 5   A    Only vaguely.

 6   Q    Okay.

 7   A    I'm discovering.

 8   Q    And you see the names of the travelers?

 9   A    Yes.

10   Q    Philip, Ally and Rachel.  Those are the names of

11   your kids, aren't they?  Philip and Rachel?

12   A    Only the first name part.

13   Q    It's quite a coincident, isn't it?

14   A    It is.

15          MR. DRESCHER:  I'd like to call up Exhibit 17

16   now, which is 8037.

17   BY MR. DRESCHER:

18   Q    This is the supplemental questionnaire that you

19   filled out when you were in the passport office that

20   day, isn't it?

21   A    No.  I don't know what that is.

22   Q    I'm sorry?

23   A    I don't know what that is.

24   Q    Well, the fellow from the passport office explained

25   that this was a supplemental questionnaire that he had
```

```
1    the applicant fill out.

2         And if we take a look at this, it says that the

3    applicant had worked at a restaurant in Ridgefield,

4    Connecticut.  Do you see that?

5    A    Yes.  Yes, I have seen it.

6    Q    In fact, your restaurant was in Ridgefield,

7    Connecticut, wasn't it?

8    A    Yes, it was.

9              MR. DRESCHER:  Can we scroll up, please.

10   BY MR. DRESCHER:

11   Q    In fact, the applicant wrote down the names of Thuy

12   Tran, the little girl who died in the 1980s.  You wrote

13   those names down, didn't you?

14   A    No, I didn't.

15             MR. DRESCHER:  Could we go to the next page,

16   please.

17   BY MR. DRESCHER:

18   Q    Let's see where this applicant went to college.

19   Where did you go to college?

20   A    St. John's University.

21   Q    Huh.  So did the same person who was applying for

22   the passport in March 2015.  You see that?  St. John's

23   University?

24   A    Yep, I have seen it.

25   Q    Pretty -- pretty big coincident, huh?
```

```
 1              THE COURT:  So let's make sure the questions
 2    are not argumentative.
 3              MR. DRESCHER:  Could I have a moment?
 4              THE COURT:  You may.
 5              (Brief pause.)
 6              MR. DRESCHER:  I'd like to call up -- I
 7    apologize.  I just want to make sure I get this right.
 8              (Brief pause.)
 9              MR. DRESCHER:  I had it just a moment ago.  I
10    apologize.
11         I am going to go back to 15A on the ELMO.
12    BY MR. DRESCHER:
13    Q    This is from the file of the passport agency as
14    well.  This was -- these are the ID cards that you
15    brought to the passport office that day, aren't they?
16    A    No.
17    Q    That's your photograph on the temporary driver's
18    license, isn't it?
19    A    Yes.
20    Q    And that's the Social Security number belonging to
21    Thi Tran, isn't it?
22    A    I don't remember who that belongs to.
23    Q    And that's the very card I just showed you that was
24    found in your residence in June 2016; isn't it?
25    A    Yes.
```

1          MR. DRESCHER:  No further questions.

2          THE COURT:  Any redirect?

3          MS. SHELKROT:  Yes, your Honor.

4                    REDIRECT EXAMINATION

5    BY MS. SHELKROT:

6    Q    Alison, there were some questions for you about the

7    rampsfive@gmail.  And I think you said that there were

8    several people who used it.  Who all used that e-mail

9    address?

10   A    Matt, me, CC, Bo.

11   Q    Anybody else?

12   A    That I can remember.

13   Q    Mr. Drescher just asked you about that Ally Koo

14   identification card that was taken from your home in

15   2016?

16   A    Correct.

17   Q    Do you know how that got there?  Do you have any

18   idea how that got there?

19   A    No, I don't.

20   Q    Did Bo ever come back to your house after you took

21   her up towards the border in 2015?

22          MR. DRESCHER:  Objection.  Leading.

23          THE COURT:  Sustained.  So she said she

24   doesn't know.  Let's move on to another question that is

25   not leading.

```
 1    BY MS. SHELKROT:

 2    Q     Did you ever see Bo again?

 3    A     Not me personally, no.

 4              MS. SHELKROT:  Could I just have a moment?

 5              THE COURT:  You may.

 6              (Brief pause.)

 7              MS. SHELKROT:  All right.  I have nothing

 8    further.  Thank you.

 9              THE COURT:  Any redirect?

10              MR. DRESCHER:  No.

11              THE COURT:  Thank you.  You may step down.

12              (Witness excused.)

13                        *** ** ***

14

15

16              C E R T I F I C A T I O N

17        I certify that the foregoing is a correct
      transcript from the record of proceedings in the
18    above-entitled matter.

19                           _____
20    January 2, 2018        _____
      Date                        Anne Nichols Pierce
21

22

23

24

25
```