UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,
                    Plaintiff,

        v.                                          Docket No. 2:16-cr-84

ALISON GU,
                    Defendants.

AFFIDAVIT OF LISA B. SHELKROT

        I provide the following, based on my personal knowledge, pursuant to the Entry Order

Directing Former Defense Counsel to Provide Affidavits, dated November 19, 2024 and as

amended by the Entry Order dated March 11, 2025:

1. Because Alison Gu's complaints about my representation are wide-ranging and because

    she has filed a number of documents with different claims, I have organized this Affidavit

    as follows: first, a background section describing the nature of the representation and

    challenges experienced; second, a section responding in order to the allegations in

    Alison's Supplemental Affidavit dated November 4, 2024; and third, a section responding

    to allegations contained in Alison's other pleadings.

2. I have tried to provide a thorough response to the allegations. To the extent that I have

    missed items of concern, I would be pleased to address them in a further filing upon

    request.

3. Considerable time has passed since my work on Alison's case, and I make this Affidavit

    based on my best recollection of events, supplemented where available by my review of

    emails, documents, recordings, and other documents that remain in my file. When I

transferred the file to successor counsel in January 2018 I did not retain a copy of Vermont Private Eye's files, so I do not have access to all the investigation notes and memoranda.

<u>Background and Nature of Representation</u>

4. I was assigned to represent Alison in May 2017 as successor counsel to Asst. Federal Public Defender David McColgin, after Alison asked to have him replaced. I believe Alison had already retained Vermont Private Eye ("VTPI") as investigator at that time. Motion practice was complete, and I understood my task was to prepare for trial.

5. On July 3, 2017 Alison provided me a "timeline" that outlined one version of her account of events. It is attached as Exhibit 1 and demonstrates the complexity of the investigation and preparation that was involved. Alison alleged a complex international conspiracy involving many individuals she believed lived overseas, and\ for whom she was unable to provide last names or contact information.

6. As complicated as the story was, it was nevertheless not consistent, which made investigation and development of a theory of defense especially complicated. While there were many versions of the story between the July "timeline" document and Alison's ultimate trial testimony in November, comparison of the two reveals some major differences on key points. Some examples are:

   a. In the Timeline Alison described meeting Mr. and Mrs. Chen (who the government alleged were both Alison's alter egos) in the summer of 2014, together with her codefendant Matthew Abel; at trial she testified that she never met Mr. Chen (AG testimony p.108).

b. In the Timeline she referred to "Mrs. Chen" and implied she was Mr. Chen's wife; at trial, she testified that Mr. Chen's wife was Jing Shao (also an alleged alter ego of Alison's) and that Ai J. Chen (female) was the sister of Aijen Chen (male). (AG testimony p.109-110).

c. In the Timeline Alison stated that her housekeeper Jenny introduced her to the Chens in fall 2013, and the Chens in turn introduced Alison to CC and Bow, both of whom worked for Alison in 2014 as nannies; at trial she testified that it occurred the other way around, and the nanny Bow introduced her to Mr. Aijen Chen. (AG Testimony p.107).

d. In the Timeline Alison wrote that she was driven to New Hampshire DMV (where she got fraudulent driver's licenses in the names of Aly Koo and Ai Chen) by Mrs. Chen; at trial testified that it was CC alone who drove her there (AG testimony p.112-15).

e. In the Timeline Alison described driving to the Canadian border in March 2015 with Mrs. Chen to get a new passport for CC, during which she had a number of drinks and became disoriented; at trial, she testified that Bow asked her for a ride to the Canadian border and that she drove Bow "another half an hour to an hour" past Burlington to a place that "looks like it's a post office" (AG testimony 117-119).

7. Meetings with Alison revealed similarly shifting versions of the facts, and it was impossible to pin her down to a story. As summer passed and we approached trial I was increasingly concerned that we did not have a consistent understanding of relevant facts or a coherent theory of defense.

8. VTPI and I nevertheless tried to contact witnesses who could help us develop some version of Alison's story and a theory of defense. Vermont Private Eye devoted several people to the investigation, including primarily Susan Randall and Rose Farley. In addition, we worked with Jonathan Couture, who was a freelance investigator. We decided fairly early on to divide the investigative work so that Jonathan did most of the financial and document investigation, and VTPI worked on identifying and developing witness information.

9. Alison was unable or unwilling to put us in touch with CC, Bow, Mr. Chen or Mrs. Chen (or the sister, if there was one.). She claimed to be working with a Chinese investigator named Mr. Wong, but could not or would not put us in touch with Mr. Wong despite our repeated requests.

10. As the deadline for disclosing defense witnesses approached (I believe it was October 12, 2017), Susan Randall and I were increasingly worried that we had no witnesses who could corroborate any portion of Alison's story. We spoke to Alison repeatedly about this concern, about our need to identify, contact and disclose defense witnesses if we wanted to use any of them at trial.

11. In the meantime, Susan Randall went to New York City several times and spoke to witnesses Alison had told us about who could discuss her abusive relationship with her ex-husband or other peripheral parts of the Timeline she had provided us. A number of them were excluded from our witness list because they insisted that Alison had stolen from them, lied to them or forged documents.

12. Meanwhile, Alison continued not to provide us information about any witnesses who could talk about the actual events surrounding the alleged mortgage fraud or passport

fraud. We continued to press her for names and contact information. She continued not to put us directly in touch with her Chinese investigator.

13. As we continued to prepare for trial I emailed to Alison a number of written "theories of the case" in which I tried to outline analyses of the evidence, approaches to a coherent narrative, and witnesses (defense and prosecution) who could present the defense. I would ask her to comment and fill in factual gaps and questions. I sent a version of this document to her on October 11 (among many others), and explained that it was my assessment of the best available defense theory. I understood that it was not necessarily consistent with what she would testify to, if she choose to testify. I wanted to be sure she was in agreement with the strategy, since it would as a practical matter make it difficult for her to testify. The document contained a number of questions for Alison, only some of which were ever answered by her.

14. Rather than respond directly to the document, Alison instead emailed me on October 11, the day before the witness disclosure deadline, a document with seven new witnesses: Xiaoyi ("Wendy") Wu; Ying Chen ("Melanie") Liu; Li Zhang; Qing (Allen) Liu; Wenyu ("Wendy") Fan; Lily Hu; and Bao ("Jack") Qu. The document contained a summary of each person's expected testimony, their dates of birth and phone numbers. It is attached as Exhibit 2. She advised that they did not speak English.

15. I had never heard most of these names before. I didn't understand how she had suddenly gotten these names and all their contact information, when I had been asking for this for months. I told Alison that we would not be able to interview them before the disclosure deadline, but that VTPI would start working immediately on contacting them, and that if they were useful, we would attempt a late disclosure.

16. The same day, Alison offered me photographs of both CC and Bow, and said she was working on getting a picture of Lida Han, all of which she later provided me.

17. Also in an email chain on October 11, I told Alison I continued to have questions about major factual issues in her case, including: "1. Who used the alyramps gmail and name Aly Ching to order a bunch of Johnson State College ids in October 2014 and have them sent to your house in Cheshire? 2. Who appeared at closing 9/28/15 for Dorset? 3. Who created the fake NH drivers licenses with your picture on them and how? Similarly, who put these docs in your house? 4. Who created the Lee & Simmons fake firm and manufactured all the name change documents?" Alison's answer to each question was some combination of CC, Bow, or Mr. Han. She asked me about getting an expert witness to testify that the person on the video at the passport office was not her, and I responded that I did not think it was an appropriate area for expert testimony.

18. I had challenges getting documents from Alison. For example, she provided a digital version of a Chinese power of attorney that she said provided authority authorizing Alison to appear as Mrs. Chen for real estate closings. However, she was unable to produce an original or account for where it had come from, and she implied that the original had disappeared during the government's search of the Cheshire, CT home. I told her I had concerns about it being a forgery and would not offer it (or other similar documents) in evidence without some confidence in their authenticity.

19. Alison had written in her October 11 witness list that Wendy Wu was Mrs. Chen, which was extremely interesting, since Mrs. Chen was allegedly one of Alison's alter egos. Given the centrality of Mrs. Chen to the case, I was surprised that Alison hadn't told us her other name or identifying details until so close to trial. She then told Susan Randall on

6

October 15 that "of course" Ai Jen Chen and Mrs. Chen are not real, but that the witnesses could talk about the conspiracy to pretend Ai Jen Chen and Mrs. Chen were real. Alison told one of Susan's co-workers the same day that Wendy Wu really was Mrs. Chen, but that Wendy Wu was not available for an interview on October 15 as previously scheduled. This was characteristic of our interactions: Alison's stories were ever-changing, and she seemed to be managing the witnesses behind the scenes, but would not make them available to us without her mediating the conversations.

20. VTPI arranged to interview the new Chinese witnesses with an interpreter. At first several of them would not speak to VTPI, which Alison attributed to cultural differences. When they did ultimately agree to speak to VTPI, they provided exactly the information Alison had summarized for us. Susan Randall, Rose Farley and I discuss on several occasions our concern that Alison was coaching the witnesses, because it was uncanny how closely they hewed to her summaries. We even hypothesized that Alison herself was the mysterious Chinese investigator Wong. We nevertheless arranged for a New York licensed investigator and certified court interpreter to serve subpoenas on Lili Hu, Sisi Hailai, Ying Chen (aka "Melanie") Liu, and Baogang (aka "Jack") Qu. I believe I also had Zheng Zhang and Wendy Fan served, but cannot locate the returns of service at this time.

21. I asked Alison repeatedly not to discuss the facts of the case with potential witnesses, but only to put them in touch with me or VTPI and allow us to develop the facts. I did this because of my concerns about her coaching or scripting the witnesses. She continued to ignore this advice. She continued not to put us in touch with the Chinese investigator who was supposedly finding the witnesses for us. At one point she sent me unsolicited a

written statement from her father about her ex-husband's and Matthew Abel's abuse of her.

22. At some point between October 11 and October 23, Alison sent us contact information for "Sissi Hailai," aka "CC."  VTPI interviewed CC, who according to Alison was one of the two major players in the conspiracy against her. I attach as Exhibit 3 the VTPI interview summary. I noted that Sissi said she had been communicating with Alison.

23. As late as October 21, nine days before jury draw, I was still sending Alison revisions to the narrative as I understood her version of events, with significant questions and holes. She would occasionally respond, but during this period of time she was more focused on buying her Vermont house out of foreclosure.

24. Jury draw began October 30, followed immediately by trial. The government rested on Friday November 3, and I began presenting the defense case that afternoon.

25. We made arrangements for seven witnesses to come from New York to Burlington to testify on Monday, November 6. Because we understood they were Chinese-speaking, we arranged for an interpreter to be present as well. My associate, Manisha Munshi, made travel arrangements for the witnesses, including booking hotel rooms for the witnesses and the interpreter.

26. Manisha and I worked on trial preparation at my office in Burlington on Saturday, November 4 as we waited for the witnesses to arrive. I received periodic updates by email regarding their progress to Burlington. Three witnesses eventually arrived at my office together. The remaining four were scheduled to arrive on Sunday.

27. Manisha, our interpreter Simon, and I met indvidually with Ying Chen "Melanie" Liu, Zheng "Allen" Zhang and Baobang "Jack" Chu to prepare them for their testimony. I had

outlined direct exams for each of them based on the information that had been provided to me. I can't recall the order in which we met with them, but I do recall that at the end of the last interview, I asked the witness how they had come to be at my office that day. It was a persistent question for me, because I had never been able to get a clear answer about who was acting as the intermediary with these witnesses.

28. The witness answered by saying something like, "It's for the movie." I asked, "What movie?" The witness said something like, "Are you a real lawyer?" I answered that I was a real lawyer, with a real case and real client, and we were going to real court on Monday, where the witness would be expected to take a real oath. As I asked additional questions, it became clear that the witness had been recruited to come to Vermont to play a part in some kind of movie or other performance. He had no actual knowledge about any of the facts I had been questioning him about, other than what he had been coached to say.

29. Manisha, Simon and I were flabbergasted. I asked the witnesses to wait while I called Susan Randall and told her I needed her to be present on a phone call with me. I then gathered all three witnesses together in our conference room, along with Manisha and Simon, and put Susan on speaker phone so she could hear and participate in the call. I recorded the conversation and told everyone I was doing so. I have a copy of this recording.

30. First I reassured the three that they were not in trouble, and that they had not done anything wrong, but that I needed to understand what had occurred. In sum, what I learned was this: The three "witnesses" at my office were actors. They had responded to an ad in a Chinese language newspaper in New York looking for people to perform their roles. They were to be paid upon their return, and had not received any compensation yet. They had

never heard of the Chinese "Investigator Wong" that Alison had been telling us about, and their only contact had been with someone named Lily. They had been given scripts and photographs to prepare them to play their roles. They showed me information on their cell phones, and Manisha took photographs. Manisha's photographs from that day are collected in Exhibit 4.

31. Some of what we saw were:

    a.   contacts with "Lily," and a phone number for her;

    b.  a Chinese document with certain items written in English, which the witnesses told us was the "script" they were working from;

    c.  photographs of places relevant to the case or the story they were to testify to (including Alison's properties in Connecticut and Vermont, the St. Albans passport office, a shopping center in St. Albans, and a Chinese restaurant);

    d.  photographs of Alison, her family, and other "people" related to the case, including photographs of Bo, CC, and Lida Han identical to those that Alison had sent me a couple weeks earlier; some of these are photos I had never seen from any source other than Alison.

    e.  photographs of items that had been produced in discovery, including a driver's license, (fake) social security card, and TD Bank card in the names of Aijen Chen, Ai J Chen, and Ai Chen.

32. Each of the three witnesses had photo identification that suggested they were using their own names, but the stories to which they were prepared to testify were entirely fabricated and supplied to them by someone else.

33. I also asked the "witnesses" about their knowledge of the additional "witnesses" who were scheduled to arrive on Sunday for preparation. I was told that they had been in touch with each other, and that the people who were arriving on Sunday were also actors. I thanked them for their honesty, assured them again they were not in trouble, and sent them home to New York.

34. I then called Alison and told her I needed her at my office first thing the next morning.

35. In the meantime I consulted with one of my partners about my ethical duties in the situation. I told him what had happened and explained my concerns about presenting perjurious testimony from Alison. We determined that it was my obligation to present her testimony if she wished to testify.

36. Alison arrived as scheduled early on Sunday November 5. Manisha, Susan and I met with her in my office and told her I was recording our conversation. I have a copy of that recording in my possession.

37. I explained to her what had occurred: that the people who came to Vermont were actors, not witnesses, that I had sent home the people who had appeared and canceled the ones who were supposed to come on Sunday. I told her I could not trust that any of them were real people and that I was not putting on any of the Chinese "witnesses" who could corroborate her story about Lida Han and the conspiracy. Alison claimed not to know anything about the plot. She suggested that maybe the second set of people who had been scheduled to come on Sunday might not be part of the scheme, and wondered if I could put on Jenny or CC. I was emphatic that I did not believe I could ethically present any of these people given the likelihood that they were not authentically who they said they were.

38. I believed that Alison had been behind the plot and told her so. I was both shaken and angry in light of how much time and energy our team had spent investigating, serving, transporting and preparing these "witnesses," and how close I had come to unwittingly defrauding the court. My assessment that the remaining witnesses were likely fraudulent, just like the three I had met with, rested on the following factors (in addition to the fact that the people I met told me the remaining "witnesses" were also actors):

   a. All of them had been presented to me at one time, in a single slate, on October 11. Prior to that date, despite by repeated urgings, I had been unable to get contact information or even names for the witnesses Alison had been telling me about. This led me to believe that they likely came from the same source, whatever it was.

   b. Alison had been telling me and Susan about the Chinese investigator Wong, but she could never put us directly in contact with him. She never even attempted to explain how she had suddenly come into contact with these critical witnesses.

   c. Susan and I had observed previously that the witnesses seemed scripted, and we had worried that Alison had been directing their testimony. We had repeatedly cautioned her not to speak to witnesses about their substance of their testimony in an effort to avoid that problem.

39. Another contributing factor in my assessment was the timing of the revelation. This encounter occurred over the weekend after a week of trial, when we were scheduled to continue presenting our case Monday morning. We had no time to do a thorough investigation of whether any of the remaining "witnesses" were anything other than

actors. Even if they were real – which I thought highly unlikely – their pieces of the story made no sense without the fake actors I had already sent home.

40. I did tell Alison I had no intention of investigating who had arranged the fraud. We had no time to do so, and it ultimately didn't matter.

41. My conversation with Alison turned to an assessment of the evidence up to that point and her decision whether to testify. I told her it was her right to do so but that I advised against it. I told her any time the defense presents evidence it has the potential to confuse the jury about who has the burden of proof, regardless of the clearest of instructions on the subject. I told her she would be subject to intensive cross-examination with the many false statements in the record. I discussed with her in great detail that I thought it was a bad idea for her to testify because of the likelihood that she would suffer devastating cross-examination. I went through some of the items that could be used on cross, and finished that despite everything, "If you are insistent on testifying, it's your right to do it, and it's my obligation – and I've looked at it, so I can tell you it's my obligation to do it with you – I'm not happy about it, but I'll do it, because I have to." She asked what she could say that would helpful, and I told her I thought nothing she could say would be helpful, and that it was a "terrible idea" for her to testify. I told her I thought the story she was likely to tell was not believable on its face, and was unlikely to be believed by the jury.

42. I said that I could argue without her testimony that there was a lack of proof of motive, a lack of witness identification of Alison as the one who presented the Aijen Chen ID, the lack of an identification from the passport agent, the possibility that it was any one of the many people with access to the Connecticut house who had created the forgeries, the lack

of computer forensics to show who was using or sending emails, and the lack of phone records corroborating the government's theory.

43. Alison tried to convince me that I should still call CC and Jenny as witnesses and that I should investigate what had happened with the "witnesses." She said that if I would put Jenny on the stand she would consider not testifying. I had met or spoken with Jenny earlier in the fall and she had little or no relevant information. On October 29, Alison had told me Jenny was in New York and did not want to testify, even though I had her under subpoena. I believe I spoke to Jenny that evening (October 29), although I cannot be completely certain; I do have a file saved on October 29 that is a proposed direct examination of Jenny. Susan and I told Alison we were extremely suspicious that Jenny could be helpful based on our earlier interview of her, but ultimately we agreed on November 5 to re-interview her if she came to Burlington. We had an interpreter who was scheduled to come to court on Monday morning so we could have put her on the stand. I remained unwilling to call Sissi//CC, who I was reasonably confident was another fake witness/actor.

44. We discussed the state of the evidence against her. Alison asked about Matt Abel testifying, and I told her (as I had previously) that I wouldn't call him because he had already admitted in his plea that he and Alison had acted in concert in their fraud.

45. Alison raised the question of a bench trial and said she thought Judge Reiss would find her not guilty. This was only the time she had mentioned it other than in an email on October 7. I don't remember a specific conversation about it other than on November 5, mid-trial. I did not think it was a good idea.

14

46. Alison determined that she wanted to testify, and so I spend the remainder of my time with her that Sunday preparing her testimony. Early Monday morning she emailed me documents outlining her proposed testimony and that of Jenny (who did not come to Burlington on Monday) and her father. Alison's November 6 outlines are attached as Exhibit 5. I continued not to think Jenny's proposed testimony would be helpful.

The Supplemental Affidavit

47. I offer the following in response to specific items raised by Alison in her Supplemental Affidavit, ECF 442-1, in the following paragraphs:

48. Paragraph 2: Alison raises the question of my trial experience. It is true that as of Alison's trial, I had tried one federal criminal case to verdict before Alison's. As a former public defender and long-time litigator, however, I had tried dozens of jury trials, including numerous state criminal trials in New York and Vermont, and state and federal civil jury trials, as well as numerous bench trials.

49. Paragraph 3: Alison says I told her to limit email correspondence with me. I do not remember saying any such thing and cannot imagine why I would have done so. I have extensive email communications with Alison.

50. Paragraph 4: Alison claims we spent little effort investigating her case. In fact, Vermont Private Eye did extensive investigation. One person did financial investigation, and two people did witness interviews. Susan Randall travelled to New York on multiple occasions to meet with witnesses. We were constantly trying to run down information and leads she gave us. Alison was adamant that she was innocent of the charges (and remains so to this day, as I understand it), and never expressed any interest in plea negotiations. She did not even authorize me to engage in such negotiations until October 4. The government made

an offer on October 5 with a deadline of October 6. Alison was uninterested in the plea offer and refused to meet with me to discuss it. I wrote a memo to the file about her refusal.

51. Paragraph 5: The defense was well-funded. I got approval for a substantial investigation budget, including Chinese language interpreters. I don't know what Alison is referring to about my letting "existing evidence from [her] state case investigation be introduced into our case a few weeks before trial." Alison sent me an email on October 7 asking about a bench trial and suggesting that Judge Reiss might be "less likely to be biased," and that she might "get a reduced punishment" because trial would be shorter. "This is just my gut feeling right now, it certainly needs some more exploring." I don't specifically recall discussing this with her after that date, although if we did I would likely have advised against it. Alison did not raise the issue again until November 5, when we met in my office about the fake witnesses and her testimony. I don't know what she is referring to regarding forensic witnesses that I supposedly refused to contact. If there was a "New York legal team" working on her Vermont case, this is the first I have heard of it; I certainly never heard that such a team had recommended "independent experts."

52. Paragraph 6: I don't understand what Alison is referring to with the respect to the Dorset property. I agree that I refused to represent her in the foreclosure of the Dorset property. I am unaware of any false statements made by the Bank of Bennington attorney, Daniel Young, during his testimony on November 3, 20217. He testified about Alison's purchase of the property out of foreclosure.

53. Paragraph 7: I don't recall discussing Agent Stella with Alison, but also don't think it would have been helpful to call the case agent as a witness. I did not have evidence of

improper "collusion" between him and Det. Brooks. Alison claims that she "instinctively denied" she was "Alison Ling" and that I should have cross-examined Det. Brooks on that subject; however, I don't think cross-examining Det. Brooks about that fact would have been useful, and I don't know what it is that Alison thinks could have been addressed in cross.

Alison also complains in Paragraph 7 that I did not "present important facts" regarding Bo (aka Bow, Ting Ting, Jinata Lee, according to Alison), her former nanny, and complains that I did not use "all [Bo's] identifications, which [Alison] provided to [me]." Alison's insistence now that Bo was a crucial person in our theory of defense was not consistent with what she told me during the course of our relationship. In the Timeline she sent me early on, she fired Bo in 2014, and Bo did not play any role after that. In most versions of Alison's story to me, CC was the one who was more involved than Bo. Alison never could provide any solid information about who Bo was (although she said she and some others called Bo "Ting Ting"), but she did belatedly offer us contact information for CC, aka "Sissi" Hailai. CC/Sissi told VTPI she was the one who drove Alison to NH DMV to get the fake licenses, and that she was the one who asked Alison to deliver documents to her near the Canadian border. I was prepared to call CC/Sissi as a witness until the fake witness plot was revealed on November 4, and the people I spoke with told me that CC/Sissi was similarly an actor who had responded to the same ad they did.

Matthew Abel was never seriously considered as a defense witness because he stipulated as part of his plea agreement to facts establishing Alison's guilt in fraudulently obtaining multiple mortgage loans under false aliases.

I disagree with much of Alison's account of our meeting on November 5 at my office, although as noted above I had no intention of launching an investigation at that stage of who had arrange the fake witnesses.

I note that Alison was not at all "kept in the dark" about our investigation of the case. VTPI and I kept our discovery and investigation materials in a Dropbox folder so that we could easily share and update materials for each other. It is my recollection that Alison had access to the entire Dropbox file.

54. Paragraph 8: VTPI did an extensive interview of Jackie Chan, one of Alison's real estate attorneys. I have notes of that interview. I did not think it was particularly helpful, and he did not know anything about Han's illicit activities. I didn't think his background character evidence was worth waiving attorney-client privilege to have him testify.

I don't recall learning that Jenny was in Vermont to testify on November 6. I do have an email from Alison early in the morning on November 6 attaching an outline of proposed testimony from her father and Jenny, and saying that "Jenny felt bad and would like to testify if it helps me," and suggesting that I "not ask her any confusing questions." This suggests to me that I tried speaking to Jenny on November 5 and she was unable to offer the information Alison thought she could. The outline does not suggest that Jenny's information was especially relevant. It is attached as Exhibit 5. I did not try to dissuade Jenny from testifying on account of her immigration status. To the contrary, Alison had

emailed me on October 29 that Jenny's daughter raised this concern. My response was that Jenny was under subpoena and was expected to be present.

Alison's affidavit is the first time I have ever heard of her having contact with Jing Shao at any time, let alone mid-trial. Given that the government alleged Jing Shao was one of Alison's aliases, I would have been extremely interested in knowing that she was a real person and could be contacted. In the same vein, I am surprised to read that CC was "her [Jing Shao's] daughter." This is another twist in Alison's story that has never appeared elsewhere.

55. Paragraph 9: Aiding and abetting would not have been a lesser offense. My difficulty in delivering a "compelling" defense was the result of (1) overwhelming evidence against Alison; and (2) Alison's refusal or inability to supply a coherent and consistent narrative of what had really occurred, coupled with her utter lack of transparency about who the supposed witnesses were, how to contact them, and what communication she was having with them. That said, I believe I assembled a coherent theory of defense, given the limitations of the available evidence against Alison.

56. Paragraph 10: I did not have or admit "prejudices" against Alison. I did not either believe or tell anyone that my compensation as a CJA lawyer was inadequate; to the contrary, I routinely tell potential clients it is in their interest to seek to have me appointed, if possible, rather than pay my private hourly rate. I don't know what facts Susan Randall supposedly provided that supported ineffective assistance on my part, but I have spoken to Susan many times about this case and would be very surprised if she believed I was ineffective in the matter. I did not discourage Alison from seeking new representation.

The first time I knew she was seeking new representation was when Attorney Paul Volk filed his notice of appearance. I have an email from Matt Abel asking me to speak to Attorney Paul Goldberger in late November, but I am not certain if I did or not. I produced my file to Stacey van Malden and Paul Volk in early January 2018. I produced some duplicate materials to sentencing counsel Natasha Sen in December 2018 (upon release by Alison). I re-produced everything to Alison in June 2022 upon her request

57. Paragraph 11: I have addressed the fake witness scheme above.

Other Allegations from Gu's Supplementary Brief for Motion under 28 U.S.C. §2255 (doc. 407-1)

58. As with Attorney Chan, I determined that Philip Russell did not have sufficiently relevant information to justify the waiver of attorney-client privilege. The topics Alison identifies would not have been particularly material to the charges.

59. As discussed above, I did not believe calling the case agent would have been beneficial to Alison's case. The deadline for filing motions to suppress (including by challenging the search warrant) had expired before I was appointed in the case. I have addressed above my reasons for not calling additional witnesses.

60. I believe I conducted appropriate and effective cross-examination of both law enforcement and lay witnesses, consistent with our theory of the case.

61. I did not discourage either Alison or her father from communicating with me by email. I did, as discussed above, try (unsuccessfully) to dissuade Alison from discussing the facts of her case with anyone, including her father, who was not in a privileged and confidential relationship with her. I did this both to prevent such communications from becoming public and to avoid Alison coaching witnesses.

62. Alison's claim that I "failed to connect with Chinese private investigator Wong and his team" is farcical. Susan Randall and I begged Alison to put us in touch with him throughout the fall of 2017. Her refusal to do us led us to suspect that Wong did not exist.

63. It was not part of my representation as CJA counsel to represent Alison in connection with the repossession of her Dorset house. I told Alison I would not and could not represent her in that matter. She had a stable of civil and real estate attorneys with whom she had worked over the years, and was fully competent to consult with them if she had questions about that matter. In any event, I have no reason to believe that it was repossessed unlawfully.

I declare that the above statement is true and correct to the best of my knowledge and belief. I understand that if the above statement is false, I will be subject to the penalty of perjury or to other sanctions in the discretion of the court.

DATED at Burlington, Vermont this 22nd day of May, 2025.

LANGROCK SPERRY & WOOL, LLP



_____

Lisa B. Shelkrot

2541195.v1