## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>ALISON GU, a/k/a ALISON LING,<br>Defendant. | Docket No. 2:16-cr-84-1 |

## POST-HEARING SUPPLEMENTAL MEMORANDUM
## IN SUPPORT OF § 2255 MOTION

### I.    INTRODUCTION

This Supplemental Brief is submitted in further support of Petitioner Alison Gu's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. It provides newly discovered facts, affidavits, and contemporaneous documentation that clarify and expand upon the core constitutional violations previously raised. These include ineffective assistance of trial counsel, suppression of exculpatory and mitigating evidence, strategic abandonment of viable defenses, and subsequent failures of postconviction standby counsel to ensure Petitioner's meaningful participation in her own case.

This filing also directly responds to concerns raised by the Court at the Rule 8 hearing on June 23, 2025 - specifically the question of whether Petitioner had outside assistance preparing her postconviction filings, and whether the deficiencies in her original defense were strategic or systemic. Through sworn affidavits, including that of her father, a retired educator, Petitioner demonstrates that she has independently developed the legal skills necessary to pursue her claims.

More importantly, this brief establishes that the original defense breakdowns were not matters of trial strategy but failures of investigation, communication, and constitutional duty.

Petitioner respectfully submits that these errors, individually and cumulatively, undermined the integrity of the adversarial process and resulted in a wrongful conviction. The facts presented herein justify relief under the Sixth and Fourteenth Amendments and warrant either vacatur or an evidentiary hearing.

## II.    PROCEDURAL BACKGROUND

On February 28, 2023, Petitioner Alison Gu filed her initial pro se motion to vacate her conviction under 28 U.S.C. § 2255. (ECF No. 407). Followed by Government's motion to transfer the petition to the Court of Appeals on the ground of successive 2255 (409), the district court granted the motion after Petitoner failed to respond due to not receiving notices (412).

In December 2023, ASUS of the District of Vermont petitioned the court to initiate yet another SVR proceeding against the Petitioner, with circumstances once again stemming from Petitioner's mentally illed son. Petitioner represented herself and advocated to have the case moved to her home district court in Conneticut, Vermont District Court granted her request and allowed the case transfer. Within two months, allegations against Petitioner were dismissed at both state and federal level, when Petitioner was effectively represented by her court appointed public defenders – attorney Tracy Hayes of the District of New Haven, Connecticut, and attorney Alexandra O'Keefe of Meriden, CT. (Exh. AS, Page 1-4)

In September of 2024, following Petitioner's pro se motions, a mandate was issued by the 2nd circuit court of appeals to remand 28 USC 2255 motion back to the district court.

On November 4, 2024, Petitioner submitted a detailed supplemental memorandum and supporting affidavit. (ECF No. 442). The Court subsequently directed Petitioner's former attorneys, Lisa Shelkrot and Mark Oettinger, to submit affidavits addressing the ineffective assistance allegations. (ECF No. 443).

On December 5, 2024, Shelkrot moved to amend the Court's order, requesting leave to file materials under seal or in camera. (ECF No. 444). On February 28, 2025, Shelkrot filed a request for oral argument regarding her sealing motion. (ECF No. 447). Following that request, the Court issued a Notice of Hearing (ECF No. 450) on March 7, 2025, scheduling a hearing for June 23, 2025. Both Shelkrot and Oettinger submitted their affidavit shortly before the hearing in May. (ECF No. 453 & 456).

The Government did not submit its opposition to Petitioner's § 2255 motion until June 20, 2025 - just three days before the hearing. (ECF No. 466). Meanwhile, Petitioner filed a motion to appear remotely (ECF No. 460), a renewed motion for appointment of counsel (ECF No. 461), and an objection to Shelkrot's selective disclosure motion (ECF No. 462). The Court granted the objection in part via Text Order (ECF No. 464) and denied the remaining motions. (ECF No. 463 & 465).

At the June 23rd Rule 8 hearing, the Court clarified in response to Petitioner's question that "granting in part" meant no sealed or in camera submissions had been accepted or relied upon. (ECF No. 468 Tr. 20:17 – 21:2). The Court reiterated that all affidavit exhibits were part of the public record and available to Petitioner, emphasizing transparency. Following the hearing, the Court directed Petitioner to submit a supplemental post-hearing memorandum by July 7, 2025.

This Post-hearing Supplemental Memorandum now offers sworn affidavits and corroborating evidence that directly rebut key points in the government's opposition and trial

counsel's explanations. It also introduces new factual material that further substantiates Petitioner's claim for relief under § 2255.

Due to the short two-week deadline set by the Court during the June 23 hearing - and the July 4th holiday falling within that period - Petitioner filed a motion requesting a one-week extension to complete this memorandum. The extension was sought in hopes that three additional witness affidavits could be obtained and incorporated into this filing. As of the time of this writing, the Court has not yet ruled on Petitioner's request.

## III.    PETITIONER'S PERSONAL EFFORT AND DEVELOPMENT IN BRINGING THIS MOTION

### Pro Se Credibility and All In Her Own Words

At the Rule 8 hearing, the Court noted that Petitioner's filings "read like they were written by a lawyer," raising the possibility of ghostwriting or outside help. This view misinterprets both the timeline and the circumstances. At the time of trial, Petitioner had no legal training and no understanding of procedural law. Her legal knowledge developed only after her conviction - driven by necessity and the lack of meaningful representation.

As shown in her December 2023 post-conviction filing (ECF No. 418), including 798 pages of exhibits, Petitioner taught herself legal writing through countless hours of study and practice under restrictive conditions. Exhibit I-1 contains her earliest work assisting fellow inmates - raw, self-directed, and earnest. Additional samples appear in Exhibits R-2 and Z. These materials are not the product of legal professionals but the result of independent, unpaid labor.

Petitioner's father, a retired educator, confirms in his affidavit (Exh. A) that this learning occurred without legal aid, funding, or staff - only perseverance and purpose. If needed, Petitioner can provide her MIT thesis and Boston University transcript to further illustrate her capacity for rigorous, self-directed work.

Petitioner's post-conviction conduct further evidences her diligence and credibility. Acting pro se, she successfully nullified four separate criminal charges against her between 2018 and 2024 - including three state charges and one federal SRV allegation. These matters were all linked to the original 2017 federal conviction and demonstrate her sustained effort to contest and clarify the record. (Exh. AS) This pattern not only supports Petitioner's factual narrative, but also highlights the broad collateral impact of the conviction and the necessity of a just resolution.

A comprehensive timeline of Petitioner's filings, trainings, and legal contributions put together by the Petitioner herself is attached as Exh. B (see also ECF No. 418, Exh. Z). It documents over 100 entries across six years. This is not a sign that Petitioner was never harmed. It is evidence of the lengths she had to go to recover from that harm. That she eventually did the job of her trial counsel is not a mitigating factor - it is part of the damage.

## IV.    FACTURAL DEVELOPMENT SUPPORTING CLAIM AGAINST SHELKROT

### A.    Identity and Forensic Evidence

#### 1.    Expert Witness Failure

Attorney Shelkrot failed to retain or consult any forensic or identity expert to analyze the government's key evidence - including video footage and photographic stills allegedly depicting the Petitioner. This omission was particularly damaging given the centrality of visual identification to the government's case. No fingerprints, confessions, or

eyewitness accounts linked Petitioner directly to the underlying acts. The prosecution's theory relied almost exclusively on a contested visual match.

From the very start of her federal case, Petitioner expressed the need for expert assistance. During her initial meeting with her first court-appointed attorney, David McColgin, she raised concerns about identification issues, requesting the help of a qualified expert. Subsequent oral requests were also made to Attorney Shelkrot, in her own 2025 affidavit admitted receiving these inquiries. Her response was dismissive: Shelkrot told Petitioner she was "barking up the wrong tree" and later said that "the burden of proof did not lie with [Petitioner], but with the government" (ECF No. 453).

Petitioner located and contacted two qualified experts - Dr. Esam Dajani and Dr. Paul Abato - who were willing to assist with forensic issues relevant to the defense, including involuntary intoxication and drug metabolism timelines. Both provided detailed email responses outlining the support they could offer and requested to be contacted by counsel to proceed. Petitioner forwarded their information to Attorney Shelkrot on September 20, 2017, but there is no record that counsel followed up or retained either expert. (Exh. C)

Petitioner took this step on her own after realizing that her defense team would not act without Attorney Shelkrot's explicit approval. On multiple occasions, Shelkrot insisted on acting as a gatekeeper for all investigative activity, instructing Petitioner to route "all requests and ideas for investigation" through her so that she could "filter through it, decide what is helpful, and prioritize" it herself. (Exh. D) This centralized control not only delayed legitimate leads but stifled Petitioner's efforts to introduce critical expert support.

In addition to forwarding expert contacts and initiating her own outreach, Petitioner also attempted to provide counsel with supporting research materials to justify retaining a forensic expert. On September 22, 2017, she emailed Shelkrot a scholarly article concerning forensic identification bias and the use of expert testimony in contested ID cases. (Exh. E) Rather than acknowledge its relevance, Shelkrot responded dismissively, suggesting the email appeared to be a "spam trap." This interaction underscores counsel's disregard for Petitioner's efforts to meaningfully engage in her own defense and highlights the broader failure to pursue expert consultation despite clear notice and supporting rationale.

Despite Petitioner's proactive outreach to both Dr. Dajani and Dr. Abato - experts willing to address issues of identity misattribution and involuntary intoxication - there is no evidence that Shelkrot followed up with either to obtain an expert opinion. Petitioner's attempts to secure forensic support were not merely ignored - they were actively derailed by counsel's insistence on unilateral control. The resulting lack of expert testimony left the government's central identification claims entirely unchallenged, violating Petitioner's right to an adequate defense under *Strickland*[1].

Courts have long recognized the importance of expert testimony in cases involving video and photographic evidence. See *United States v. Smith*[2], reversing conviction where visual identification was contested and no expert was offered to rebut assumptions. Here,

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984): ineffective assistance of counsel requires showing (1) that counsel's performance was objectively deficient, and (2) that the deficiency prejudiced the outcome - meaning there is a reasonable probability that, but for counsel's errors, the result would have been different. This dual standard protects both the fairness and reliability of criminal proceedings.

[2] *United States v. Smith*, 870 F.3d 1237 (9th Cir. 2017): reversing conviction where identity was disputed, and no expert was presented to rebut video-based assumptions.

the failure to retain an expert deprived Petitioner of the opportunity to challenge the very foundation of the government's theory.

Under *Strickland*, trial counsel has a duty to investigate and present expert testimony where the prosecution's case hinges on specialized interpretation of technical evidence. The failure to do so not only weakened the defense - it left the prosecution's claims entirely untested.

2.    *Matthew Abel – Co-Defendant*

Attorney Shelkrot's failure to explore or develop critical identity defenses was especially evident in how she handled evidence related to co-defendant Matthew Abel. Despite the availability of defense strategies involving Abel - either as a cooperative witness or as an alternative suspect - Shelkrot failed to pursue any avenue that could have meaningfully shifted the trial's outcome.

Abel and Petitioner had executed a Joint Defense Agreement in late September 2017, with the intention of mounting a coordinated defense. Documentary evidence - including the signed agreement and an email confirming its transmission to counsel (Exh. F) - shows that Shelkrot had full awareness of this strategy. Yet, she never interviewed Abel, never asked him to review the government's video or passport evidence, and never followed up on his availability to testify. After learning that Abel was willing to testify at trial, Shelkrot advised keeping him out of the courtroom, stating that his presence might create a negative impression on the jury. (Exh. G)

One of the core tactical options discussed early in trial preparation was a "point to the empty chair" strategy: if Abel took a plea and declined to testify, his absence could be used to create reasonable doubt. Shelkrot initially affirmed this approach, presenting it as a viable alternative to a direct confrontation defense. However, when Petitioner declined the government's plea deal - based on Shelkrot's inaccurate and inflated estimation of sentencing exposure - Shelkrot not only abandoned the strategy but also failed to pivot to any alternative defense theory.

Her sentencing miscalculations further compounded the issue. In an October 6, 2017 email, Shelkrot warned Petitioner that going to trial could result in a sentence of 210–240 months - nearly four times the actual sentence imposed. (Exh. H) These inflated projections placed undue pressure on Petitioner to accept a plea and undermined trust in counsel. Worse still, Shelkrot insisted "it was too late" to negotiate better terms, even though trial had not yet begun. Her guidance was based on a mechanical reading of the guidelines and omitted any reference to mitigating factors or legal alternatives.

Only later did Petitioner learn that, despite Shelkrot's claimed experience, she had only tried one case in the District of Vermont prior to this one. (ECF No. 442 Suppl. Aff. ¶2). Her lack of preparation and discomfort with trial advocacy became apparent during the proceedings. Petitioner overheard Shelkrot tell Abel's attorney, Craig Nolan, "You are lucky to avoid a trial" - a remark that suggests Shelkrot was more concerned with her own risk exposure than her client's defense. The abandonment of the Abel strategy, and Shelkrot's refusal to cross-reference identity leads or leverage Abel's position, left the defense with no coherent narrative.

An opportunity to shift the government's identification theory came when Petitioner suggested a bench trial - a format better suited to the nuanced financial and forensic issues involved. In an October 2017 email, Petitioner urged Shelkrot to consider Judge Reiss's competence and fairness as a reason to proceed without a jury. (Exh. I) The suggestion was ignored. Shelkrot did not follow up or present any strategic rationale for rejecting the proposal. Instead, she pressed forward with an unprepared and unsupported trial plan.

Petitioner raised the idea more than once, in both contemporaneous emails and later sworn affidavits, emphasizing that a bench trial could better accommodate the cultural misunderstandings and evidentiary complexity that a jury might misinterpret. Yet Attorney Shelkrot dismissed the request outright, calling it "not a good idea" without further explanation. She never submitted a written motion under Rule 23(a) or sought the Government's consent - both prerequisites for a valid bench trial waiver.

Petitioner did not learn of these procedural requirements until long after the fact, during discussions with appellate counsel (ECF No. 442 Suppl. Aff. ¶5). By then, the opportunity was lost. At the Rule 8 hearing, Petitioner testified that her bench trial requests were repeatedly brushed aside or treated with condescension, despite the fact that no formal effort was ever made to preserve or present them. The Court confirmed on the record that the decision ultimately rests with the Petitioner (ECF No. 468, Tr. 14:23)

Perhaps most consequentially, Shelkrot squandered the final opportunity to shift the government's theory of identity before trial. By the time Abel had entered a plea admitting to aiding and abetting - but not masterminding - his presence in court could have

raised immediate questions for the jury about who truly bore primary responsibility. Petitioner requested that he be called, and he was available and willing to testify. Yet Shelkrot unilaterally rejected this option, telling Petitioner that his presence "wouldn't look good." She did not interview him, request a proffer, or seek to admit his plea through judicial notice or stipulation. Had the jury been informed that Abel had accepted guilt for the very acts the government attributed solely to Petitioner, they would have had a concrete alternative theory to consider. Courts have long held that when a defendant identifies an available, material witness, counsel must investigate and have a sound strategic basis for excluding them. No such inquiry occurred here. See *Wiggins v. Smith*[3] *and United States v. Mullins*[4].

These failures are not mere strategic differences - they reflect ineffective assistance under both prongs of *Strickland*. When defense counsel (1) fails investigate clear alternate suspects, (2) abandons a defense plan without substitution, and (3) disregards the client's informed procedural requests, the adversarial process collapses. The result in this case was a conviction built on unchallenged assumptions and a defense strategy that never made it to court.

*3.    Jenny The Housekeeper*

Jenny was a longtime nanny and housekeeper in Petitioner's household. She had direct knowledge of daily routines, domestic dynamics, and key individuals, including

---

[3] *Wiggins v. Smith*, 539 U.S. 510, 534 (2003): Counsel rendered ineffective assistance by failing to investigate mitigating evidence without a reasoned strategic basis, violating Strickland.

[4] *United States v. Mullins*, 315 F.3d 449, 455–56 (5th Cir. 2002): Defense counsel's failure to interview or present a key eyewitness without justification constituted ineffective assistance.

Petitioner's ex-husband Allen and their children. On October 17, 2017, during an interview conducted by defense investigator Susan Randall, Jenny was shown several images - among them a passport photo and driver's license central to the government's identity theory. Although the interview notes do not explicitly document her verbal response, Randall annotated the images with the name "Yuki," consistent with Petitioner's account that Jenny identified the individual as Yuki, a former restaurant manager - not Petitioner herself. (Exh. J)

This misidentification is vital. It directly undermines the government's core claim that Petitioner was the individual depicted in the government's visual evidence. Jenny's long-term familiarity with Petitioner, and her ability to distinguish her from Yuki, made her a crucial rebuttal witness - particularly because the government's theory relied heavily on visual resemblance rather than forensic proof.

Yet Jenny was never called to testify, and the result of her interview was never disclosed to the Court. Attorney Shelkrot not only failed to document this exculpatory identification in a usable form, but also declined to question Jenny further or follow up. Instead, she preemptively labeled Jenny - along with other witnesses - as "not credible" or "actors," a characterization not supported by facts and now contradicted by the record.

In an effort to clarify household access and support her claim that multiple other individuals had the opportunity to be misidentified, Petitioner compiled a timeline chart of occupants and staff who lived in or had access to her residences from 2012–2016. This visual timeline - emailed directly to Attorney Shelkrot and Investigator Randall on October 19, 2017 - detailed shifting occupancy across her Danbury and Cheshire homes, including

full-time and part-time domestic workers, her boyfriend at the time Matt, and others. (Exh. K) Despite the relevance of this document to the government's identity theory, it was never used or referenced at trial. Had it been introduced, it would have supported reasonable doubt by showing multiple people had access and opportunity, especially those who shared physical characteristics or ties to disputed evidence.

This suppression of available, corroborated exculpatory material is a constitutional violation under *Strickland* and *Wiggins v. Smith*.

4.    *Defendant's Father as a Suppressed Identification Witness*

One of the most troubling failures of trial counsel was her refusal to engage Petitioner's father, Mr. Zhimin Gu, as a potential identification witness. At no point did Attorney Shelkrot review the government's key exhibits - such as the video footage from the passport agency or associated photographic stills - with Mr. Gu or ask whether he believed the person depicted was his daughter. This is despite Mr. Gu's lifelong familiarity with Petitioner's appearance and his clear capacity to offer credible, non-expert opinion testimony on a central question in the case.

In his sworn affidavit, Mr. Gu confirms that had he been shown the footage, he would have informed the Court that the person in the video was not Alison. (Exh. A) He also recalls preparing materials to provide context on Petitioner's past abuse and injuries, which he hoped would be helpful in explaining the circumstances surrounding her conduct. However, Shelkrot blocked every attempt he made to participate.

This exclusion is corroborated by a contemporaneous email exchange. On October 16, 2017, Mr. Gu sent a brief statement regarding Petitioner and asked that it be forwarded to Attorney Shelkrot. Rather than accepting the document, Shelkrot responded dismissively:

> "*Why is your dad sending me written statements? Why is he sending me information about Matt and your relationship with him? Why is he telling me about CC? I haven't asked him any questions about Matt or CC, and as far as I know, neither has Susan. And I don't want written statements from witnesses, as I think I have mentioned.*"  (Exh. L)

This tone and refusal to engage highlight a consistent pattern: counsel did not merely fail to utilize available defense witnesses - she actively rejected assistance, ignored basic support efforts, and discouraged family participation.

Had Shelkrot allowed Mr. Gu to testify, his observations could have directly challenged the prosecution's theory of identification and helped establish Petitioner's defense of mistaken identity. His familiarity with her physical features, voice, and posture was unmatched by any other potential witness.

Her refusal to permit his involvement reflects both a breakdown in communication and a broader failure to pursue reasonable investigative leads. Under the standards articulated in *Wiggins v. Smith*, and *Kimmelman v. Morrison* [5] , this constitutes constitutionally deficient performance.

## B.    <u>Suppressed Witnesses and Withheld Evidence</u>

---

[5] *Kimmelman v. Morrison*, 477 U.S. 365 (1986): Defense counsel's failure to conduct reasonable pretrial investigation - including neglecting to obtain or challenge key evidence - can amount to ineffective assistance under *Strickland*. Investigative lapses, even when tied to broader strategic failures, violate a defendant's Sixth Amendment rights.

1.     Attorney Shelkrot failed to interview or call Matthew Abel before his guilty plea, despite his relevance and potential support for the defense. Abel confirmed in his affidavit (Exh. G) that no outreach was made, no request was extended to view or comment on government exhibits, and no effort was made to clarify conflicting factual narratives. This is inexcusable given the known existence of the Joint Defense Agreement and shared strategy.

Shelkrot dropped the "blame Matt" strategy entirely after his plea - without informing Petitioner or substituting a coherent defense. At no point did she ask Abel to testify or appear at trial. She instead told Petitioner and her family that Abel's presence in court "wouldn't look good," a conclusion never explained or supported.

This is not simply a missed opportunity - it is suppression. Evidence that could have raised reasonable doubt, corroborated Petitioner's version of events, or impeached the government's theory was effectively buried. Courts have repeatedly held that counsel's failure to call known, helpful witnesses violates both due process and the Sixth Amendment right to present a defense. See *Wiggins v. Smith*; *Ex parte Lewis*[6].

This miscalculation was not isolated. In an October 6, 2017 email, Shelkrot grossly exaggerated the sentencing range Petitioner would face at trial - stating a maximum guideline of 210–240 months, nearly quadruple the actual sentence imposed. (Exh. H) This alarming figure was presented without meaningful analysis, creating undue pressure on Petitioner to accept the government's first - and only - plea offer just weeks before trial.

---

[6] *Ex parte Lewis*, 537 S.W.3d 917 (Tex. Crim. App. 2017): Trial counsel's failure to investigate and call a known, favorable witness constituted ineffective assistance. The omission deprived the defendant of a meaningful opportunity to present a defense, violating the Sixth Amendment.

Compounding this issue was Shelkrot's failure to explain that a better-negotiated plea could still be pursued. Instead, she insisted that "it was too late."

Only much later did Petitioner discover a critical omission in Shelkrot's credentials: despite her claim of extensive federal experience, she had only tried one case in this District prior to Petitioner's. (See 442 Suppl. Aff. ¶2) Her inexperience was inadvertently revealed during trial, when Petitioner overheard Shelkrot telling Abel's counsel, Craig Nolan, "You are lucky to avoid a trial" - a revealing remark that suggests her avoidance of trial may have been motivated more by her own limitations than strategy.

Together, these facts suggest that Shelkrot's repeated attempts to push a late, unfavorable plea were not the result of strategic discretion, but a lack of readiness and familiarity with the case - despite having represented Petitioner for over four months.

2.      Susan Randall is a licensed investigator and owner of Vermont PrivateEye Investigations (VTPI). Petitioner first met Randall in 2017 after expressing dissatisfaction with the performance of her public defender, David McLoughlin. It was Randall who referred Attorney Lisa Shelkrot to Petitioner, leading to an initial meeting in Shelkrot's office where Shelkrot agreed to accept the case under Criminal Justice Act (CJA) appointment. Following this, Randall and VTPI were formally retained as the chief investigative team for the defense.

In 2022, Randall was retained again by Petitioner to assist in responding to a supervised release violation. Numerous detailed conversations took place during this time, some in the presence of Petitioner's then-attorney Mark Oettinger. While Randall

expressed willingness to provide a sworn statement in support of a future § 2255 motion, she advised Petitioner to delay filing until the supervised release issue was resolved, concerned that it might reflect negatively before the court.

After the Rule 8 hearing on June 27, 2025, Petitioner contacted Randall to request an affidavit. On July 2, Randall replied that she was undergoing breast cancer treatment and procedures and could not assist at this time. The account that follows is thus based on their trial preparation encounters and past conversations between Randall and Petitioner, to the extent known, and may be corroborated in the future through sworn testimony or affidavit.

Randall personally interviewed Jenny, who was shown a photo allegedly tied to the government's evidence. Jenny affirmatively stated that the person in the image was "Yuki," a former restaurant employee - not Petitioner. (Exh. J) This negative identification was never presented to the jury, even though it directly undercuts the government's core identity theory. The suppression of this exculpatory observation violated Petitioner's right to present a defense.

At one point, Randall advised Petitioner that Jenny made inconsistent statements during her interview. However, the supposed discrepancies - such as confusion over a fish tank or document familiarity - had no bearing on the core identity issues at stake. Petitioner noted that Randall never asked critical follow-up questions and instead cut the interview short. Despite this superficial doubt, Jenny remained a key eyewitness familiar with the people and routines involved.

In her affidavit, Shelkrot falsely denied knowledge about Jenny coming to Burlington in November 2017 for trial. (ECF No. 453, ¶46, 54). This claim can be easily contradicted by her own recording of the conversation she had with Petitioner on that date - Shelkrot was told that Jenny was on her way there accompanied by Abel. (Exh. V, Tr. Part 2, 3:35). Petitioner's father's affidavit also supported this fact. (Exh. A)

Despite initial concerns raised by Jenny's daughter Utami about her mother's visitor visa status, Jenny ultimately traveled to Burlington and stayed at the same hotel with Petitioner's family. Her travel arrangements - including airfare and lodging - were paid for by Mr. Gu. On November 5, Jenny was brought to Attorney Shelkrot's office by co-defendant Matt Abel. During a meeting inside, Shelkrot spoke to Jenny briefly with her daughter was over the phone translating. Following that meeting, Jenny informed both Petitioner and Mr. Gu that she was suddenly discouraged from testifying, citing fears relayed by her daughter that doing so might endanger her immigration status - particularly given that her recollection of some events' time and places conflicted with government evidence.

However, Jenny remained willing to take the stand. In a 7:09 AM email, on the day Petitioner testified, she informed Shelkrot that Jenny wanted to testify but was concerned she might give incorrect answers or fail to be helpful, noting: "Jenny said she felt bad and would like to testify if it helps me. Can we not ask her any confusing questions?" (Exh. M) Later, Jenny asked Petitioner if she could be compensated a few thousand dollars, it might help persuade her daughter to let her testify. Petitioner, financially unable to offer such compensation, told Jenny to do what was best for herself, and offered to pay for her return

trip to New York should she decide to leave. Jenny ultimately appeared at the courthouse, likely still hoping to testify, but was never called to the stand. Her exclusion - despite her clear willingness and physical presence - was the result of defense counsel's mishandling and undue pressure, and it had a profound psychological and strategic impact on Petitioner's case.

Additionally, Randall could affirm that Attorney Shelkrot insisted on routing all investigative information including witness interviews through your investigation team but asserted sole control over defense strategy. This bottleneck appears to have contributed to her failure to contact multiple witnesses directly. It also led to an absence of meaningful follow-up regarding the power of attorney form executed by Ai Chen - a key dispute regarding identity at trial. To Petitioner's knowledge, Randall was never tasked with verifying the authenticity of that document.

This top-down control was not limited to investigative personnel. In an October 12, 2017 email, Shelkrot explicitly told Petitioner that "everything… should go through me," explaining that she wanted to "filter through" Petitioner's requests and "decide what is helpful". (Exh. D)

Under *Wiggins v. Smith*, 539 U.S. 510 (2003), defense counsel is obligated to thoroughly investigate exculpatory leads unless a clear strategic rationale exists. No such rationale was supported by the record here. Shelkrot's assertion that she avoided obstruction by declining to present witnesses she suspected were "actors" - including Jenny

- is legally deficient. In *Nix v. Whiteside*[7], the Supreme Court held that a defense attorney must not present knowingly false testimony - but mere suspicion is not enough. Despite Shelkrot's claim in her affidavit that Jenny was not called due to credibility issues, Jenny was never accused of scripting, lying, or acting. She was vouched for by Petitioner as a real and long-term employee. The transcript shows Petitioner distinguishing her from other witnesses and offering substantial context to support her credibility.

This episode must also be viewed in light of other exculpatory material that Shelkrot quietly returned without explanation. On November 14, 2017, after Petitioner had already begun her prison sentence, Shelkrot mailed co-defendant Matt Abel a package of unused evidence that had never been introduced at trial. Among the contents were (1) a U.S. Customs Entry Form for "Bow," a foreign national who appeared to be connected to fraudulent identity activity, and (2) a Citibank credit card letter sent to Petitioner's father, corroborating his concerns about Allen's illicit financial behavior. These materials were not included in the record, shared with Petitioner, or discussed at trial. Their post hoc return suggests that potentially exculpatory documents were unilaterally suppressed.

Shelkrot's 2025 affidavit attempts to justify Jenny's exclusion by citing generalized concerns and her theory that some defense witnesses were "paid actors." But this narrative is both legally insufficient and factually contradicted. The record shows no evidence Jenny rehearsed, falsified, or embellished anything. What it shows is a pattern of distrust and

---

[7] *Nix v. Whiteside,* 475 U.S. 157 (1986): The Court held that an attorney must not present testimony known to be false but is not ineffective for refusing to do so. This duty does not extend to witnesses merely suspected of being untruthful, making blanket refusal without proof constitutionally inadequate.

control exercised by Shelkrot, undermining the defense by silencing credible, available witnesses. That is not a strategic choice - it is constitutional failure.

While counsel has a duty to avoid presenting false testimony, the Supreme Court in *Nix v. Whiteside*, makes clear that this obligation applies only where testimony is *knowingly* false. In contrast, mere suspicion, cultural misunderstanding, or generalized distrust does not justify the wholesale suppression of favorable testimony. No evidence suggests Shelkrot conducted a full inquiry into witness credibility; rather, her exclusions were blanket and unexplained. Jenny, for example, was a long-term domestic employee who identified the photo subject as "Yuki," not Petitioner. The failure to present such materially exculpatory evidence - absent proof of falsity - constitutes constitutional error. See *Wiggins v. Smith*.

Even accepting Shelkrot's framing, at least two of the excluded witnesses - Jackie Chan and Philip Russell - were licensed attorneys and practicing professionals at the time of trial. They presented no risk of fabrication, payment, or perjury, and their testimony was critical to the defense. Attorney Shelkrot's decision to reject their participation, alongside others, cannot be excused as a strategic effort to avoid "fake actors." Rather, it reflects a categorical exclusion of supportive witnesses - regardless of their credibility - based on generalized distrust and not on any substantiated finding of unreliability. This indiscriminate rejection of available, legitimate testimony violated Petitioner's right to present a defense and deprived the Court of a full evidentiary picture.

3.    One of the most significant omissions from Petitioner's defense was the suppression of testimony from Attorney Jackie Chan. Mr. Chan served as legal counsel on

the real estate transaction that formed the basis for the original state charges - later incorporated into the federal indictment against Petitioner. He was present at both the closing and the final walkthrough inspection of the Connecticut property sold to Lida Han and had first-hand knowledge of the transaction's legitimacy. In a formal interview with Investigator Susan Randall on September 12, 2017, Mr. Chan directly refuted Han's allegation that the property was incomplete or misrepresented at the time of sale. He also vouched for Petitioner's character, noting that she had "done the right thing" and had "always been upfront and honest" in her dealings. (Exh. N)

Chan could also have provided crucial testimony to support the origin and legitimacy of Petitioner's investment funds. Specifically, he was the closing attorney in the transaction where Han paid the full purchase price in cash. The net proceeds - over $700,000 - were paid to Petitioner and were later invested into the five Vermont properties that became the focus of the federal mortgage fraud charges. This unrefuted financial trail would have demonstrated not only that Petitioner had a lawful source of capital, but also that she suffered a significant financial loss - facts entirely inconsistent with fraudulent intent. Yet, trial counsel never presented this to the jury.

This is corroborated by contemporaneous documentation of the Park Avenue Commons townhouse sales in Connecticut, which generated certified funds totaling $714,000 in net proceeds paid to Petitioner. (Exh. AR)

Contrary to Attorney Shelkrot's later claim that Chan lacked useful information, Petitioner recalls that Chan had packed "cases of legal documents" in preparation to testify. However, the day before he was scheduled to appear, Chan informed Petitioner that

Shelkrot called - not to conduct witness preparation - but simply to advise him not to come. When asked why, Chan expressed confusion and indicated that he had expected to take the stand.

Investigator Randall later stated that Chan "seemed reluctant," but this was likely due to a financial issue rather than unwillingness to support Petitioner. In an email dated October 23, 2017, Chan requested a modest $1,000 retainer, noting that his preparation time had come at the expense of other clients. Petitioner, lacking borrowing power and funds, responded that she could not pay until after trial. (Exh. O) This was not an excuse; contemporaneous emails to her probation officer confirm she was seeking court permission to be added to family credit cards to meet basic living expenses. (Exh. P)  The next day, she followed up with Attorney Shelkrot, reminding her of Chan's importance and urging resolution before the Friday hearing. (Exh. Q)

Further, Petitioner's father and other witnesses confirm that she had borrowed money to support her legal defense and household needs, having previously used her joint savings to fund co-defendant Matthew Abel's private attorney. These facts contradict any narrative that Petitioner orchestrated a fraudulent witness scheme. Instead, the record reflects financial hardship, transparency, and diligent effort to engage legitimate, cooperative witnesses - including Chan, whose key testimony was ultimately silenced.

The Court never heard from Chan at trial. No summary, proffer, or affidavit was submitted by defense counsel. The only official record of his statement appears as exhibit in Petitioner's December 4, 2023 Motion for Early Termination of Supervised Release (ECF No. 418, Exh. V) - submitted by Petitioner herself years after the fact. His exclusion

deprived Petitioner of a highly credible rebuttal to the central fraud allegations and a critical opportunity to impeach the government's witness, Lida Han. It also withheld exculpatory evidence concerning the lawful origin of Petitioner's real estate investments, which went completely unchallenged at trial. This was not a discretionary omission. It was the suppression of a known, available, and corroborating witness - one who could have shifted the entire financial and factual narrative of the case.

4.      Further compounding the suppression of exculpatory materials, Attorney Shelkrot failed to utilize key investigative leads provided by Petitioner's former state defense counsel, Attorney Philip Russell. Mr. Russell was retained between 2014 and 2018 to represent Petitioner in connection with the Danbury, Connecticut real estate transaction that formed the basis of the state prosecution. That same transaction, and the alleged conduct surrounding it, later triggered the federal indictment against Petitioner. The connection between the two cases was not superficial - it was foundational. The same players, including Lida Han, Bow, Jenny, and Allen, were involved in both matters. The funds from the real estate sale were alleged to have flowed into subsequent transactions examined in the federal case. Indeed, Petitioner was directly impeached about the state case during her federal testimony, illustrating the government's reliance on that background to establish intent and credibility issues.

Attorney Russell's role was not passive or tangential. By June 2016, he had engaged a New York law firm that assisted in retrieving court records from China confirming Han's oversea criminal conviction. This information was conveyed to Petitioner's federal team again in September 2017. (Exh. R) Russell also held knowledge that would have severely

damaged Han's credibility and supported Petitioner's defense that she had been misled and framed by Han's elaborate real estate and EB-5 investment fraud.

Despite this, the evidence was never disclosed to the jury. In her May 2025 affidavit (Doc. 453), Shelkrot stated:

> As with Attorney Chan, I determined that Philip Russell did not have sufficiently relevant information to justify the waiver of attorney-client privilege. The topics Alison identifies would not have been particularly material to the charges.

This conclusion is simply indefensible. Shelkrot's determination that Russell lacked material information flies in the face of the factual and procedural history. The Danbury real estate case was the direct catalyst for the federal prosecution. It shared not only witnesses and evidence but was introduced into the record during trial testimony. As such, Russell's files and insights were quintessential to the defense. His testimony could have exposed Han's broader fraudulent patterns, discredited the central government witness, and corroborated Petitioner's own narrative.

A follow-up email dated August 31, 2017, sent by Investigator Susan Randall, confirms her conversation with Russell on that date. (Exh. S) There is no indication that Shelkrot disclosed or memorialized her own conversation with Russell. Nor did she subpoena him or seek to file the Han conviction materials under seal, in camera, or via Brady disclosures. Instead, she dismissed the material entirely - never informing the Court or defense team of its existence or potential impact.

This is not a discretionary omission. It is a textbook violation of defense duties under Strickland and Brady. The United States Supreme Court in *Rompilla v. Beard*[8] found ineffective assistance where counsel failed to examine records that could have undermined prosecution arguments and supported mitigation. Here, Shelkrot failed to use a former defense counsel - who had already obtained exculpatory materials - as a witness or evidentiary conduit.

The failure to involve Russell is not only professionally irresponsible; it suggests a strategic blind spot that gravely harmed Petitioner's case. That Shelkrot later attempted to downplay the relevance of this evidence only further underscores her unwillingness to confront facts that may have conflicted with her preferred theory. Petitioner's right to present a complete defense was denied - not because the evidence didn't exist - but because her attorney refused to use it.

5.     Even if we accept that Attorney Shelkrot adopted a strategy change at the last minute - prompted by her earlier failure to investigate - she still missed the opportunity to present the allegedly questionable witnesses as supporting factual proof of Petitioner's actual defense. Their very existence, and the nature of their claims, could have reinforced Petitioner's narrative: that she was the victim of an elaborate scheme orchestrated by a criminal enterprise that took extraordinary steps to fabricate evidence, create false identity links, and undermine the integrity of the judicial process. Instead of using this as leverage to advance a defense of victimization and strategic manipulation, Shelkrot dismissed the

---

[8] *Rompilla v. Beard*, 545 U.S. 374 (2005): Court held that counsel was ineffective for failing to review readily available records that could aid the defense. Defense attorneys must investigate and present accessible exculpatory materials, even without client prompting – failure to do so vilates Strickland.

witnesses wholesale - depriving the Court of the broader context necessary to understand truth in Defendant's proclaim of innocence and to undermine the government's case.

Petitioner believes that Shelkrot had at least three constitutionally valid alternatives to wholesale suppression:

a)   She could have conducted a case-by-case inquiry, separating credible witnesses like Jenny from those she found questionable.

b)   She could have requested an in camera review or voir dire to allow the Court to assess the reliability of the contested testimony.

c)   She could have disclosed the complexities to the Court transparently and asked for guidance - preserving the defense narrative while upholding her ethical obligations.

By failing to pursue any of these avenues, Shelkrot silenced not only Jenny but multiple witnesses whose testimony - whether wholly credible, flawed, or partially corroborative - could have supported Petitioner's actual innocence claim. This is not just strategic error. It is a constitutional violation that contributed materially to Petitioner's wrongful conviction and sentencing.

6.   Mr. Gu further stated that shortly after learning of the indictment in 2017, Alison came to him for financial help. She explained that Matt Abel had exhausted their shared savings to hire a private attorney, concerned about his own potential prosecution. Mr. Gu's recollection not only confirms Matt's central role in the events but also shows that "blaming Matt" was an early and credible strategy, not an invented post hoc defense.

His account supports the claim that Shelkrot's failure to pursue this defense was both prejudicial and constitutionally deficient.

Before trial, Mr. Gu handed to Shelkrot a Citibank letter containing a credit card sent to him, showing that someone - using a male name unknown to him - had fraudulently attempted to add themselves to his credit account. He believed this was connected to Alison's ex-husband, who had a known criminal background and history of harassment.

Mr. Gu clarified that the letter he provided included an actual physical credit card sent to his home under the suspicious male name. He never authorized this addition and found it highly alarming. He explicitly conveyed to Shelkrot his suspicion that this fraudulent act was connected to Allen, Alison's ex-husband, based on his past criminal history – racketeering and identity theft – corroborated by Randall's investigation finders. (Exh. U) Despite the gravity of this potential identity fraud - and its relevance to the defense - counsel never followed up, never asked additional questions, and never introduced the evidence at trial. This omission left unexplored a crucial lead that could have undermined the government's narrative and supported the theory of manipulation and misattribution.

Among the missing investigative materials was certified documentation from Bay Ridge Toyota - a car dealership where Allen allegedly secured a vehicle loan using stolen identity. This file, along with the remaining 95% of the evidence Randall collected and certified that supported Petitioner's innocence and contradicted the government's theory, was never produced at trial and appears to have gone missing. While Attorney Shelkrot claimed she does not have possession of these materials, Randall assured Petitioner that she returned all investigation files back to Shelkrot as she expressly instructed.

In addition to obstructing exculpatory leads, Attorney Shelkrot failed to preserve and turn over the vast majority of critical case materials. Contrary to any implication that Petitioner possessed the full defense file, only general motion filings and court documents were ever delivered to her residence by Attorney Stacy Smith's office. None of the crucial items - including investigation notes, certified records, and other work product central to Petitioner's defense - were included in the handoff. These missing materials, which collectively represented the majority of Shelkrot's team's substantive work, were never returned to Petitioner or made part of the trial record.

Petitioner testified to this at the Rule 8 hearing, stating that what was missing "counted [as] the vast majority of her team's work" and directly supported the defense she attempted to build (ECF No. 468). That these files vanished - despite multiple attempts to recover or identify them - further reflects the breakdown in counsel's duties under the Sixth Amendment. It also contradicts Shelkrot's later implication that Petitioner fabricated or misunderstood the evidentiary trail. The problem was not Petitioner's failure to disclose - it was counsel's failure to maintain, transmit, and utilize the very records her own team had created.

Following the verdict, Mr. Gu asked Randall what went wrong. She told him that "ninety-five percent" of the evidence she collected - much of it certified or investigative in nature - was never presented at trial. Mr. Gu also recalled that Randall herself appeared shocked by the exclusion of witnesses and exhibits she considered essential to the defense (Exh. A)

7.     Further demonstrating counsel's failure to present key exculpatory documents, Petitioner later discovered that Attorney Shelkrot returned multiple pieces of unused defense evidence to co-defendant Matt Abel - after Petitioner had already been incarcerated. Among the returned items were (1) a U.S. Customs Entry Form issued to "Bow," a Chinese national believed to be used as a false identity in the underlying fraud scheme, (2) a Citibank credit card notice addressed to Petitioner's father, which supported his claims about illicit account activity tied to Petitioner's ex-husband Allen, and (3) a photograph of Petitioner taken shortly after sustaining physical abuse inflicted by Allen. The return envelope was postmarked November 14, 2017 and addressed to Abel. (Exh. T) This act confirms that Shelkrot had possession of evidence corroborating Petitioner's theory of identity manipulation and financial misappropriation - yet failed to disclose or present it. Her quiet return of these materials to a third party, without informing Petitioner or the Court, is further indication of material suppression in violation of *Brady* (also see *Strickland, Wiggins, Rompilla* and *Giglio*[9]).

## C.     Coerced Testimony and Strategic Collapse

The November 5, 2017 audio recordings (Exh. V) show that Shelkrot coerced Petitioner into testifying without preparation or support - despite the availability of alternative strategies, including blaming Matt Abel. Petitioner asked directly, "Are we doing this now?", expressing confusion and emotional distress. Shelkrot offered no

---

[9] *United States v. Giglio*, 405 U.S. 150 (1972) (Suppression of evidence affecting the credibility of a prosecution witness, including impeachment material, is constitutionally deficient. Though commonly cited under Brady, courts have extended Giglio to counsel's duty: defense attorneys must seek and present evidence that could undercut government witnesses or establish their bias.)

structured guidance, merely responding, "Yep," and launching into unstructured questions about the story Petitioner wanted to tell.

This moment is pivotal. At the time, Shelkrot had already abandoned the agreed-upon strategy to shift culpability toward Abel. She did not explain this change. She did not raise Abel's guilty plea as leverage. She did not inform Petitioner of any fallback plan.

Further illustrating the breakdown in counsel's performance was Attorney Shelkrot's inaccurate assessment of the sentencing exposure. In an October 6, 2017 email, she warned Petitioner that rejecting the plea deal could result in a sentence of 10 to 12 years, citing inflated guideline estimates and projecting that if Petitioner testified and was found guilty, her sentence could reach 135 months plus two additional years. (Exh. H). This was based on a mechanical reading of the guidelines and ignored mitigating factors specific to the case - indicating a lack of case familiarity despite having taken over the matter over four months earlier.

These dire predictions pressured Petitioner into an impossible position: accept a plea based on flawed guidance or risk an exaggerated sentence. Ironically, despite this warning, Shelkrot ultimately abandoned her own strategy to shift blame to Matt Abel and left Petitioner unprepared to testify. The fear instilled by her flawed guidance contributed directly to Petitioner's distress and sense of helplessness at trial.

This breakdown is corroborated by Petitioner's father who personally witnessed three witnesses being turned away at trial. According to Mr. Gu and the record, Shelkrot told the family - after deciding to put Petitioner on the stand - that the strategy was still

"blaming Matt." This statement was knowingly false. It contradicts Shelkrot's actions at trial and appears calculated to deflect responsibility. (Exh. A)

He also confirmed the events concerning Jenny on the morning of November 6, 2017, when Petitioner was unexpectedly put on the stand. Mr. Gu recalls that Jenny, the family's longtime housekeeper, remained available and offered to testify in support of Petitioner. In his affidavit, he explains that Jenny was visibly distressed upon learning that she would not be called, and that this upset triggered a severe emotional reaction in her daughter, resulting in a medical emergency and hospital visit. This chain of events was not just emotionally devastating but emblematic of the chaos and confusion caused by Shelkrot's last-minute strategic reversal.

This account was not new or developed post hoc. As early as October 16, 2017, Mr. Gu had prepared a detailed written statement about his observations and forwarded it through Petitioner to Attorney Shelkrot. Her dismissive response - "I don't want written statements from witnesses" - not only ignored the contents of Mr. Gu's affidavit but reflects a pattern of deliberate suppression of supportive testimony. (Exh. L)

Compounding this coercion was Shelkrot's refusal to investigate or clarify the origins of defense witnesses - despite Petitioner's repeated insistence that she lacked funds to hire anyone, much less professional actors. "I don't have the money to pay these people. I don't even have the money to pay Jenny," Petitioner explained. (Exh. V, Tr. Part 2, 3:20) She further emphasized she had bluntly told anyone requesting compensation, including Jackie Chan, that she couldn't afford to pay them. This directly refutes Shelkrot's

assumption that Petitioner had fabricated a fake defense team - an assumption that irreparably damaged Petitioner's ability to present any coherent defense.

This breakdown in advocacy was not an isolated lapse - it was a byproduct of a broader pattern of control. As already documented, Shelkrot maintained exclusive authority over all investigative and strategic decisions. This same "gatekeeping" approach extended into trial preparation, where Petitioner was given no real input into whether she would testify, how to prepare, or what evidence would be presented. By excluding her client from strategy decisions and withholding meaningful collaboration, Shelkrot left Petitioner unprepared, unsupported, and alone at the most critical moment of the trial.

Further compounding the coercion, Petitioner was discharged from the hospital the morning of her testimony after experiencing a health crisis triggered by the sudden removal of key witnesses, including Jenny and Jackie Chan. As documented in email exchanges from November 6, 2017, Attorney Shelkrot was informed of Petitioner's hospitalization but insisted that Petitioner appear in court immediately, stating: "I think you'd better be here by 11:30. Court wants to see you". (Exh. W) No consideration was given to Petitioner's medical condition, nor was a continuance requested. This disregard not only forced Petitioner to testify while experiencing significant cognitive and emotional impairment, but also contributed to the disjointed narrative and memory lapses that the Court would later construe as inconsistent or even perjurious. The resulting damage - both legal and psychological - stemmed directly from counsel's refusal to adapt or protect her client under objectively unreasonable circumstances.

Constructive coercion into testifying, compounded by false reassurances, micromanagement, and failure to investigate viable explanations or present available witnesses, meets the standard for ineffective assistance. See *Poe v. United States*[10].

**D.    Cultural Competency and Communication Failures**

In September 2017, Petitioner proactively sent her trial counsel a peer-reviewed academic article co-authored by Prof. Michael Perlin, a leading authority on forensic mental health and disability law (Exh. E). The article stressed the necessity of cultural competency in criminal defense, especially when the defendant is from a minority cultural background or suffers from trauma-related impairments. Despite its direct relevance, counsel never followed up, made no inquiry into Petitioner's cultural history, and failed to consult or retain any expert capable of presenting such mitigation. Her refusal to even consider the material - as corroborated by her own admissions - was constitutionally deficient and professionally unreasonable.

This failure extended beyond theory. Petitioner also attempted to bring in culturally competent support personnel - including Mandarin-speaking translators - to assist with document review and witness communications. In an October 25, 2017 email, Petitioner submitted the resume of a translator candidate and inquired about bringing him onboard. (Exh. X) Shelkrot responded by discouraging the request, claiming that federal court budget restrictions would not permit adequate compensation. However, Petitioner later discovered that both Shelkrot and investigator Randall had been fully compensated under

---

[10] *Poe v. United States*, 233 F. Supp. 173 (D.D.C. 1964) (Constructive coercion - where a defendant is compelled to testify due to counsel's neglect or misguidance - violates the Sixth Amendment guarantee of effective assistance and undermines a fair trial.)

the CJA program, and that the case file contained ample investigative records - casting doubt on the claimed budgetary limitation. This false narrative left Petitioner unable to access the culturally competent assistance she sought and reinforced the sense that her defense team did not take her cultural or linguistic needs seriously.

Petitioner's father further supports this point. In his affidavit, Mr. Gu states that Shelkrot instructed him not to discuss any case-related matters with his daughter, discouraged him from emailing her (Exh. A; Exh. L). These limitations were never explained and served only to isolate Petitioner from her family and defense support.

Mr. Gu, a retired schoolteacher with over 40 years of experience, expressed that he felt silenced and removed from his daughter's defense efforts. Rather than being engaged as a source of cultural insight or familial context, he was treated as a liability. Shelkrot's refusal to involve him, or even accept meaningful documentation from him, reflects a broader disregard for both cultural competency and common-sense support from loved ones. In his view, this exclusion was neither strategic nor necessary - it was alienating and damaging.

E.    **Personal Bias and Strategic Manipulation**

Beyond tactical disagreements, Attorney Shelkrot's actions reflected a deeper pattern of exclusion and personal bias that materially impaired Petitioner's defense. This is exemplified in an October 12, 2017 email (Exh. D), in which Shelkrot insisted that "everything… should go through me" and that she alone would "decide what is helpful." Such a statement is not a reflection of careful This top-down approach was further reflected in how Shelkrot handled Petitioner's father's involvement. Mr. Gu had drafted a letter for

the defense explaining his observations and affirming Petitioner's credibility. Yet in a November 2, 2017 email (Exh. Y), Shelkrot informed Petitioner that she had "lost" the letter and asked her to resend it - days before trial. This lack of basic organization, coupled with her earlier instructions that Mr. Gu should not communicate with his daughter about the case, points to an arbitrary and counterproductive control over witness engagement.

The same pattern extended to defense witness Jenny. Even after Shelkrot had supposedly dismissed her as lacking credibility, Jenny was still willing to testify. On the morning of November 6, 2017 - the day Petitioner was forced to take the stand - Jenny told Petitioner she "felt bad and would like to testify if it helps" (Exh. M). This contemporaneous record contradicts any claim that Jenny was unavailable or unwilling and exposes Shelkrot's rejection of her as based on subjective distrust rather than any objective assessment.

These events culminated in a revealing admission from Shelkrot herself. In an email sent later that same day, she acknowledged: "I was really angry about the fake witnesses showing up here. But I think I allowed my frustration and irritation to get in the way of being as professional as I should have been, so I am sorry about that". (Exh. Z) Rather than a considered strategic decision, this confession demonstrates that personal emotion - not legal reasoning - drove her behavior during a critical juncture of the trial.

Together, these actions illustrate a broader pattern: Petitioner was not merely underrepresented - she was isolated and silenced. Shelkrot's decision-making was less about protecting trial integrity and more about asserting dominance over the narrative. The

result was a breakdown in communication, trust, and effective advocacy at a time when Petitioner's liberty was on the line.

**F.    <u>Early Missteps by Attorney Mary Nurino and Strategic Consequences</u>**

Although Petitioner is not formally renewing her ineffective assistance claim against former defense counsel Mary Nurino, she respectfully preserves the factual record of those early missteps, which materially shaped the trajectory of her defense.

During her tenure as court-appointed counsel, Nurino demonstrated a repeated unwillingness to investigate or present available evidence. This included Jing Shao and Philip Lin, despite their firsthand knowledge of Petitioner's whereabouts and circumstances during key periods. Petitioner repeatedly asked that these individuals be contacted, yet Nurino declined, later claiming they had "nothing to say" or that they "couldn't be trusted."

Nurino also discouraged Petitioner from pursuing an innocence-based strategy. In a May 13, 2022 email (Exh. AA), Petitioner followed up on their phone conversation, reiterating her concern that critical witnesses were being dismissed and that her case was being steered toward mitigation rather than investigation. Nurino responded by minimizing the significance of these leads.

When Petitioner attempted to support her credibility with documentation - including project team's feedback and a professional reference from PixelPlex, an IT firm familiar with her work ethic and background (Exh. AB) - Nurino ignored them. She never discussed their evidentiary value nor incorporated them into any filing. These omissions

undermined Petitioner's ability to rebut the government's narrative and deprived her of meaningful corroborating testimony at a pivotal stage.

Additionally, as previously stated in Petitioner's original § 2255 motion (ECF No. 407, Ground 3, P11–13), Nurino misrepresented the timeline and content of discovery materials, and at one point falsely claimed that she had received no Rule 16 disclosures from the government - only to reverse herself when confronted. She also dissuaded Petitioner from requesting a Franks hearing or pursuing suppression strategies, citing futility rather than legal merit.

Though Petitioner ultimately chose not to proceed with a renewed claim against Nurino, the deficiencies identified above are relevant to the broader context of counsel failures across the course of her defense. They illustrate the institutional pattern of representation marked by premature judgment, lack of cultural understanding, and persistent refusal to meaningfully engage with Petitioner's assertions of innocence.

## V.    CLARIFICATION REGARDING COUNSEL OETTINGER

### A.    Contradiction Regarding Justification for Withholding Z.G.'s Letter

At the June 23rd hearing, the Court relayed that Mr. Oettinger withheld Petitioner's father's letter because it referenced an unrelated New Hampshire matter in detail. However, the letter from Mr. Gu, dated August 15, 2022, makes no mention whatsoever of any such case. It contains only a personal and thoughtful appeal on behalf of his daughter, rooted in his observations of her rehabilitation and service efforts. This discrepancy calls into question Mr. Oettinger's stated rationale and contributes to a pattern of justifications that were either inaccurate or pretextual. (Exh. AC)

Mr. Gu further clarified that his letter focused solely on his daughter's character and conduct, including her demonstrated commitment to rehabilitation, community service, and responsibility. He confirmed under oath that he was unaware of any other legal matters involving Alison at the time and that she deliberately kept him out of such affairs due to concerns about his health and tendency to worry. This statement eliminates any factual basis for Oettinger's claim and demonstrates that a critical letter of support was wrongly excluded from the sentencing record. (Exh. A)

**B.    Misunderstanding Regarding Dr. Wu's Letter**

Petitioner had requested a support letter from Dr. Ming Wu, PhD - a Chinese medicine doctor and longtime mentor - prior to her sentencing hearing. Dr. Wu agreed and informed Petitioner that he had already sent the letter after speaking with Attorney Oettinger. However, following the hearing, Petitioner discovered the letter had never been filed. She then found it sitting, unopened, in her own email inbox - delivered the day after sentencing.

Upon following up, Dr. Wu explained that he had misplaced Oettinger's email address, which Petitioner had previously provided, and instead sent the letter directly to Petitioner without copying counsel. As a result, what was intended as timely mitigation support arrived too late to be of any use.

Separately, on August 17, 2022, Petitioner also forwarded Dr. Wu's letter to Mr. Oettinger with a note: "Let me know if you find any issue with that." She received no reply. (Exh. AD) Based on this silence and their prior communication patterns, Petitioner

reasonably assumed the letter had been submitted. At the time, she had no PACER access and no means of independently verifying its inclusion.

This chain of miscommunication, coupled with Oettinger's failure to clarify his role as standby counsel or notify Petitioner of filing responsibilities, contributed to a critical piece of mitigation being lost to procedural mishap - another example of the broader breakdown in defense support and strategic preparation.

**C.    Clarification Regarding Attorney Sen's Sentencing Memo**

On the day of Petitioner's supervised release violation (SRV) hearing, Attorney Oettinger informed her that he had submitted a sentencing memorandum authored by Attorney Natasha Sen in support of mitigation. (Exh. AP) This statement led Petitioner to believe the memorandum had been formally filed and made part of the record.

Approximately a year later - after completing her 10-month sentence for the violation - Petitioner began preparing her post-conviction relief filings. At that time, she contacted the Court and was instructed on how to register for PACER to access her case docket. Upon reviewing the docket, Petitioner located an entry indicating that a filing had been made on the relevant date. However, unlike other documents, the referenced sentencing memo could not be opened or viewed. (ECF No. 386) This unusual limitation caused Petitioner to suspect that the full memorandum had never actually been submitted or had been filed improperly.

Out of diligence, Petitioner followed up with the Clerk's Office. A court clerk confirmed that the full document had, in fact, been properly filed by Mr. Oettinger. The

clerk further explained that pursuant to court policy, sentencing-related documents are generally restricted from public access on PACER. This clarified the discrepancy.

In light of this explanation, Petitioner no longer contends that Oettinger failed to file the memorandum or misled her. While the initial inaccessibility caused genuine confusion and concern, the issue has since been resolved. Accordingly, no ineffective assistance claim is pursued on this ground.

**D.    Omissions of Additional Supporting Documents**

Petitioner provided Mr. Oettinger with multiple supporting documents in advance of her revocation hearing. These included:

1. A letter from her father, dated August 15, 2022, intended to humanize Petitioner and offer support. Oettinger later claimed he withheld the letter because it referenced an unrelated New Hampshire matter. However, a review of the letter confirms it makes no such reference (Exh. AC);

2. A support letter from Dr. Ming Wu, submitted via email on August 17, 2022, accompanied by the clear instruction: "Let me know if you find any issue." Oettinger did not reply. Based on prior communication patterns and the lack of response, Petitioner reasonably believed the letter had been submitted. It had not (Exh. AD);

3. Petitioner's MIT Thesis, Not-for-Profit White Paper, and project slides, and brand designs, affirming her leadership, innovation, and ethical conduct (Exh. AE);

4. An impact statement from Petitioner's son, Philip Lin, and an email sent to probation, both submitted in June 2022 but never filed (Exh. AF);

5. A personal infographic titled "What It's Like to Be Me," which visually explained Petitioner's background, challenges, and rehabilitative efforts (Exh. AG).

None of these items appear on the docket. At no point did Oettinger inform Petitioner that he declined to file them or advise her on alternative means of submission. The result was a materially incomplete record that failed to reflect Petitioner's efforts, circumstances, and supporting documentation.

These omissions, when viewed in aggregate, demonstrate a pattern of miscommunication and passive obstruction. They further deprived Petitioner of an opportunity to present mitigating evidence that could have meaningfully affected the outcome.

**E.   <u>Failure to Clarify Pro Se Rights and Procedures</u>**

While Petitioner has withdrawn any formal claim of misconduct against Attorney Oettinger, the record should reflect that he failed to meet the minimum obligations of standby counsel. He neither explained his role nor ensured that Petitioner could independently advocate for herself. He did not provide PACER access, educate her on pro se procedures, or notify her when submissions were declined or delayed.

The failure to submit multiple mitigating exhibits - including family letters, expert references, and materials relevant to Petitioner's background and sentencing - was not a matter of strategy. It was a systemic breakdown in support and communication. Oettinger's role was to enable Petitioner's participation, not obstruct it through omission.

Under *Faretta v. California*[11], and *McKaskle v. Wiggins*[12], defendants who choose to represent themselves retain a right to meaningful access to the tools necessary to do so. Standby counsel plays a crucial role in safeguarding that right. When counsel fails to act - and fails to empower the pro se defendant to act in their stead - the adversarial structure collapses.

## F.    Clarifying Scope of Claim

To be clear, Petitioner does not allege that Mr. Oettinger's omissions were malicious. In light of his prior support and the absence of direct harm arising from any one omission, Petitioner withdraws any claim of intentional misconduct. However, the record should reflect the pattern of confusion, non-responsiveness, and failure to explain basic procedures - especially where Petitioner relied on his silence as confirmation. These systemic lapses contributed to the suppression of critical mitigation evidence and deprived Petitioner of fair participation in her own defense.

## VI.    NEWLY SUBMITTED EVIDENCE AND IMPACT

## A.    Failure to Pursue Co-Defendant Strategy

---

[11] *Faretta v. California*, 422 U.S. 806 (1975) (Affirm that pro se defendants retain the constitutional right to meaningfully control and participate in their defense. Failure to submit critical mitigation materials or inform their omission deprived Petitioner of that right, violating the standards articulated in these decisions.in these decision)

[12] *McKaskle v. Wiggins*, 465 U.S. 168 (1984) (The Supreme Court held that a pro se defendant has a constitutional right to preserve actual control over the case and meaningful access to self-representation. This right was undermined, in Petition's case, when standby counsel failed to assist or advise on filing critical sentencing materials, contributing to procedural gaps and prejudicial omissions)

Petitioner submits contemporaneous emails, plea agreement documents, and a Joint Defense Agreement to establish that Attorney Shelkrot had both notice and access to critical defense strategies involving Matthew Abel. These include:

1) Joint Defense Agreement signed by Abel and communicated to Shelkrot (Exh. F);

2) Email from Shelkrot warning of a 10–12-year sentence and discussing trial risks (Exh. H);

3) Summary of Shelkrot's verbal assurance that Matt's plea would strengthen a 'blame Matt' strategy at trial (Exh. I);

4) Petitioner's written response confirming she agreed to that strategy, so long as it did not implicate her (Exh. AH);

5) "Theory of the Case" memo that incorporates Petitioner's victim narrative, but omits Abel post-plea (Exh. AI).

Together, these exhibits confirm that Shelkrot abandoned a viable and partially developed defense theory without informing Petitioner or using the available materials. Had counsel simply called Abel, or asked him to view the government's evidence, the entire identity narrative could have shifted. At minimum, Abel could have affirmed key background facts (as he does in his affidavit), refuting the prosecution's portrayal and supporting Petitioner's defense.

This strategic collapse - captured in real-time and confirmed by newly submitted evidence - warrants relief under *Strickland and Williams v. Taylor*[13].

**B.**    **Russell Evidence and Brady Foundation**

Although an affidavit from Attorney Philip Russell has not yet been returned, Petitioner believes it may become available shortly after this filing. Russell, who previously represented Petitioner in her Connecticut state criminal matter, was contacted multiple times beginning in 2024 with requests to confirm key facts. Despite leaving several messages with his office and speaking briefly with him when his office manager John Steward facilitated a call, Russell indicated only: "I'll get to it when I get to it." Subsequent follow-ups were met with no response, and staff reiterated that his heavy workload with current clients likely caused the delay.

The significance of Russell's involvement cannot be overstated. As Petitioner's retained counsel in the underlying Danbury matter - which directly triggered the federal investigation and charges - Russell had conducted an independent investigation into Lida Han and retained a Chinese attorney from a New York City law firm to gather evidence of Han's criminal background and EB-5 investment fraud. These findings included official conviction records obtained from Chinese official court websites, which Petitioner shared with her federal defense team around September 2017. (Exh. R)

Despite this clear and early evidentiary trail, no defense motion or impeachment effort was made based on Han's criminal history. Attorney Shelkrot failed to incorporate

---

[13] *Williams v. Taylor*, 529 U.S. 362 (2000): found ineffective assistance where counsel failed to investigate and present available mitigating evidence. The Court held that decisions made without adequate investigation do not qualify as reasonable strategy.

this evidence, did not move for Brady disclosures on its basis, and later returned related physical evidence without explanation. The state's witness - Han - was thereby shielded from scrutiny, even though he was a central accuser and beneficiary in both the state and federal cases. During Petitioner's federal trial, the prosecution explicitly questioned Petitioner about the Danbury case and its dismissal. The overlap between these two proceedings - including shared financial documents, actors, and claims of identity manipulation - made the state investigation quintessential to any meaningful defense strategy.

Russell's decision to file a Brady motion in state court using this same evidence, which ultimately contributed to the dismissal of the Danbury charges in April 2018, further affirms its credibility and probative value. That Shelkrot ignored the material - even after knowing of its existence and relevance - represents a prejudicial omission that falls well below constitutional standards. The Supreme Court has made clear in *Kyles*[14] and *Strickler*[15] that defense counsel has a duty not only to review, but to disclose and deploy exculpatory material. Failing to do so - particularly when the records were available and verifiable - warrants relief under the Sixth and Fourteenth Amendments. Her failure to do so constitutes suppression by omission and warrants relief under the Sixth and Fourteenth Amendments.

---

[14] *Kyles v. Whitley*, 514 U.S. 419 (1995): Held that failure to disclose favorable evidence violates due process, even without bad faith. Emphasizes duty to investigate and present material evidence - mirroring Shelkrot's failure to use Han's conviction.

[15] *Strickler v. Greene,* 527 U.S. 263 (1999): Reaffirmed that suppression of material exculpatory evidence - whether by omission or oversight - violates due process. Counsel's failure to use Han-related evidence fits this framework.

Additionally, Petitioner's former attorney Russell filed a Brady motion in the Connecticut state court based on the very same investigative findings about Han's criminal background. As a result, on March 27, 2018, the Danbury State's Attorney entered a formal nolle prosequi on all charges against Petitioner, including forgery and first-degree larceny. (Exh. AJ) Petitioner later learned this dismissal followed an in-person interview between the prosecutor and Han, which corroborated Han's underlying criminal conduct and fraud.

This outcome not only validates the evidentiary weight of the Han materials - but underscores the constitutional magnitude of Attorney Shelkrot's failure to investigate, file, or use them in federal court. The Danbury case was not tangential to Petitioner's federal prosecution - it was the predicate act that triggered the investigation, shaped the government's narrative, and was later used to impeach her credibility at trial. The two matters shared financial evidence, identity-related witnesses, and overlapping themes of manipulation by the same individuals. The suppression of this Brady material by omission was therefore neither harmless nor excusable. It left the jury with a skewed record, deprived Petitioner of an essential defense, and violated her rights under *Strickler, Kyles* and *Rompilla*.

## C.    <u>Randall and Strategic Gaps in Trial Preparation</u>

Although a formal affidavit from Susan Randall is not available for this filing, her role and account remain essential to understanding the strategic breakdowns that undermined Petitioner's defense. Randall was the defense investigator retained by Petitioner in 2017, and again in 2022 to assist with her supervised release (SVR) defense. At that time, she and Petitioner had multiple case-related conversations, including some in

the presence of attorney Mark Oettinger. Randall indicated she was willing to provide an affidavit but advised against filing a § 2255 motion while SVR proceedings were ongoing. On June 27, 2025, after the Rule 8 hearing, Petitioner renewed her request. Randall responded on July 2 that she was undergoing breast cancer treatment and was unable to assist at this time.

Based on prior conversations and corroborating documentation, the following facts emerge:

- Randall assisted in investigative activities in New York related to Allen and Lida Han. This included gathering photographic surveillance, collecting mail from residential locations, and obtaining records from a Toyota dealership. All materials were certified and prepared for potential use at trial.

- She later advised Petitioner that all investigative files were returned to Attorney Shelkrot per instruction, and that she did not retain copies.

- Randall was in receipt of a witness list from Petitioner on July 26, 2017, which included Jing Shao - an identity witness who was never contacted or called by the trial team. (Exh. AK)

- She personally interviewed Jenny, Petitioner's longtime housekeeper, who identified a photo shown to her as "Yuki," not Petitioner. This critical misidentification - undermining the government's core identity theory - was never disclosed or presented to the Court. (Exh. J)

- Despite Jenny's clear familiarity with the people involved, Randall observed that the interview was cut short, and follow-up questions were not pursued. She later concluded

that Attorney Shelkrot dismissed these witnesses based on subjective distrust rather than any objective rationale.

- Randall explained that Shelkrot maintained rigid control over all investigative activities. She confirmed that Shelkrot insisted all materials be routed through her - a claim supported by Shelkrot's own October 12, 2017 email, in which she stated that "everything… should go through me" and that she alone would "filter through" what was "helpful". (Exh. D) This bottleneck obstructed meaningful collaboration and impeded the pursuit of exculpatory leads.

- Finally, Randall reportedly told Petitioner's father, Mr. Gu, that over 95% of the evidence she gathered was never used at trial. She appeared visibly upset by this exclusion, referencing certified mail, surveillance photos, and identity-related documents. Mr. Gu's affidavit (Exh. A) corroborates this encounter and underscores the defense team's unexplained failure to present crucial materials.

Taken together, these facts point to a strategic failure by counsel to develop and present a coherent identity defense. The lack of follow-up on available witnesses, suppression of exculpatory statements, and failure to verify disputed documents constituted a collapse of basic investigatory function. The result was a defense that left key evidence untouched and left the Petitioner vulnerable to the government's narrative - despite having tools to challenge it.

Such omissions fall below the professional standard required under *Strickland* and *Kimmelman*[16], both of which recognize that counsel's failure to investigate and present available exculpatory evidence constitutes ineffective assistance of counsel.

**D.    Audio recordings**

This filing includes two key audio recordings (to be manually submitted) and accompanying transcripts (Exh. V; Exh. AL) that were never submitted to the Court at trial or sentencing. These recordings - dated November 4 and 5, 2017 - capture one instance of Attorney Shelkrot interviewing Chinese witnesses and another of her pretrial exchange with Petitioner. The tone, content, and omissions revealed in these exchanges provide direct support for Petitioner's claims of ineffective assistance of counsel under *Strickland*. They also respond directly to the Court's inquiry at the Rule 8 hearing regarding whether Attorney Shelkrot's decision not to call certain witnesses was a valid strategic choice or a prejudicial failure of advocacy.

These recordings show that the decision to suppress witnesses and compel Petitioner's testimony was driven not by evidence-based litigation strategy, but by Attorney Shelkrot's personal discomfort, fear of professional exposure, and wholesale rejection of her client's defense.

*1. Failure to Investigate or Ask Witnesses to Identify Petitioner*

---

[16] *Kimmelman v. Morrison*, 477 U.S. 365 (1986): held that a defense counsel's failure to conduct basic pretrial investigation - such as obtaining and reviewing evidence the prosecution plans to use - can constitute ineffective assistance under *Strickland*, especially when it undermines the defense's ability to challenge key evidence at trial.

The audio recording (submitted with transcripts) of the witness interview reveals that Attorney Shelkrot made a unilateral decision to withhold key witnesses without conducting any factual investigation. (Exh. AL)

The November 4, 2017 witness interview recording includes a critical statement by Attorney Shelkrot:

LISA: "*I'm recording this so that I'M not in trouble, OK. I'm protecting myself.*" (Tr. 4:60)

This candid admission underscores that Shelkrot's decision to suppress defense witnesses stemmed from her personal concern about liability - not a fact-driven trial strategy. Rather than fulfilling her obligation to advocate for Petitioner's defense, she prioritized her own protection, which contradicts the Sixth Amendment's guarantee of adversarial testing under *Strickland*.

Two additional statements support the claim that Shelkrot failed to conduct a meaningful investigation:

LISA: "*Have you three been in touch with any of the other actors who are scheduled to...*" (Tr. 5:65)
LISA: "*All actors.*" (Tr. 5:74)

This omission is profound. The Sixth Amendment guarantees adversarial testing of the government's case. Shelkrot's failure to even ask basic credibility questions

precluded any meaningful challenge to identity, leaving the prosecution's theory entirely unopposed.

Moreover, the government's claim that Shelkrot avoided calling these witnesses to prevent obstruction collapses under its own weight. In her own affidavit (ECF No. 453, Exh. 4), Shelkrot attached photos allegedly found on the phones of these supposed "actors." One of those images depicted Petitioner - an old personal photo taken by Allen and remained in his sole possession. Allen was a suspected figure in the fraudulent scheme (Exh. T & U, ECF No. 453, Exh. 1 & 5). Yet none of the witnesses interviewed by Shelkrot ever identified the woman in that photo as someone they had met. This contradicts the premise that these individuals were part of a coordinated effort linked to Petitioner. Rather, it raises serious questions about how that photo was obtained and whether false assumptions of guilt drove counsel's decision to suppress their testimony. Shelkrot failed to investigate or even ask witnesses whether they recognized the person in the photo, abandoning basic duties of advocacy. This casts serious doubt on the government's obstruction narrative and further exposes counsel's failure to investigate or confront the inconsistencies in the government's theory.

Rather than verifying the identity or factual value of each witness, Shelkrot dismissed them wholesale as "actors," including Jenny, without asking key questions such as:

- "Do you recognize my client?"

- "Is this her voice or image?"

- "Did you witness her involvement?"

This omission is material. Jenny later reported she was shown an image by the defense investigator and identified the individual as "Yuki," not the Petitioner - directly refuting the government's visual evidence. The government's obstruction justification collapses in light of this: a credible witness like Jenny was never given a chance to testify, even though she was not implicated in fabrication.

Shelkrot's failure to investigate or present such exculpatory testimony constitutes a violation under *Kimmelman*, and deprives Petitioner of the right to a meaningful defense.

By refusing to engage these witnesses, failing to ask even the most basic questions, and withdrawing them out of concern for herself rather than her client, Attorney Shelkrot abandoned her constitutional role as advocate. This failure alone, when viewed through the lens of *Strickland* and *Kimmelman*, is sufficient to establish ineffective assistance of counsel.

2. Passive-Aggressive Dismissal of Defense Witnesses

LISA: "*Thank you very much, Alison – four hotel rooms*."

ALISON: "*For me, for what*?"

LISA: "*For your crappy witnesses*."

(Exh. V Tr. Part 2, 3:26-28)

This brief but revealing exchange encapsulates Shelkrot's derisive and dismissive stance toward Petitioner's defense efforts. Her use of the phrase "your crappy witnesses" was not only unprofessional and uncalled for - it reflected a clear prejudgment of defense

witnesses based not on substance, but on disdain. The statement suggests Shelkrot had already written off the relevance or credibility of these witnesses before any thorough investigation, interview, or strategic vetting occurred.

This is critical. The government has defended Shelkrot's exclusion of witnesses as part of a calculated, strategic effort to avoid presenting false testimony. But this quote undermines that argument. It shows that Shelkrot's attitude toward the witnesses was shaped by sarcasm, irritation, and personal frustration - not any demonstrated analysis of credibility, truthfulness, or legal risk.

By preemptively discarding them with derogatory language, Shelkrot not only denied Petitioner her right to present a defense, but created a toxic and demoralizing atmosphere that discouraged Petitioner from further asserting her innocence. This was not a strategic decision - it was a dereliction of duty.

3. Lack of Strategic Preparation and Coercion into Testimony

In a telling exchange the night before Petitioner was forced to testify, Attorney Shelkrot sarcastically remarked:

ALISON: "*Are we doing this now*?"

LISA: "*Yep.*"

LISA: "*So, what are the elements of the story you wanna tell... Where do you wanna begin?*"

(Exh. AL Tr. Part 2, Page 3:30–31)

These lines open the trial preparation conversation - or more accurately, its absence. Petitioner's exasperated question, "Are we doing this now?", underscores her confusion and emotional distress, indicating that no advance notice or planning had occurred. Lisa Shelkrot's offhand "Yep," followed by a broad question about how Petitioner wants to tell her story, reveals that counsel had no outline, theme, or strategic framing prepared. This was not testimony guided by counsel; it was improvisation under pressure.

Petitioner was cornered into testifying without knowing what she would be asked, what the risks were, or how her testimony would be used. There is no indication of mitigation planning, impeachment preparation, or trial strategy. The record supports a claim of constructive coercion, not voluntary tactical choice - a violation of Petitioner's Sixth Amendment rights under *Strickland* and *Poe*.

## 4. Dismissiveness About Evidence and Defense Rights

The next telling exchange between Petitioner and Attorney Shelkrot took place just as Petitioner attempted to clarify whether she would be allowed to explain or rebut government exhibits:

ALISON: "But they're not gonna introduce any evidence... or are they?"

LISA: "Oh certainly they can introduce evidence."

ALISON: "Okay… but I can explain..."

LISA: "Whatever..."

(Exh. AM, Tr. Part 2, 4:39-41)

This brief but pivotal interaction illustrates Shelkrot's disengaged and dismissive tone at a critical moment of trial preparation. Petitioner was clearly seeking guidance on how to respond to government evidence - an opportunity to frame her testimony or clarify key points before taking the stand. But instead of providing support or reassurance, Shelkrot shut down the conversation with a flippant "whatever." The remark was not merely curt; it signaled indifference and a refusal to engage with the substance of Petitioner's concern.

Seen in the broader context of witness suppression, lack of cultural competency, and Petitioner's coerced testimony, this exchange is part of a larger pattern. It reflects a defense attorney who consistently minimized the importance of the client's participation, rejected external input, and failed to prepare a coherent trial strategy. More than poor bedside manner, this was a failure of duty: a failure to advise, a failure to inform, and a failure to advocate. No reasonable jurist could conclude that Petitioner received the defense guaranteed by the Sixth Amendment.

**E.    <u>Contradictory Evidence Regarding Jing Shao</u>**

In her May 2025 affidavit (EFC. No. 453, ¶6, ¶54), Attorney Shelkrot states:

> Alison's affidavit is the first time I have ever heard of her having contact with Jing Shao at any time, let alone mid-trial... I would have been extremely interested in knowing that she was a real person and could be contacted.

This representation is demonstrably false. Contemporaneous documentary evidence shows that Petitioner had explicitly included "Shao Jing (Mrs. Chen)" on an updated witness contact list emailed to Shelkrot and investigator Susan Randall on July 26, 2017. This list, attached as Exhibit AK, placed Jing Shao alongside other trial witnesses

discussed during the preparation phase, confirming that Shelkrot had timely notice of her potential value to the defense.

Moreover, during trial, a Citizens Bank representative (name omitted for privacy) testified under oath that she personally met Jing Shao while executing mortgage documents for the Cheshire, Connecticut property. This direct testimony from a third-party witness independently verified that Jing Shao was a real person - not an alias or fabrication - thus refuting Shelkrot's claim of ignorance or disbelief.

Petitioner also raised this issue multiple times in pro se filings, challenging the Court's judgment order that referred to her as "Alison Gu aka Jing Shao." At no point during trial did the government establish a factual connection between the two identities, and Petitioner's repeated objections to this assumption were never addressed. The government's reliance on this unproven alias - combined with Shelkrot's failure to investigate or call Jing Shao - resulted in prejudicial error.

If Shelkrot truly overlooked the contact sheet, this amounts to a serious lapse in diligence under the standard set by *Strickland* and *Wiggins*. If she instead recalled the name and later denied knowledge under oath, then the issue escalates to a misrepresentation that further undermines the credibility of her strategic justifications. Either way, this failure contributed to the erosion of Petitioner's ability to rebut the government's central identity theory.

## F.    <u>False Narrative Regarding Witness Disclosures</u>

In her affidavit (ECF No. 453, ¶14–15), Attorney Shelkrot claimed that Petitioner only provided names and contact information for key witnesses on October 11, 2017 - too late to prepare for trial. She further suggested that Petitioner's stories were "ever-changing" and that she was "managing witnesses behind the scenes." These characterizations are demonstrably false and contradicted by contemporaneous records.

As early as April 25, 2017, months before Shelkrot entered the case, Petitioner had already submitted a detailed narrative and timeline of the events - including the individuals involved - to Investigator Susan Randall. (Exh. AM) On July 26, 2017, Petitioner emailed both Randall and Shelkrot an updated contact sheet listing over 20 witnesses, including *Jing Shao* (Exh. AK), whom Shelkrot would later claim she had never heard of.

Moreover, the October 11 email - cited in Shelkrot's affidavit as the "first time" witness names were shared - was in fact a follow-up sent after a meeting where Shelkrot approved the involvement of a Chinese-language investigation team to assist with defense strategy. The email included a file titled "More Witness Info," which by its very name makes clear that it supplemented prior disclosures. (Exh. AI) In that same communication thread, Shelkrot herself distributed drafts of the "Theory of the Case," "Defendant's Exhibit List," and "Defendant's Witness List" - all of which were derived from the earlier leads Petitioner had provided. (Exh. AN)

By omitting this context and attaching only the "More Witness Info" file to her affidavit, Shelkrot misrepresented the timeline and substance of Petitioner's contributions. The record demonstrates not only consistent efforts by Petitioner to provide relevant

information but also a collaborative process - ultimately derailed by Shelkrot's refusal to act on the leads she was given.

**G.**     **November 2 Email Chain: Transparent Witness Coordination**

Petitioner submits two newly reviewed emails dated November 2, 2017, which collectively rebut Attorney Shelkrot's claim that defense witnesses were being manipulated or coordinated by an unknown third party. In her affidavit, Shelkrot suggests that "someone else" may have been orchestrating witness appearances behind the scenes - a narrative that was used to justify the suppression of several key identity witnesses.

These emails tell a different story. In one message, Attorney Shelkrot explicitly directs that witnesses "NOT talk to each other about the case or what their testimony will be," and requests that all such instructions "go through me". (Exh. AO) This establishes that she was fully aware of and exercising oversight over the travel logistics. In response, Investigator Susan Randall confirms the itinerary and ensures that the instructions will be followed. Both messages were shared openly with Petitioner.

This correspondence directly contradicts any suggestion that witness appearances were secretly orchestrated. Rather, it shows that the coordination was transparent, orderly, and known to all parties - including defense counsel. These emails are material to undermine Shelkrot's stated justification for suppressing critical defense testimony and further support the claim that her failure to present these witnesses was not strategic but constitutionally deficient.

**H.**     **Oettinger's Discrepancies and Strategic Confusion**

In prior filings, Petitioner raised concerns about the performance of Attorney Mark Oettinger in the context of posttrial representation. In addition to Dr. Wu's and my father's letters, Mr. Oettinger failed to submit several other materials that I had timely provided (Exh. AD, AG, AH, AI)

Although Mr. Oettinger nominally served as standby counsel, he never explained what that role entailed or how Petitioner could supplement the record independently. Petitioner was never informed that she had the right to file documents pro se during his standby period, nor was she given any guidance on how to do so. At the time, she lacked access to PACER and had no familiarity with federal court procedure. This resulted in a critical gap in her defense during a stage where standby counsel's constitutional role - under well-established Sixth Amendment jurisprudence - was to ensure that a pro se defendant could meaningfully and effectively exercise the right to self-representation. See *McKaskle v. Wiggins*[17]

## VII.    CUMULATIVE PREJUDICE RESULTED IN WRONGFUL CONVICTIONS

### A.    <u>Pattern of Strategic Failure and Suppressed Defense</u>

While each individual failure raised in this petition may meet the standard for ineffective assistance on its own, it is the cumulative breakdown - centered on Attorney Shelkrot's strategic misjudgments, suppression of key witnesses, and refusal to pursue viable defenses - that ultimately rendered the trial fundamentally unfair. Her actions were

---

[17] *McKaskle v. Wiggins*, 465 U.S. 168, 176–77 (1984): holds that pro se defendants retain primary control over their defense and that standby counsel must not interfere without consent. Failure to guide or enable Petitioner's participation violated this standard, undermining the ability to present a meaningful defense.

not isolated errors, but part of a pattern that, over time, erased the adversarial balance the Constitution guarantees. This prejudice was further compounded by the government's framing of the case, which relied heavily on disputed identity evidence, ignored contradictory facts, and went uncorrected due to counsel's inaction. The result was a cascading failure of process, where critical facts were excluded, credibility was misrepresented, and the jury was deprived of essential context. Together, these intersecting errors produced a conviction that cannot be trusted.

**B.      Unilateral Control and Coerced Testimony**

At the center of this breakdown was Shelkrot's unilateral control over trial strategy. She foreclosed the use of expert testimony, failed to consult with critical witnesses such as Attorney Jackie Chan and Petitioner's father, and shifted strategies without notice or consent - ultimately coercing Petitioner into testifying without preparation. Her documented distrust of the defense team, dismissive communications, and refusal to investigate plainly relevant leads undermined Petitioner's right to participate in her own defense. Rather than pursue reasonable doubt, Shelkrot retreated into assumptions of guilt and narrowed the defense to a point of collapse.

These failures were not abstract; they had real consequences. As corroborated in Mr. Zhimin Gu's affidavit (Exh. A) and testimony transcript (ECF No. 302), Petitioner's father was barred from meaningful participation in the defense, denied the opportunity to provide exculpatory evidence, and ultimately placed on the stand without preparation or explanation. His confusion and misdirected testimony became a tool for the prosecution, not the defense. He was never shown the passport video, never asked to identify his

daughter, and left in the dark about his own role until the moment he was called. These conditions, coupled with Shelkrot's contradictory messages and refusal to involve him in trial preparation, created a false appearance of family detachment and undermined Petitioner's innocence narrative. The coerced testimony was not limited to Petitioner herself - it extended to her family, whose ability to aid in the defense was actively obstructed.

Beyond trial strategy, Shelkrot's control extended to communication restrictions. In her affidavit (ECF No. 453, ¶62) Shelkrot states: *"I never instructed her or her father not to email me."* This statement is demonstrably false. Petitioner's father, Zhimin Gu, confirmed under oath that Shelkrot told him directly not to email her, and contemporaneous records show the same instruction was issued to Petitioner. Initially, Petitioner abided by this directive, believing it to be legally necessary. But within months, it became clear that counsel had not conducted adequate investigation, routinely expressed confusion about core facts, and provided materially incorrect advice about sentencing exposure and loss calculations during plea discussions. At that point, Petitioner resumed regular email communication - reverting to her normal documentation practices out of necessity. It is because of this decision that Petitioner retained a robust email record, which now directly contradicts key aspects of Shelkrot's sworn statement and establishes the suppressed scope of defense options that were never pursued.

## C.     Government's "Linkage" Theory Was Circumstantial, Misleading, and Unrebutted

Despite the government's claim that certain information on the fraudulent passport application linked Petitioner to the offense, a careful analysis reveals this evidence was entirely circumstantial and easily susceptible to an alternative explanation - had defense counsel offered one. The passport applicant used a fabricated identity, "Ally Koo," based on the social security number of a deceased person and a forged court order authorizing a name change. The alias resembled Petitioner's legal name, and the supplemental questionnaire drew on publicly known or easily accessible details - her children's first names and college affiliation - suggesting deliberate scapegoating by someone with insider knowledge.

Further, the so-called "damning" physical evidence - an embroidered seal and notary stamps - was found under a fish tank in Petitioner's home. Investigator Susan Randall later claimed that a discrepancy in witness's response about the fish tank's location reflected credibility issues. Yet that location, visible but indirect, is consistent with the behavior of a fraudster seeking to frame someone from within the household. No forensic testing or ownership tracing was conducted to establish whether those items were actually used by Petitioner, nor was any innocent explanation offered at trial.

Petitioner directly raised with counsel the possibility of suppressing this evidence, given its seizure was based on a search warrant she believed to be misleading. She questioned whether federal agent Jeremy Stella had used false pretenses - including unsupported wire fraud allegations - to obtain the warrant. Counsel either flatly rejected the idea without analysis or failed to respond at all. Later, when the government initially listed Stella as a trial witness and then quietly removed him, Petitioner again asked whether

he could be subpoenaed. Counsel responded only that "the government can subpoena whoever they want," refusing to pursue any challenge to the credibility or conduct of the lead agent. In her postconviction affidavit, Shelkrot stated, "*I don't recall discussing Agent Stella with Alison, but also don't think it would have been helpful to call the case agent as a witness. I did not have evidence of improper 'collusion' between him and Det. Brooks.*" (ECF No. 453, ¶53). This statement reflects not only a lack of investigation, but a failure to recognize the importance of accountability for how critical evidence was obtained. The issue was never explored - despite its direct relevance to constitutional rights under *Franks v. Delaware*[18].

Had counsel contextualized these facts, the jury could have been shown that Petitioner, a U.S. citizen with a good education, close family, and over $700,000 of documented legal investment in real estate, had no rational motive to engage in petty or risky fraud. Her conduct - continuing to pay mortgages, completing renovations, and preparing the properties for rental income - stands in stark contrast to the behavior of someone attempting to commit identity fraud for financial gain. Notably, only one bank, Bank of Bennington, ever claimed a loss, and Petitioner has consistently alleged that the bank colluded with federal agents to induce criminal liability where none existed - later using her conviction to obtain foreclosure through judicial maneuvering (ECF No. 316 & 318).

---

[18] *Franks v. Delaware*, 438 U.S. 154 (1978): allows defendants to contest evidence if officers knowingly or recklessly submitted false information. Shelkrot's failure to explore potential misconduct denied Petitioner that constitutional safeguard.

The government's circumstantial narrative might have been neutralized with a well-developed defense. Instead, trial counsel did nothing to frame this context or explain to the jury why Petitioner, of all people, would not be the architect of the crimes charged. The jury was left to speculate, unopposed, about what the circumstantial clues might mean. That failure is not strategy - it is constitutional breakdown.

**D.    Government Narrative Unchecked by Defense**

The harm was magnified by the government's selective narrative, which cast Petitioner as the singular mastermind while shielding other key actors from scrutiny. Evidence of Lida Han's criminal convictions and fraudulent activities - documents submitted to counsel but never disclosed to the Court - was ignored. The prosecution's identification theory rested almost entirely on images and video footage that were never subjected to expert analysis or cross-identification, even though witnesses like Jenny and Petitioner's father could have meaningfully challenged them. The government presented a coherent, simplified story, unimpeded by any adversarial testing. Counsel's failure to object, investigate, or rebut allowed that framing to harden into fact.

Worse still, trial counsel failed to challenge or explain damaging elements within the government's presentation. When Detective Roger Brooks testified that Petitioner denied being "Alison Ling" at their first encounter, counsel failed to elicit the most critical context: Brooks was in plain clothes, and Petitioner had a well-founded fear of impersonation stemming from her prior experience as a victim of identity fraud by

associates of her ex-husband Allen Lin [19]. That omission allowed the jury to infer evasiveness rather than self-protection.

The government also displayed images of Petitioner's home, both interior and exterior, with no probative purpose other than to imply wealth and privilege. These visuals were unrelated to the charged conduct, but were allowed into evidence without objection. Their likely effect was to inflame the jury with class bias and jealousy - suggesting that Petitioner's lifestyle had been fraudulently acquired.

When Abel's sister, Christianna, testified, she could have confirmed the existence of "Bo" (or "Bow") - a person who had appeared at family gatherings and was central to Petitioner's identity defense. Yet counsel failed to ask this basic corroborating question during cross-examination. This was a missed opportunity to validate Petitioner's explanation and present third-party involvement in the alleged passport offense.

Similarly, the government introduced only a still image clipped from the passport video, rather than the video itself. The still lacked resemblance to Petitioner, and its use - without objection - allowed the jury to rely on a misleading image rather than the full motion footage, which may have shown the actual applicant's different physical profile or behavior. A properly prepared defense would have demanded full forensic review or objected to selective evidence display.

---

[19] See *Shelkrot Aff.*, ECF No. 453 ¶53 (acknowledging Petitioner's claim that she denied being Alison Ling out of instinct and that counsel declined to cross-examine Detective Brooks on the matter). see also Gov't Opp., ECF No. 466 at 7 (dismissing any need to cross-examine Det. Brooks on this issue as lacking material impact).

In her affidavit, Attorney Shelkrot claimed: *"She would occasionally respond, but during this period of time she was more focused on buying her Vermont house out of foreclosure."* (ECF No. 453, ¶23) This statement is misleading. As discussed, Petitioner consistently responded to trial communications and raised meaningful questions about strategy and sentencing exposure. Her simultaneous effort to complete the property transaction was not a distraction - it was a rational legal step to mitigate financial exposure and reduce the perceived loss underpinning the prosecution's theory.

Email communications from October 12 to 26, 2017, confirm that Petitioner was actively working to eliminate or reduce any financial harm to the Bank of Bennington. She had won the foreclosure auction by matching the full judgment amount and was seeking approval from her Probation Officer to proceed with the mortgage needed to complete the purchase. Counsel was fully aware of this effort, yet failed to present it as a rebuttal to the government's theory of loss. Nor did she inform the jury of public statements by co-defendant Abel's counsel that no actual loss was expected. Instead, the defense allowed the prosecution to portray Petitioner as financially desperate and predatory - an image that could have been directly undermined by evidence showing she was attempting to fulfill contractual obligations in good faith and preserve equity in the property. (Exh. AQ)

Counsel's portrayal of this effort as a distraction ignores its legal significance: had the purchase gone through, there would have been no financial loss, eliminating a core element of the government's theory and undermining the basis for prosecution and restitution. Rather than support and present this exculpatory effort to the jury or Court, counsel dismissed it and later mischaracterized it as a sign of disinterest in trial strategy.

This is not a matter of interpretation - it is a failure to understand or act upon facts that would have materially altered the posture of the case.

Even in her closing argument, Attorney Shelkrot asked rhetorically: *"Does anybody really think that somebody went to this much trouble for a two percent difference in the down payment? Does that make any sense to you?"* (ECF No. 302, Tr. 66:5–7). Yet this question - without jury instructions, foundational education on real estate law, or expert guidance - left jurors ill-equipped to evaluate the answer. Complex property finance concepts like "equity protection," "constructive fraud," or "down payment calculations" were never explained. Petitioner's contemporaneous requests for a bench trial (Exh. I) stemmed precisely from this concern: that a legally trained judge could understand the nuances of real estate law that a lay jury could not. That strategy was ignored, and the government's misleading narrative went unchecked.

### E.     Clarifying the Incomplete Identity Defense

Although Petitioner testified that "Bow" and "CC" were responsible for key events, this narrative was uncorroborated, unprepared, and delivered under coercive conditions without the benefit of strategic framing or corroborating witnesses. The identity defense was not "heard" by the jury in any meaningful sense. It lacked evidentiary support from key witnesses such as Jenny, Abel, or Mr. Gu - all of whom could have confirmed misidentification, explained the presence of third parties, or authenticated relevant records. Without such testimony, Petitioner's claims appeared isolated and self-serving. The Court's suggestion that the jury was presented with the identity defense through Petitioner's testimony overlooks the fact that this was a diluted, unsupported version -

stripped of the very evidence that could have made it credible. Under Strickland, the failure to present corroborating witnesses rendered the defense ineffective and prejudicial.

Trial counsel also failed to utilize a critical piece of exculpatory context: Matthew Abel's guilty plea. After entering a plea agreement, Abel admitted to aiding and abetting the offense conduct but did not identify Petitioner as the mastermind, nor did his allocution implicate her as the primary actor. This fact alone could have introduced reasonable doubt about Petitioner's central role in the scheme. Counsel had multiple avenues to present this evidence - by calling Abel to testify, eliciting the plea terms through Petitioner's own testimony, or submitting the plea transcript or judgment via stipulation or judicial notice. Instead, the jury was left unaware that a co-defendant had already accepted responsibility for conduct the prosecution sought to attribute solely to Petitioner. This omission further compounded the prejudice caused by the suppression of defense witnesses and the abandonment of the "blame Matt" strategy. Under *Strickland* and *Kimmelman*, such a failure to introduce plainly relevant, available exculpatory information constitutes deficient performance with a reasonable probability of affecting the verdict.

### F.    Jury Deliberation Questions Confirm Prejudice

The clearest reflection of the prejudice resulting from trial counsel's cumulative failures appears in the jury's own words. During deliberation, jurors submitted two written questions:

1.    Referencing Page 16 of the jury charge:

> Are we to assume in this case another is guilty of the crime as primary
> based on the evidence in general? If we choose to consider her innocence
> as primary?
>
> (ECF No. 302, Tr. 132:6-11)

2.    Regarding Count 1 aiding and abetting on Page 15:

> Do we as the jury need to consider aiding and abetting if Alison Gu is
> guilty of Count 1, three elements found on Page 13?
>
> (ECF No. 302, Tr. 132:13-16)

In response, the Court instructed: *"You cannot assume someone's guilt."*

These questions expose fundamental uncertainty among jurors about whether:

- Someone else may have committed the core criminal act (i.e., whether Gu was the principal actor or merely an aider/abettor), and
- Gu's role could be interpreted differently than what the prosecution alleged - i.e., not as a mastermind, but as a secondary or manipulated participant.

Yet Petitioner's trial counsel offered no coherent theory or evidence to support that distinction. Witnesses who could have cast doubt on identity - such as Jenny, Gu's father, Matthew Abel, and expert analysts - were never called. No alternative narrative was offered. The result was a vacuum of exculpatory explanation that left the jury confused and unsupported in resolving reasonable doubt.

That the jury raised these exact questions after hearing all of the prosecution's evidence - and none of the excluded defense testimony - strongly supports the conclusion that trial counsel's cumulative errors were not harmless. They were case-determinative.

This is prejudice under Strickland. And it is even more compelling under *Kyles v. Whitley*, which emphasizes how suppressed evidence and strategic omissions must be considered collectively, not piecemeal. The jury was seeking answers only counsel could have provided - and she did not.

## G.  Missed Opportunities to Present Mitigating Motive and Financial Context

Petitioner's original § 2255 motion included a claim against Attorney Sen, who represented her during sentencing. That claim questioned whether Sen adequately challenged the government's inflated loss figures, which were used to justify sentencing enhancements. Specifically, Petitioner believed the loss attributed to her was artificially created by Bennington Bank's foreclosure tactics and did not reflect actual harm. However, Petitioner now declines to renew that claim - out of fairness, focus, and recognition that Attorney Sen ultimately presented a thoughtful and well-supported sentencing memorandum.

Sen's memo (Exh. AP, ECF No. 267) made several arguments that trial counsel failed to raise. It explained that only one bank, Bennington Bank, claimed a loss; the total exposure was less than $117,000 on over $1.6 million in loans. Petitioner had lawfully invested over $700,000 of her own funds into the properties, completed renovations, and made timely payments until her arrest. She even attempted to repurchase one foreclosed property, putting down a $10,000 earnest deposit. The memo also questioned the two-level enhancement for "gross receipts," noting Petitioner personally received under the $1 million threshold.

Sen also highlighted personal mitigating factors, including Petitioner's efforts to raise her children alone, her educational background, and lack of prior criminal conduct. These facts, presented effectively at sentencing, were entirely absent at trial.

This contrast demonstrates that the financial and human context essential to Petitioner's defense was always available - but never offered to the jury. A competent trial attorney would have used this evidence to rebut motive and intent. That it appeared only after conviction illustrates the prejudice caused by trial counsel's failure to present a complete and truthful picture of who Petitioner was - and why the government's narrative did not make sense.

## H.    <u>Continuity of Harm from Successive Counsel</u>

Attorney Lisa Shelkrot represented Petitioner from 2016 through 2017, during the critical pretrial and trial phases. Her representation was followed years later by Attorney Mary Nurino, who was appointed in 2022 during supervised release proceedings. Although Petitioner does not assert a separate ineffective assistance claim against Nurino, her later representation was marked by limited communication and failure to investigate lingering evidentiary concerns - contributing to continued gaps in the record. Likewise, Attorney Mark Oettinger, who served as standby counsel, failed to advise Petitioner on essential procedures or act on her requests to file mitigating documents.

While each attorney served during distinct phases, the cumulative impact reflects a continuity of harm. At no point was Petitioner fully informed, adequately supported, or equipped to present a complete and constitutionally sound defense.

I.    **Collapse of the Adversarial Process**

Under *Strickland* and its progeny, courts evaluate not isolated errors, but whether the cumulative effect of counsel's performance undermined confidence in the outcome. In this case, the answer is clear: multiple breakdowns in representation - both before and after trial - compromised the fairness of the proceedings and support a finding of prejudice.

Following the Court's Entry Order (ECF No. 443) directing former counsel to file affidavits with supporting documents, Attorney Shelkrot moved to amend the order to allow selective filing under seal or in camera, citing reputational concerns (ECF No. 444), followed by a request for oral argument (ECF No. 447). On March 11, 2025, the Court granted that motion (ECF No. 451).

Due to a known CM/ECF system issue affecting closed cases and pro se parties, Petitioner did not receive electronic notice of that ruling. She continued preparing her opposition under the belief that the motion remained pending and filed a response on June 19, 2025 (ECF No. 462).

Shortly before the scheduled June 23 hearing, Shelkrot emailed Judge's clerk stating, "I think this is scheduled as an evidentiary hearing, right? It will be helpful for me to know as early as possible whether either of the parties intends to subpoena me." While not misleading in itself, this communication - combined with prior procedural ambiguity - contributed to Petitioner's misunderstanding of the hearing's scope and timeline.

Taken together, these events created confusion and hindered Petitioner's ability to fully engage in the post-conviction process. With incomplete access to filings and shifting

expectations about the hearing, Petitioner was left without a clear understanding of the framework for presenting evidence and argument.

What began as a breakdown in trial strategy extended into post-conviction practice. The resulting prejudice was not isolated or incidental - it was cumulative. In light of the structural irregularities and record gaps that emerged throughout, relief is warranted to ensure the integrity of the § 2255 proceedings and the fairness of the original trial.

## J.   Prejudice and Resulting Harm

The cumulative breakdown in representation had real, measurable consequences for Petitioner - legally, personally, and reputationally. Beyond structural failures and factual omissions at trial, Petitioner was forced to defend herself against four additional prosecutions between 2018 and 2024, all of which stemmed directly from the original 2017 conviction. Despite lacking legal representation for much of this period, she succeeded in getting each charge dismissed - three in state courts and one in federal supervised release proceedings. (Exh. AS)

This record illustrates not only the ongoing collateral damage caused by the ineffective assistance, but also Petitioner's commitment to defending her name and correcting the record. Her success in nullifying these derivative charges affirms the underlying weaknesses in the government's case and supports her consistent claims of innocence.

The dismissals also reflect a broader scope of harm: reputational degradation, continued legal exposure, emotional toll, and economic losses spanning seven years. Taken

together, these consequences are emblematic of the prejudice *Strickland* addresses - harms that flow not from isolated errors, but from a sustained failure to provide constitutionally adequate representation at a critical moment.

## VII.    MISAPPLICATION OF LEGAL PREDEDENT BY THE GOVERNMENT

The government's reliance on *Kelly*, *Luciano*, *Smith*, and *Pizarro* is misplaced. These cases are distinguishable both procedurally and substantively. Unlike *Kelly* or *Pizarro*, where the record lacked detail or was procedurally barred, the record here is fully developed - including letters, affidavits, and direct factual contradictions between counsel's claims and the actual evidence.

Unlike *Luciano* and *Smith*, where courts deferred to strategic decisions made after some investigation, the errors in this case reflect non-performance, not poor performance. Counsel abandoned meaningful preparation and suppressed evidence without any investigation or valid tactical explanation. These are not "strategic choices" entitled to deference - they are constitutional violations that deprived Petitioner of an adversarial trial altogether. The prejudice is not speculative. It is real, documented, and outcome-altering - falling squarely within the core concerns addressed by *Strickland* and its progeny.

## VII. CONCLUSION

Petitioner's trial was not merely flawed - it was structurally unsound. The errors documented herein were not isolated lapses or subjective disagreements about trial strategy. They were systemic violations that rendered the adversarial process ineffective and deprived Petitioner of a fair opportunity to defend herself.

Trial counsel failed to investigate critical identity issues, suppressed credible and exculpatory witnesses, misrepresented legal risk during plea discussions, and coerced Petitioner into testifying under distress and without preparation. She exerted unilateral control over strategy and communication, misled both client and Court, and manipulated postconviction procedures to restrict Petitioner's ability to respond. The cumulative impact of these actions destroyed the factual and strategic foundation of the defense, resulting in a wrongful conviction.

What followed was not a recovery but a lone effort to repair the damage. Petitioner's ability to uncover exculpatory evidence, marshal affidavits, and reconstruct suppressed defense material is not a sign she was adequately represented - it is evidence of how much was denied. The factual record is now fully developed. It reveals unrebutted breakdowns at every stage of representation, supported by sworn affidavits, contemporaneous emails, audio recordings, and the omissions trial counsel now seeks to revise.

Relief is warranted. At a minimum, Petitioner is entitled to an evidentiary hearing. But the record already establishes ineffective assistance and constitutional prejudice sufficient to vacate the conviction outright. Justice demands that the outcome of this case be reconsidered - on a record that reflects the truth, not one shaped by omission, suppression, or unchallenged assumptions.

## VIII. REQUEST FOR RELIEF

For the reasons set forth above, Petitioner respectfully requests that this Court:

1. Vacate the judgment of conviction pursuant to 28 U.S.C. § 2255 and issue an order of full exoneration;

2. Strike the conviction from Petitioner's record to eliminate ongoing collateral consequences;

3. Discharge or vacate any remaining monetary penalties, including unresolved forfeiture orders, particularly where duplicative of previously paid restitution;

4. Alternatively, grant an evidentiary hearing to fully develop the factual record concerning trial counsel's constitutional failures;

5. Appoint counsel pursuant to Rule 8(c) of the Rules Governing § 2255 Proceedings in the event such hearing is granted. Petitioner respectfully emphasizes that appointment of counsel is mandatory at the hearing stage. Rule 8(c) requires counsel be assigned when an evidentiary hearing is ordered, particularly in a case involving complex factual disputes, voluminous records, and multiple former attorneys. Additionally, several material witnesses - including co-defendant Matt Abel, real estate attorney Jackie Chan, and state defense attorney Philip Russell - are non-party individuals whose cooperation may not be obtained voluntarily. As a pro se litigant, Petitioner lacks subpoena power and has no legal authority to compel testimony or obtain affidavits from such witnesses in advance. Without appointed counsel, Petitioner would be unable to meaningfully develop or present the factual record, resulting in a structurally deficient hearing and potential appellate error. Prior changes in counsel were necessitated by ethical and performance issues, not abuse of the process.

6. Should the Court decline to vacate the conviction based on the current record, Petitioner alternatively requests the appointment of limited-purpose or standby counsel to assist with (1) obtaining affidavits from key witnesses - including Susan Randall, Philip Russell, Jackie Chan, and Jenny The - and (2) certifying the authenticity of audio and digital records. This targeted assistance is necessary to complete the factual record, especially where the complexity of the case and prior counsel conflicts may deter full representation.

7. Preserve the existing affidavit record for purposes of credibility determinations. Attorney Shelkrot has submitted her sworn statement (ECF No. 453), and the Government's opposition is now on file. Given the history of selective disclosure and procedural confusion - including Shelkrot's prior motion to submit materials under seal (ECF No. 444) - Petitioner respectfully requests that no supplementation or revision of counsel affidavits be permitted without leave of Court.

8. Alternatively, grant relief on the existing record without a hearing. Petitioner submits that the evidence already before the Court - audio recordings, contemporaneous emails, sworn affidavits, and supporting exhibits - establishes both deficient performance and resulting prejudice, obviating the need for further testimony. See *United States v. Dawson*[20].

9. Allow submission of anticipated affidavits from Russell and Randall if they become available post-filing, or grant appointed counsel authority to subpoena their sworn testimony, should the Court find their statements necessary to resolve disputed factual issues.

10. Grant such other and further relief as this Court deems just and proper in the interest of justice.

Petitioner further requests leave to supplement this motion as may be necessary to address any newly discovered evidence or respond to subsequent filings by the Government[21].

---

[20]*United States v. Dawson*, 857 F.2d 923, 928 (3d Cir. 1988): holds that a district court may resolve a § 2255 motion without an evidentiary hearing when the record, including affidavits and documentation, conclusively establishes ineffective assistance and prejudice.

[21] Petitioner acknowledges that several 2017–2018 email exhibits remain uncertified due to logistical constraints. The files align with metadata and were exchanged between trial counsel during the relevant period. Petitioner submits them in good faith and reserves the right to authenticate them through a licensed investigator, such as Susan Randall, if needed.

Respectfully submitted on this 7th day of July 2025.


By:_____/s/ Alison Gu
Alison Gu a/k/a Alison Ling
Pro Se