U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2025 DEC 12  PM 1: 56

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA )
)
v. )   Case No. 2:16-cr-00084-1
)
ALISON GU )
Defendant. )

**OPINION AND ORDER DENYING DEFENDANT ALISON GU'S
MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT
TO 28 U.S.C. § 2255**
(Doc. 407)

Pending before the court is Defendant Alison Gu's motion to vacate, set aside, or

correct sentence pursuant to 28 U.S.C. § 2255. (Doc. 407.) Ms. Gu claims she is entitled

to relief because her defense trial counsel provided her with constitutionally ineffective

assistance of counsel by failing to call specific defense witnesses, failing to adequately

cross-examine government witnesses, providing "conflicting, inconsistent, and

misleading" legal advice, compelling Ms. Gu to testify, and failing to appropriately

investigate and prepare for trial. (Doc. 407-1 at 5.)

Plaintiff is self-represented. The government is represented by First Assistant

United States Attorney Michael P. Drescher.

I.      **Factual and Procedural Background.**

Ms. Gu was charged in a three-count indictment with bank fraud, knowingly

making a false statement in an application for a passport, and aggravated identity theft.

She was originally represented by former Assistant Federal Public Defender David L.

McColgin, before Lisa B. Shelkrot, Esq., was appointed as Criminal Justice Act ("CJA")

counsel on May 22, 2017, and represented Ms. Gu throughout her trial.

On November 7, 2017, a jury convicted Ms. Gu on charges of bank fraud,

knowingly making a false statement in an application for a passport, and aggravated

identity theft. Ms. Gu sought a judgment of acquittal notwithstanding the verdict pursuant

to Fed. R. Crim. P. 29(c) or, in the alternative, a new trial pursuant to Fed. R. Crim. P.

33(a). (Doc. 193.) The court denied both motions on February 1, 2018, (Doc. 204), and on December 27, 2018, Ms. Gu was sentenced to a term of thirty-six months of imprisonment followed by three years of supervised release and ordered to pay $107,117.55 in restitution to the Bank of Bennington as well as a $109,104.00 forfeiture judgment. Ms. Gu was represented by Attorneys Paul S. Volk, Esq., Stacey Van Malden, Esq., and Peter A. Goldberger, Esq. during part of her sentencing proceedings, as well as by CJA counsel Natasha Sen, Esq.

Ms. Gu appealed her conviction and sentence to the Second Circuit on January 8, 2019. (Doc. 280.) While the appeal was pending, Ms. Gu filed a *pro se* motion to set aside the restitution and forfeiture judgment portions of her sentence, claiming her counsel of record ineffectively represented her during the criminal proceedings. (Doc. 316.) The court denied Ms. Gu's motion on April 16, 2020. (Doc. 342.) The Second Circuit affirmed Ms. Gu's conviction on August 5, 2021,[1] and the Supreme Court denied certiorari on February 22, 2022.[2]

On August 16, 2022, in response to Ms. Gu's violation of conditions of supervised release, the court sentenced her to ten months of imprisonment followed by one year of supervised release. During her revocation of supervised release proceeding, Ms. Gu was represented by Assistant Federal Public Defender Mary M. Nerino until, at her request, CJA counsel Mark D. Oettinger, Esq., was substituted as counsel. Attorney Oettinger served in a standby counsel role after Ms. Gu asked to represent herself.

On February 28, 2023, Ms. Gu, representing herself, filed the instant motion to vacate her sentences and original conviction pursuant to 28 U.S.C. § 2255. (Doc. 407.) She alleged that all of her counsel throughout her criminal case and supervised release violation proceedings were ineffective. The government, believing Ms. Gu's motion to be a second or successive application within the meaning of § 2255(h), moved on April 5, 2023, to transfer the matter to the Court of Appeals or, in the alternative, for a court order

---

[1] *See United States v. Gu*, 8 F.4th 82 (2d Cir. 2021).

[2] *See Gu v. United States*, 142 S. Ct. 1186 (2022).

directing former counsel to provide affidavits responding to Ms. Gu's assertion. (Doc. 409.) On May 11, 2023, the court granted the government's motion to transfer the matter to the Court of Appeals and denied the motion to order counsel to submit affidavits as moot. (Doc. 412.) In July 2024, the Second Circuit held Ms. Gu's motion was not successive and remanded the matter to this court to rule on her claims. (Doc. 438.)

Upon remand, the court ordered Ms. Gu to file a supplemental memorandum identifying the specific ineffective assistance claims she intended to pursue and the grounds for those claims. On November 4, 2024, Ms. Gu filed a supplemental memorandum, alleging Lisa Shelkrot, Esq., and Mark Oettinger, Esq., provided ineffective assistance of counsel.[3] (Doc. 442.)

On November 19, 2024, the court ordered Attorneys Shelkrot and Oettinger to submit affidavits addressing Ms. Gu's claims of ineffective assistance of counsel. (Doc. 443.) Attorney Shelkrot filed her affidavit on May 22, 2025, (Doc. 453), and Attorney Oettinger filed his affidavit on May 29, 2025. (Doc. 456.) The government opposed Ms. Gu's motion on June 20, 2025. (Doc. 466.) The court heard arguments and held an evidentiary hearing on the motion on June 23, 2025, during which Ms. Gu withdrew her claims against Attorney Oettinger. The court granted Ms. Gu leave to file supplemental briefing following the hearing, which Ms. Gu submitted on July 7, 2025. (Doc. 470.) The government responded on July 14, 2025, (Doc. 474), at which time the court took the motion under advisement. Ms. Gu filed an additional reply on July 23, 2025. (Doc. 477.)[4]

---

[3] Ms. Gu also mentioned Attorneys David L. McColgin, Natasha Sen, and Mary M. Nerino, but her allegations related to these attorneys were de minimis, lacked specifics, and/or were conclusory. *See* Doc. 443 at 3 n.2. She subsequently advised the court she was not pursuing ineffective assistance of counsel claims against them.

[4] This additional reply from Ms. Gu "elaborates on the prejudice arising from trial counsel's failures – both procedurally and substantively – and demonstrates why, should the [c]ourt deny relief, a Certificate of Appealability (COA) is warranted." (Doc. 477 at 1.) The document includes allegations not made in Ms. Gu's previous filings of "inaction or permissiveness [by the court that] enabled a pattern of off-record coordination between the [g]overnment and defense counsel, contributing to ineffective assistance of counsel and prejudicial denial of constitutional protections." *Id.* at 22. Ms. Gu also renewed her request for appointment of counsel. *Id.* at 28.

In total, after the court's evidentiary hearing, Ms. Gu submitted over three hundred pages of additional information, including that she was "involuntarily intoxicated (drugged) by someone." (Doc. 470-5 at 2.)

Ms. Gu's request for appointment of counsel was made in a standalone motion on June 19, 2025, four days before the evidentiary hearing. (Doc. 461.) Ms. Gu's requests for counsel under the Prayer for Relief section of her November 4, 2024 supplemental memorandum and in a Motion to Continue the evidentiary hearing filed on June 13, 2025, (Doc. 458 at 3), did not comply with the District of Vermont's Local Rules. *See* D. Vt. L.R. 7(a)(1) ("The court will not consider any motion unless it contains the word 'motion' in the title."). The court determined that to appoint counsel in the days immediately preceding the evidentiary hearing would needlessly delay a hearing that had been difficult to schedule and of which Ms. Gu had notice for several months. The court advised Ms. Gu that she could call witnesses at the hearing. (Doc. 468 at 5:23-6:1) (The court to Ms. Gu regarding an evidentiary hearing: "[T]his was the opportunity today. . . . And you either present witnesses or you don't. That's up to you."). Ms. Gu did not call any witnesses.

In seeking appointed counsel, Ms. Gu has not demonstrated that she is indigent. She has previously requested to represent herself and initiated her petition as a self-represented litigant. She has filed extensive petitions challenging her conviction and sentence without the assistance of counsel and with no apparent difficulty in identifying her claims and citing case law to support her arguments, although the government argues that some of the cited cases do not exist or are misrepresented. *See* Doc. 474 at 5-6.

Throughout her criminal proceedings, Ms. Gu was represented by eight different attorneys, most of whom she asked to withdraw when their strategy conflicted with her own. Against this backdrop, the court finds it futile to appoint further counsel because Ms. Gu seeks to call witnesses and advance claims that a lawyer may be unable to ethically support. *See, e.g.*, *Abad v. United States*, 2023 WL 3901528, at *2 (S.D.N.Y. June 8, 2023) (denying appointment of counsel for petitioner seeking relief under § 2255

4

because petitioner "failed to demonstrate that his claim ha[d] merit").[5]

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

The standard for ineffective assistance of counsel established in *Strickland v.*
*Washington*, 466 U.S. 668 (1984), is two-pronged:

> A defendant claiming ineffective assistance of counsel must make two
> showings. First, "the defendant must show that counsel's representation fell
> below an objective standard of reasonableness" under "prevailing
> professional norms" such that "counsel was not functioning as the 'counsel'
> guaranteed the defendant by the Sixth Amendment." Second, the defendant
> must "affirmatively prove prejudice" from the deficient performance such
> that "there is a reasonable probability that, but for counsel's unprofessional
> errors, the result of the proceeding would have been different."

*United States v. Ortiz*, 100 F.4th 112, 118 (2d Cir. 2024) (internal citations omitted)
(quoting *Strickland*, 466 U.S. at 687-88, 693-94). "A strong presumption exists that
counsel's conduct falls within the wide range of reasonable professional assistance, given
that there are countless ways to provide effective assistance in any given case and that
even the best criminal defense attorneys would not defend a particular client in the same
way." *United States v. Guang*, 511 F.3d 110, 120 (2d Cir. 2007) (alterations adopted)
(internal quotation marks omitted) (quoting *United States v. Aguirre*, 912 F.2d 555, 560
(2d Cir. 1990)). "In considering these requirements, 'the benchmark for judging any
claim of ineffectiveness must be whether counsel's conduct so undermined the proper
functioning of the adversarial process that the trial cannot be relied on as having
produced a just result.'" *Ortiz*, 100 F.4th at 118 (alteration adopted) (quoting *Strickland*,
466 U.S. at 686).

"Section 2255 provides relief in cases where the sentence: (1) was imposed in
violation of the U.S. Constitution or the laws of the United States; or (2) was entered by a
court without jurisdiction to impose the sentence; or (3) exceeded the maximum detention

---

[5] *See also United States v. Garrison*, 2020 WL 5253219, at *1 n.1 (S.D.N.Y. Sept. 3, 2020) ("For
the [c]ourt to order the appointment of counsel [for a motion for compassionate release], the
applicant must, as a threshold matter, demonstrate that his [or her] claim has substance or a
likelihood of success on the merits.").

authorized by law; or (4) is otherwise subject to collateral attack." *Adams v. United States*, 372 F.3d 132, 134 (2d Cir. 2004) (citing 28 U.S.C. § 2255). The Second Circuit has held that Section 2255 "is the appropriate vehicle for a federal prisoner to challenge the imposition of his [or her] sentence." *Id.* (emphasis omitted) (quoting *Chambers v. United States*, 106 F.3d 472, 474 (2d Cir. 1997)).

## B.    Failure to Call Witnesses.

Ms. Gu faults Attorney Shelkrot for failing to call "key" defense witnesses who, if called, would have testified in a manner that would have contradicted evidence of bank fraud, provided evidence of alternative perpetrators of the alleged crimes, and supported Ms. Gu's credibility. (Doc 442 at 3, ¶ 12.) Generally, the "decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) (quoting *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992)); *see also United States v. Nolan*, 956 F.3d 71, 82 (2d Cir. 2020) (*Strickland* "does not require defense counsel to call any particular witness[]"); *United States v. Best*, 219 F.3d 192, 202 (2d Cir. 2000) ("Nor do we see anything unreasonable in counsel's decision not to call the potential witnesses[]"); *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) (counsel's decision as to "whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation[]"). Reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound legal strategy.'" *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004) (alteration adopted) (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 689); *see also Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (there is a "strong presumption" of reasonable representation) (internal quotation marks omitted). "A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel." *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002).

6

### 1.    Jackie Chan and Philip Russell.

Ms. Gu argues that Attorney Shelkrot should have called Jackie Chan and Philip Russell, two Connecticut attorneys who helped Ms. Gu conduct real estate transactions in Connecticut. Ms. Gu asserts that evidence from Attorneys Chan and Russell could have refuted the bank fraud charges by establishing the lawful funding for real estate the prosecution claimed was fraudulently obtained. According to Ms. Gu, Attorneys Chan and Russell also could have served as character witnesses to bolster her credibility and impeach a government witness named Lida Han. Ms. Gu characterizes Attorney Shelkrot's rejection of these two witnesses as "based on generalized distrust and not on any substantiated finding of unreliability." (Doc. 470 at 21.)

In contrast, Attorney Shelkrot avers that her evaluation revealed that Attorneys Chan and Russell lacked relevant, material information related to the case and she did not consider their potential character evidence on behalf of Ms. Gu to be "worth waiving [the] attorney-client privilege[.]" (Doc. 453 at 18, ¶ 54.)

Ms. Gu's contention that Attorneys Chan and Russell possessed exculpatory evidence is unsubstantiated by her own supporting documents. For example, she claims that Attorney Chan could have vouched for her character because he had noted "that she had 'done the right thing' and had 'always been upfront and honest' in her dealings." (Doc. 470 at 22) (citing Doc. 470-16.) Those quotes do not appear in the cited exhibit.[6]

Similarly, Ms. Gu alleges that Attorney Russell had allegedly uncovered information about government witness Lida Han's "oversea[s] criminal conviction[,]" which was conveyed to Attorney Shelkrot in September 2017. *Id.* at 24 (citing Doc. 470-20). There is no government witness named Lida Han. *See* Doc. 182. Assuming Ms. Gu misidentified a government witness as Lida Han in her filings, the referenced September 2017 email is from Ms. Gu to Attorney Russell, not from or to Attorney Shelkrot. Ms.

---

[6] The cited exhibit cites Attorney Chan stating the following: "I can say that she worked hard to save the project, and to get everyone paid. She put in her own funds to finish the project. She had to bring in other people from Chinatown, materials[,] and labor to finish the project." (Doc. 470-16 at 6.)

Gu's statement that "[t]he Danbury real estate case was the direct catalyst for the federal prosecution" is not accurate and, in any event, does not render Attorney Russell a material witness. (Doc. 470 at 25.)

Because Ms. Gu has failed to demonstrate that Attorneys Chan or Russell had evidence material to her defense which Attorney Shelkrot ignored, Attorney Shelkrot's decision not to call these individuals as witnesses and thereby waive Ms. Gu's attorney-client privilege did not fall below "an objective standard of reasonableness[]" under "prevailing professional norms[,]" and Ms. Gu has failed to demonstrate a reasonable probability that the outcome would have been different had they testified. *Strickland*, 466 U.S. at 688.

### 2.    Agent Jeremy Stella.

Ms. Gu asserts that Attorney Shelkrot should have called as a witness federal agent Jeremy Stella, who managed the federal investigation of Ms. Gu, in order to reveal that Agent Stella employed false pretenses to secure the search warrant for Ms. Gu's residence, which would have led to the suppression of physical evidence found in her home. The physical evidence seized as a result of the search warrant included, among other things, a court seal, notary stamps, and numerous fraudulent identification documents with Ms. Gu's photograph associated with various aliases, as well as a document found on her computer entitled "Change of Identity[,]" advising as to how to obtain a false identity.

Attorney Shelkrot does not recall discussing Agent Stella with Ms. Gu but contends that calling Agent Stella would not have been helpful because she lacked evidence of the alleged false pretenses by law enforcement. Ms. Gu provides no evidence of the alleged false pretenses, only a conclusory statement that they exist. There is therefore no evidence that Attorney Shelkrot's decision to not call Agent Stella as a witness constituted ineffective assistance of counsel as it was not outside "the wide range of reasonable professional assistance[.]" *Guang*, 511 F.3d at 120 (internal quotation marks omitted).

8

### 3.    Matthew Abel.

According to Ms. Gu, her co-defendant, Matthew Abel, should have been called as a witness to testify to the existence of alternative perpetrators of the alleged crimes and to state that Ms. Gu was not the person depicted in a U.S. passport office's surveillance video who was attempting to obtain a fraudulent passport. Attorney Shelkrot attests that Mr. Abel "was never seriously considered as a defense witness because he stipulated as part of his plea agreement to facts establishing [Ms. Gu's] guilt in fraudulently obtaining multiple mortgage loans under false aliases." (Doc. 453 at 17, ¶ 53.)

Mr. Abel pled guilty to bank fraud in connection with his and Ms. Gu's practices in the course of purchasing certain real estate. In his plea agreement, Mr. Abel admitted that it was part of their fraud scheme for Ms. Gu to "establish[] false identities using the Social Security Number of a deceased individual" and apply for loans from banks. (Doc. 148 at 6.) His plea agreement also admitted that Ms. Gu submitted "altered bank statements, forged employment identification forms, forged pay statements, and a forged IRS W-2 form" to secure bank loans. *Id.* As Attorney Shelkrot pointed out, calling Mr. Abel would have created considerable risk to the defense. Mr. Abel would be expected to testify consistent with his plea agreement to Ms. Gu's direct involvement in the fraud scheme. Because Mr. Abel's testimony was more likely to be harmful than favorable, Ms. Gu has not shown ineffective assistance of counsel under *Strickland* for the failure to call him as a witness.

### 4.    Jenny Nio The.

Ms. Gu argues that her "longtime nanny and housekeeper[,]" Jenny Nio The ("Jenny"), should have been called as a witness to testify to the existence of alternative perpetrators of the alleged crimes and cast doubt on whether Ms. Gu was the person in the surveillance video at the passport office. (Doc. 470 at 11.) In particular, Ms. Gu claims that Jenny identified the person in "a passport photo and driver's license central to the government's identity theory[]" as someone named Yuki, not Ms. Gu. *Id.* at 12. Attorney Shelkrot recalls that she investigated this lead and found Jenny to have "little or no relevant information." (Doc. 453 at 14, ¶ 43.)

9

An individual's identification of someone depicted in a video may not be admissible if it seeks to usurp a determination the jury may make itself. *See United States v. Sanchez*, 789 F.3d 827, 837 (8th Cir. 2015) ("Under Federal Rule of Evidence 701, '[a] witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.'") (alteration in original) (quoting *United States v. Anderson*, 783 F.3d 727, 746 (8th Cir. 2015)). Assuming *arguendo* that Jenny would testify in the manner described by Ms. Gu, a jury could find that testimony false or, at a minimum, find that it conflicts with their own evaluation of whether Ms. Gu was the person in the surveillance video from the passport office. Rather than find Jenny credible, a jury might conclude that Ms. Gu's and Jenny's "longtime" employer-employee relationship biased Jenny's testimony. Ms. Gu has therefore failed to satisfy the second prong of *Strickland* that there be a "reasonable probability . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## C.    Alleged Failure to Adequately Cross-Examine Government Witnesses.

Ms. Gu also argues she received ineffective assistance of counsel because Attorney Shelkrot failed to adequately cross-examine the government's witnesses at trial. "[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) (*per curiam*); *see also United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (no ineffective assistance despite defendant's claim that lawyer had failed to thoroughly impeach prosecution witnesses, because decisions as to nature and extent of cross-examination are strategic). Without greater specificity, Ms. Gu's complaints regarding Attorney Shelkrot's cross-examinations remain conclusory. At trial, Attorney Shelkrot aggressively challenged the testimony of the government's witnesses and presented a vigorous defense. No *Strickland* violation may be found on this basis.

### 1.    Detective Roger Brooks.

Ms. Gu contends that Detective Roger Brooks, who testified that she denied being "Alison Ling" during their first encounter, should have been cross-examined about whether he identified himself as a law enforcement officer, was in uniform, or knew Ms. Gu no longer identified herself as "Alison Ling" when he visited her residence. It is Ms. Gu's belief that these questions would have demonstrated that, given her experience as a victim of identity fraud and fear of being stalked by her ex-husband, her denial of being "Alison Ling" was the result not of "evasiveness" but rather "self-protection." (Doc. 470 at 66.) Attorney Shelkrot counters that she does not "think cross-examining Det[ective] Brooks about that fact would have been useful[.]" (Doc. 453 at 17, ¶ 53.)

Ms. Gu has failed to demonstrate that "there is a reasonable probability that, but for [this alleged] error[], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Detective Brooks's testimony that Ms. Gu initially denied being "Alison Ling" was not the only evidence of Ms. Gu's use of aliases presented at trial. Instead, a plethora of identification cards with Ms. Gu's photograph and various aliases was introduced into evidence, including driver's licenses issued the same day with two different identities. Even if a jury found Ms. Gu's denial of the "Alison Ling" alias was driven by self-protection, a reasonable jury could still have weighed the remaining evidence and found Ms. Gu guilty of the alleged crimes. Failure to cross-examine Detective Brooks regarding why Ms. Gu may have initially misidentified herself does not constitute ineffective assistance of counsel under *Strickland*.

### 2.    Christina Abel.[7]

Ms. Gu proffers that, if Attorney Shelkrot had cross-examined Mr. Abel's sister, Christina Abel, about the existence of Ms. Gu's former au pair, Bo (a/k/a "Bow," "Ting Ting," and "Jinata Lee," according to Ms. Gu), Attorney Shelkrot could have undermined

---

[7] Ms. Gu spells Ms. Abel's first name as "Christinna" in her initial supplemental memorandum, *see* Doc. 442 at 6, ¶ 13, and "Christianna" in her post-hearing supplemental memorandum. *See* Doc. 470 at 66. The government's witness list spells her first name as "Christina." *See* Doc 182 at 2. The court adopts the government's spelling.

11

the government's identification of Ms. Gu at the passport office and identified an alternative perpetrator of her alleged crimes.

Attorney Shelkrot maintains that Ms. Gu's representation of Bo as a "crucial person in [her] theory of defense [is] not consistent with what she told [Attorney Shelkrot] during the course of [their] relationship." (Doc. 453 at 17, ¶ 53.) According to a timeline of events Ms. Gu provided to Attorney Shelkrot, Ms. Gu hired and fired Bo in 2014 "after discovering she had been stealing, soliciting herself to [Ms. Gu's] son for sex, and randomly disappear[ing] without notice[ for] days at [a] time[], and snooping into [Ms. Gu's] personal stuff and work items." (Doc. 453-1 at 3.) However, Ms. Gu was never able to "provide any solid information about who Bo was" or provide contact information for her. (Doc. 453 at 17, ¶ 53.) Ms. Gu herself testified at trial regarding Bo's involvement in the fraudulent scheme. It was not outside the range of professional reasonableness for Attorney Shelkrot not to call or cross-examine a witness regarding a person whose identity she could not verify. The failure to cross-examine Ms. Abel about the alleged existence of Ms. Gu's former au pair Bo therefore does not constitute ineffective assistance of counsel under *Strickland*.

### 3. Bank of Bennington Representative.

Ms. Gu argues that Attorney Shelkrot should have cross-examined the "Bank of Bennington representative," who would have clarified how Ms. Gu was induced to commit wire fraud and who would have testified to what Ms. Gu characterizes as the "illegal process that led to the foreclosure of" an East Dorset, Vermont property Ms. Gu purchased. (Doc. 442-1 at 6, ¶ 6.) Ms. Gu fails to identify the Bank of Bennington representative with specificity. In an affidavit, Ms. Gu states that the attorney for the Bank of Bennington "repeatedly made false allegations to federal prosecutors in an effort to tie [her] actions to the government's false narrative," which Attorney Shelkrot allowed to go unchallenged. *Id.* In the same affidavit, Ms. Gu refers to another employee of the Bank of Bennington who "was called as a government witness to support the charges against [her,]" but does not make any allegations that Attorney Shelkrot improperly cross-examined this second Bank of Bennington witness. *Id.* at ¶ 7.

12

Attorney Shelkrot's affidavit refers to Daniel Young, an attorney for the Bank of Bennington, and reports that she is "unaware of any false statements made by [him] during his testimony on November 3, 20[]17. He testified about [Ms. Gu's] purchase of the [Dorset] property out of foreclosure." (Doc. 453 at 16, ¶ 52.) Her affidavit does not identify or address the second Bank of Bennington employee. The government's witness list, however, includes a person named Lisa Souls as a witness associated with the Bank of Bennington.

Whether the Bank of Bennington representative Ms. Gu is referring to is Mr. Young or Ms. Souls, Ms. Gu fails to explain how cross-examination regarding the repossession of the East Dorset property impacts her convictions for bank fraud, knowingly making a false statement in an application for a passport, and aggravated identity theft. Without evidence of prejudice, Ms. Gu has not established ineffective assistance of counsel under *Strickland* based on the alleged failure to adequately cross-examine the Bank of Benington representatives.

### D.    Alleged "Conflicting, Inconsistent, and Misleading" Legal Advice.

Ms. Gu contends that Attorney Shelkrot "provided conflicting, inconsistent, and misleading statements to [her] and others involved in her trial preparation." (Doc. 442 at 7, ¶ 14.) Ms. Gu makes six specific allegations: (1) Attorney Shelkrot discouraged Ms. Gu and her father from communicating with her through email; (2) Attorney Shelkrot made untrue and inconsistent statements to Ms. Gu about keeping Mr. Abel away from court as part of the strategy to blame Mr. Abel for the alleged crimes; (3) Attorney Shelkrot advised Ms. Gu's father not to discuss the case with Ms. Gu "in order to avoid her receiving harsher punishment[]"; (4) Attorney Shelkrot told Ms. Gu "that truth did not matter as her justification as to why she considered blaming Matthew Abel a better strategy[]"; (5) Attorney Shelkrot did not address an error in the sentencing calculation of a plea agreement with the government and told Ms. Gu she had only twenty-four hours to accept or refuse the offer; and (6) Attorney Shelkrot inaccurately represented to Ms. Gu that all the Chinese witnesses were actors, whereas Ms. Gu claims she did not discover

13

that only three of the witnesses had admitted to being actors until she received the audio recording in 2022. *Id.* at 7-9, ¶ 14.

Attorney Shelkrot denies Ms. Gu's allegations. She claims she never discouraged Ms. Gu or Ms. Gu's father from communicating with her by email but, rather, advised Ms. Gu not to discuss the case "with anyone, including her father, who was not in a privileged and confidential relationship with her." (Doc. 453 at 20, ¶ 61.) This advice was given "both to prevent such communications from becoming public and to avoid [Ms. Gu] coaching witnesses." *Id.* Such advice is well within the range of professional reasonableness to protect the attorney-client privilege and to prevent an obstruction of justice. In addition, Ms. Gu has not articulated how a lack of email communication with her father prejudiced her and would have resulted in a different outcome in her trial.

Ms. Gu next claims Attorney Shelkrot "dropped the 'blame [Mr. Abel]' strategy entirely after [Mr. Abel's] plea – without informing [Ms. Gu] or substituting a coherent defense." (Doc. 470 at 15.) However, Mr. Abel's plea agreement stipulated to Ms. Gu's guilt in the fraud scheme, making him a risky witness for the defense. Although Ms. Gu believes Mr. Abel's presence "could have raised immediate questions for the jury about who truly bore primary responsibility[,]" (Doc. 470 at 10-11), the jury still would have had other evidence, including physical evidence of forgery tools found in Ms. Gu's residence and video evidence of Ms. Gu at the passport office, to consider in determining Ms. Gu's guilt. While Ms. Gu may not have agreed with Attorney Shelkrot's alleged statement that the "truth did not not matter[,]" (Doc. 442 at 8, ¶ 14), it accurately reflects that the government must bear the burden of proving its charges against a defendant beyond a reasonable doubt and a defendant need not prove the "truth" of her innocence. *See Zafiro v. United States*, 506 U.S. 534, 543 (1993) (Stevens, J., concurring) ("The burden of overcoming any individual defendant's presumption of innocence, by proving guilt beyond a reasonable doubt, rests solely on the shoulders of the prosecutor.").

With respect to the plea agreement offered to Ms. Gu, Attorney Shelkrot recalls that Ms. Gu:

14

> never expressed any interest in plea negotiations [and] . . . did not even
> authorize me to engage in such negotiations until October 4. The
> government made an offer on October 5 with a deadline of October 6. [Ms.
> Gu] was uninterested in the plea offer and refused to meet with me to
> discuss it. I wrote a memo to the file about her refusal.

(Doc. 453 at 15-16, ¶ 50.) Attorney Shelkrot had no control over the amount of time Ms. Gu was given by the government to consider the plea agreement. Moreover, Ms. Gu has not alleged that she would have accepted the plea agreement. Ms. Gu professed her innocence throughout the trial and continues to do so. There is no evidence of prejudice.

Finally, Ms. Gu's claim that Attorney Shelkrot misrepresented how many witnesses were actors and that she did not learn that only three witnesses had admitted to being actors until 2022 is refuted by a transcript of a meeting Ms. Gu had with Attorney Shelkrot in 2017, the day after Attorney Shelkrot's discovery of the actor witnesses. According to Attorney Shelkrot, Ms. Gu emailed her a list of seven new witnesses and a description of their potential testimony the day before the witness disclosure deadline. The list consisted of the names Xiaoyi ("Wendy") Wu, Ying Chen ("Melanie") Liu, Li Zhang, Qing ("Allen") Liu, Wenyu ("Wendy") Fan, Lily Hu, and Bao ("Jack") Qu.

Attorney Shelkrot met with Melanie, Allen, and Jack on November 4, 2017, to prepare them to testify on November 6, 2017. At the end of her interview with Allen, Allen allegedly revealed that he was an actor and that he thought this entire experience was for a movie and not a real court case. Alarmed, Attorney Shelkrot asked Melanie, Allen, and Jack to join her in a conference room with her associate, an interpreter, and an investigator working on the case present by phone. She informed everyone she would be recording the conversation and did so. Ms. Gu provided a transcript of that recording as part of her post-hearing supplemental briefing. *See* Doc. 470-39.

In the conference room discussion, the three witnesses stated that they had responded to an advertisement seeking Chinese-speaking actors and were provided scripts for their testimony. *See, e.g., id.* at 3-4 (Allen recounts that he was hired to play a role, not commit perjury, and Jack reveals he also believed he was hired to play a role); *id.* at 5 (Melanie states she responded to an advertisement in a Chinese newspaper). They

15

showed Attorney Shelkrot scripts and photographs of places relevant to the case and their testimony. The witnesses told Attorney Shelkrot they had been sent these materials by a contact known as "Lily[.]" *See* Doc. 453-4. They had also been sent photographs of Ms. Gu, her family, and other people related to the case. Attorney Shelkrot attests that these photographs were the same ones Ms. Gu had provided her. Melanie, Allen, and Jack also possessed photographs of items that had been produced in discovery, including a New Hampshire driver's license for Ai J Chen, a Social Security card for Ai Jen Chen, and a TD Bank card for Ai Chen. *Id.* at 6. These three witnesses claimed that the other witnesses on Ms. Gu's list, who were scheduled to arrive the following day for trial preparation, were also actors, as was "CC" (also known as "Sisi"), who Ms. Gu maintains is the perpetrator of the crimes for which she was convicted. *See* Doc. 470-39 at 6 (all three admitted fake witnesses confirming that the other witnesses are actors and "Sisi is fake too[.]").

When Attorney Shelkrot met with Ms. Gu for trial preparation, she told her, "I talked to three people who showed up here yesterday . . . and we spent hours with them. But at the end of it, what they finally admitted was they are being paid to be here as actors." (Doc. 470-23 at 3.) In response to Ms. Gu's comment that only three witnesses admitted to being actors, Attorney Shelkrot explained that those three witnesses were also claiming the remaining witnesses were also actors. Attorney Shelkrot therefore truthfully represented to Ms. Gu how many witnesses had admitted to being actors and how many others had been identified as fake witnesses. She relayed that information to Ms. Gu the day after her discovery of this information, not five years later as Ms. Gu claims.

More importantly, the proffer of actors as witnesses would have been a grave violation of Attorney Shelkrot's ethical responsibilities as Ms. Gu's counsel. Its severity may have been enough to result in Attorney Shelkrot's disbarment and being held in contempt of court. There was no error, let alone prejudicial error, in her refusal to call the actors as witnesses.

When confronted with conflicting factual assertions from a defendant and her allegedly ineffective counsel, it is within a court's discretion whose version of events to

16

credit. *See Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) ("The court then determines whether, viewing the evidentiary proffers, where credible, and record in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a *prima facie* case for relief.") (emphasis in original). "[A] district court need not assume the credibility of factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding." *Id.* at 214. For an ineffective assistance of counsel claim, it is Ms. Gu who bears the burden of proof. *Id.* at 213. In this case, Attorney Shelkrot's version of the events is more credible and supported by the evidence. In sentencing Ms. Gu, the court concluded that she had testified falsely regarding several material matters. Against this backdrop, the court finds Ms. Gu's version of the events not credible and concludes that her allegations of conflicting, inconsistent, and misleading legal advice fail to establish her claim of ineffective assistance of counsel under *Strickland*.

### E.    Alleged Compelled Testimony.

Ms. Gu alleges that Attorney Shelkrot employed a "passively aggressive last-minute strategy to compel her [to] testify[]" by "making the last-minute decision to dismiss almost every person from the defense witness list, . . . misle[ading Ms. Gu] into believing that taking the stand was her only option." (Doc. 442 at 10, ¶ 15.) Criminal defendants have a constitutional right to testify, and "the decision whether to testify belongs to the defendant and may not be made for him [or her] by defense counsel." *Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997). Accordingly, "counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter." *Id.* at 79. A failure by counsel to communicate as much would thus be unreasonable "under prevailing professional norms." *Strickland*, 466 U.S. at 688; *see, e.g.*, *Hayward v. Brown*, 2010 WL 2629037, at *23 (S.D.N.Y. July 1, 2010).

In this case, the presiding judge personally engaged in a colloquy with Ms. Gu, advising her that it was her decision, not her attorney's, whether she testified. The court did so at the close of the government's case-in-chief and before Ms. Gu took the stand.

17

Ms. Gu's representations of her decision to testify are inconsistent with the evidence, including her own. Attorney Shelkrot's decision to dismiss most of the people on the defense witness list was driven by her discovery that the witnesses were paid actors, not by a strategy to compel Ms. Gu to testify. Confronted with the strong likelihood that all of Ms. Gu's witnesses were paid actors, and no time to vet them, Attorney Shelkrot met with Ms. Gu, recounted what had happened, and informed Ms. Gu that she would not be calling any of these witnesses to the stand. Attorney Shelkrot explained that she could not ethically place witnesses on the stand knowing they were lying and that the confession from the three witnesses created doubt as to the veracity of the other witnesses Ms. Gu had identified. Attorney Shelkrot advised Ms. Gu that "if it hadn't been for the fact that I just met with three paid actors yesterday, maybe I'd feel differently. But I did meet with three paid actors yesterday, and . . . I am not putting these people on." (Doc. 470-23 at 12.) There is therefore no evidence that Attorney Shelkrot's decision to dismiss witnesses on the eve of the trial was part of a "passively aggressive last-minute strategy to compel [Ms. Gu to] testify[][.]" (Doc. 442 at 10, ¶ 15.)

The court credits Attorney Shelkrot's representation that she did not coerce or compel Ms. Gu to testify but, rather, repeatedly advised Ms. Gu against taking the stand. In her affidavit, Attorney Shelkrot directly disputes Ms. Gu's allegation, stating:

> I told her it was her right to do so but that I advised against it. I told her any time the defense presents evidence it has the potential to confuse the jury about who has the burden of proof, regardless of the clearest of instructions on the subject. I told her she would be subject to intensive cross-examination with the many false statements in the record. I discussed with her in great detail that I thought it was a bad idea for her to testify because of the likelihood that she would suffer devastating cross-examination. I went through some of the items that could be used on cross, and finished that despite everything, "If you are insistent on testifying, it's your right to do it, and it's my obligation – and I've looked at it, so I can tell you it's my obligation to do it with you – I'm not happy about it, but I'll do it, because I have to." She asked what she could say that would helpful, and I told her I thought nothing she could say would be helpful, and that it was a "terrible idea" for her to testify. I told her I thought the story she was likely to tell was not believable on its face, and was unlikely to be believed by the jury.

18

(Doc. 453 at 13, ¶ 41.) This statement is supported by a transcript of a conversation she had with Ms. Gu on the eve of the trial, provided by Ms. Gu. In this November 5, 2017 conversation, Attorney Shelkrot told Ms. Gu, "I will put you on the stand if you insist, because you have a right to do it[,]" but she thought it was "a bad idea strategically." (Doc. 470-23 at 10.) Attorney Shelkrot noted that it had "nothing to do with whether [Ms. Gu's] story is truthful or not" but, rather, had to do with how difficult and harmful cross-examination might be. *Id.* She warned Ms. Gu that cross-examination may include questions regarding convictions for fraud from Connecticut and New York, as well as bank accounts and passport applications involving her children's names. She made clear that Ms. Gu did not have the burden to testify, instead "the government has to prove its case." *Id.* at 24. These statements from Attorney Shelkrot undermine Ms. Gu's assertion that Attorney Shelkrot "failed to make [Ms. Gu] understand the impeachment process, by which certain evidence could be introduced into the trial if she took the stand." (Doc. 442 at 9, ¶ 15.) After receiving Attorney Shelkrot's advice that she not take the stand and the likely consequences if she chose to testify, and after Ms. Gu's colloquy with the court, it was ultimately Ms. Gu who made the decision to testify. Attorney Shelkrot, in turn, honored Ms. Gu's constitutional right to testify in her own defense.

Because Ms. Gu has failed to demonstrate Attorney Shelkrot acted unreasonably and coerced her or misled her into testifying on her own behalf, she has failed to establish ineffective assistance of counsel under *Strickland* on this basis.

### F.    Alleged Failure to Investigate and Prepare for Trial.

Effective assistance of counsel encompasses a duty to investigate both the claims against a defendant and the defendant's potential defenses prior to trial.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91.

19

"To prevail on an ineffective assistance claim for counsel's alleged failure to investigate, a petitioner has the 'burden of providing the court sufficiently precise information[;] that is, a comprehensive showing as to what the investigation would have produced.'" *Dollison v. Nassau Cnty.*, 2019 WL 3531522, at \*9 (E.D.N.Y. Aug. 2, 2019) (quoting *Taylor v. Poole*, 2009 WL 2634724, at \*14 (S.D.N.Y. Aug. 27, 2009)). "In assessing prejudice arising from an alleged failure to investigate, courts must consider '*all* the relevant evidence that the jury would have had before it.'" *Guerrero v. United States*, 2017 WL 1435743, at \*9 (S.D.N.Y. Apr. 20, 2017) (emphasis in original) (quoting *Wong v. Belmontes*, 558 U.S. 15, 20 (2009)). "[T]o successfully assert an ineffective assistance of counsel claim based on a failure to investigate, a petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation." *Id.* (quoting *United States v. Peterson*, 896 F. Supp. 2d 305, 316 (S.D.N.Y. 2012) (internal quotation marks omitted)).

Ms. Gu faults Attorney Shelkrot's alleged failure to "conduct relevant, sufficient, and culturally appropriate trial preparation and investigation that was consistent with the facts of the case, and in accordance with the cultural background and life circumstances of [Ms. Gu]." (Doc. 442 at 11, ¶ 16.) In particular, Ms. Gu alleges Attorney Shelkrot: (1) failed to obtain forensic experts who would have proven Ms. Gu was not the person in the passport office's surveillance video and it was not her handwriting on the passport application; (2) failed to use research from "Chinese private investigator Wong and his team," which would have identified other alleged perpetrators of the crimes and demonstrated that it was Ms. Gu's former au pair Bo who had purchased and downloaded the "Change of Identity" eBook using Ms. Gu's laptop; (3) failed to pay for Chinese language translators and denied Ms. Gu's "request to pay for a certified translation service for handling oversea[s] Chinese investigation files"; (4) failed to investigate the claim that some of the witnesses were actors; and (5) "failed to investigate the unlawful repossession of the [East Dorset p]roperty in connection to the alleged bank fraud charge[,] . . . result[ing] in the [Bennington] Bank once again unscrupulously taking possession of the [p]roperty[.]" *Id.* at 11-13, ¶ 16. These conclusory allegations do not

20

suffice to establish a claim of ineffective assistance of counsel. *See Guerrero*, 2017 WL 1435743, at *9.

With respect to Ms. Gu's assertion that Attorney Shelkrot should have hired an expert witness to testify that the person in the passport office video was not Ms. Gu, Attorney Shelkrot explains that she "did not think it was an appropriate area for expert testimony." (Doc. 453 at 6, ¶ 17.) The decision to call or not call a witness, including an expert witness, is generally a tactical decision. *See Luciano*, 158 F. 3d at 660. Although a failure to present expert testimony may constitute ineffective assistance when "the jury is likely to be incapable of evaluating essential facts" without it, "[w]here an expert would only marginally assist the jury in its role as fact finder, an attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant." *United States v. Aliotta*, 1998 WL 43015, at *3 (S.D.N.Y. Feb. 3, 1998).

In this case, the issue Ms. Gu sought to have an expert resolve was whether it was her in the passport office's surveillance video, an issue a jury could determine for itself without an expert witness.[8] *See* Fed. R. Evid. 702; *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (observing that the Federal Rules of Evidence "afford ample assurances *against the admission of opinions which would merely tell the jury what result to reach*") (emphasis in original). Ms. Gu has therefore failed to overcome the strong presumption that Attorney Shelkrot's decision not to call a forensic expert was reasonable.

Attorney Shelkrot also claims that Ms. Gu never put her in contact with the investigator, Mr. Wong, despite frequent requests. This repeated failure by Ms. Gu to produce Mr. Wong led Attorney Shelkrot to believe that he was not real, a belief reinforced when the fake witnesses Ms. Gu had said were identified by Mr. Wong reported that they had never heard of him. Ms. Gu has not provided the alleged

---

[8] Ms. Gu also references forensic chemical experts in subsequent filings, related to an allegation that she was drugged at one point, an issue not raised at trial.

21

exculpatory evidence Mr. Wong possessed, and this speculative claim cannot serve as a basis for a claim of ineffective assistance of counsel. *See Guerrero*, 2017 WL 1435743, at *9.

In her affidavit accompanying her November 4, 2024 supplemental memorandum, Ms. Gu includes an allegation that Attorney Shelkrot failed to seek a bench trial despite Ms. Gu's request. *See* Doc. 442-1 at 4-5, ¶ 5. "Trial by jury has been established by the Constitution as the 'normal and . . . preferable mode of disposing of issues of fact in criminal cases.'" *Singer v. United States*, 380 U.S. 24, 35 (1965) (quoting *Patton v. United States*, 281 U.S. 276, 312 (1930)). A defendant may, however, waive his right to a jury trial if the government consents and the court approves. *See* Fed. R. Crim. P. 23(a).

Ms. Gu was concerned that a jury trial would be prejudiced by jury bias, cultural misunderstanding, and unsophisticated jury members unable to "understand how real estate financing differs from conventional bank loans." (Doc. 442-1 at 5, ¶ 5.) She believes the court would have been a more neutral and sophisticated fact finder. Assuming *arguendo* it was "professionally unreasonable" not to seek a bench trial, *Strickland*, 466 U.S. at 691, Ms. Gu has not demonstrated that it "actually had an adverse effect on the defense." *Id.* at 693. First, she has failed to demonstrate that the government would have consented to one, and the government states it "never would have consented to a bench trial[.]" (Doc. 468 at 14:25-15:1). *See* Fed. R. Crim. P. 23(a) ("If the defendant is entitled to a jury trial, the trial must be by jury unless . . . the government consents[.]"). Second, there is no reason to believe that the outcome of the trial would have been any different had the case been tried to a judge, rather than a jury. Ms. Gu has cited no evidence that the jury was biased against her, suffered from cultural misunderstandings, or did not understand real estate financing. Ms. Gu thus received "the very thing that the Constitution guarantees": an "impartial trial by jury[.]" *Singer*, 380 U.S. at 36.

Because Ms. Gu has failed to establish that Attorney Shelkrot's investigation of the case and preparation for trial fell below an objective standard of reasonableness or had an adverse effect on her defense, she has not established a *Strickland* violation on this basis.

## CONCLUSION

For the foregoing reasons, the court DENIES Ms. Gu's motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255. (Doc. 407.) Ms. Gu was provided with a reasonable and vigorous defense. Any other potential claims by Ms. Gu alleging ineffective assistance of counsel similarly lack merit.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 12th day of December, 2025.

Christina Reiss, Chief Judge
United States District Court